# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

BRIAN J. DRISCOLL, JR.,
STEVEN J. JENSEN, and
SPENCER L. EVANS,[1]

     *Plaintiffs*,

     *v.*

KASHYAP P. PATEL
in his official capacity as
Director of the Federal Bureau of Investigation
Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Washington, D.C. 20535;

FEDERAL BUREAU OF INVESTIGATION
935 Pennsylvania Avenue, NW
Washington, D.C. 20535;

PAMELA J. BONDI,
in her official capacity as Attorney General
of the United States
950 Pennsylvania Avenue, NW
Washington, D.C. 20530;

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, D.C. 20530;

EXECUTIVE OFFICE OF THE PRESIDENT
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500;

and

THE UNITED STATES OF AMERICA
Washington, D.C. 20500,

     *Defendants*.

Civil Action No. 25-_____

**JURY TRIAL DEMANDED**

---

[1] Pursuant to Local Civil Rule 5.1(c)(1), Plaintiffs' residential addresses are being filed under seal with the Court in a separate Notice of Filing.

**COMPLAINT**

I.     **INTRODUCTION**

1.     For decades, Plaintiffs Brian J. Driscoll, Jr., Steven J. Jensen, and Spencer L. Evans served this country with distinction and courage as Special Agents and senior officials of the Federal Bureau of Investigation ("FBI").  Over the course of their remarkable careers, they prevented terrorist attacks, rescued American hostages, saved children from predators, and disabled violent street gangs.  Each day of their service was dedicated to protecting the American people and to fulfilling the oath they took when they joined the FBI: to "support and defend the Constitution of the United States" and to "bear true faith and allegiance to the same."

2.     Plaintiffs' commitment to these higher principles compelled them at all times to perform their duties free from political bias or influence.  This same commitment galled Defendants, who initiated a campaign of retribution against Plaintiffs for what Defendants deemed to be a failure to demonstrate sufficient political loyalty.  On August 8, 2025, FBI Director Kashyap "Kash" P. Patel terminated Plaintiffs' combined 60 years of distinguished service in federal law enforcement with cursory, single-page letters sent to each Plaintiff.  He did so in violation of federal law and the United States Constitution.

3.     Patel not only acted unlawfully but deliberately chose to prioritize politicizing the FBI over protecting the American people.  As explained herein, his decision to do so degraded the country's national security by firing three of the FBI's most experienced operational leaders, each of them experts in preventing terrorism and reducing violent crime.

4.     Patel openly acknowledged the unlawfulness of his actions.  On or about August 5, 2025, in a conversation with Driscoll, Patel plainly stated the reasoning behind his firing of FBI employees that Mr. Driscoll sought to defend.  In sum and substance, Patel admitted that his

superiors, who he referred to as "they" and who Driscoll understood to include Defendant Department of Justice ("DOJ") and the White House (which encompasses Defendant Executive Office of the President ("EOP")), had directed him to fire anyone who they identified as having worked on a criminal investigation against President Donald J. Trump. Patel explained that he had to fire the people his superiors told him to fire, because his ability to keep his own job depended on the removal of the agents who worked on cases involving the President. Patel explained that there was nothing he or Driscoll could do to stop these or any other firings, because "the FBI tried to put the President in jail and he hasn't forgotten it." Driscoll indicated his belief that Patel's reference to his superiors meant DOJ and the White House, and Patel did not deny it.

5.     When Driscoll explained that firing employees based on case assignments would be in direct violation of internal FBI processes meant to adjudicate adverse actions and prevent retaliation based on case assignments, Patel said that he understood that and he knew the nature of the summary firings were likely illegal and that he could be sued and later deposed.

6.     Patel's actions stood in stark contrast to his sworn testimony during his confirmation hearing before the Senate Judiciary Committee. There, he assured the Committee and the country that "all FBI employees will be protected against political retribution." An exchange with Senator Richard Blumenthal on the topic of firing agents who worked on criminal investigations involving President Trump proceeded as follows:

> Sen. Blumenthal:        You've committed that the FBI will not be politicized. So here's your first test. Will you commit that you will not tolerate the firing of the FBI agents who worked with the Special Counsel's Office on these investigations?
>
> . . .
>
> Patel:        Senator. Every FBI employee will be held to the absolute same standard, and no one will be

terminated for case assignments.

7.    Likewise in his written responses to a Senate Questionnaire, Patel repeatedly emphasized his commitment that "personnel decisions should be based on performance and adherence to the law" and that "every FBI employee will be held to the absolute same standard, and no one will be terminated for case assignments."  He also asserted that he would "ensure that the appropriate processes are always followed" with respect to adverse actions against FBI personnel.

8.    As explained herein, Driscoll, Jensen, and Evans were the targets of Defendants' retribution for their refusals to politicize the FBI, and they seek to vindicate their constitutional and legal rights.  This vindication will also serve to illuminate and protect the rights of all remaining active FBI employees to be free from coercive political demands by Defendants.

9.    Plaintiffs request that this Court review and grant relief on the grounds that Defendants' actions violated their Fifth Amendment rights to due process and their First Amendment rights to free association and speech, were taken without any constitutional authority, and are a legal nullity.  Plaintiffs seek equitable relief in vindication of their constitutional rights; declaratory relief under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; and mandamus relief under 28 U.S.C. § 1361.

## II.    JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' causes of action arise under the Constitution and laws of the United States.  The Court has authority to issue declaratory, injunctive, and equitable relief, including reinstatement of Plaintiffs to their employment with the FBI, pursuant to 28 U.S.C. § 2201 and its inherent equitable powers.

11.    Venue is appropriate in this judicial district under 28 U.S.C. §§ 1391(b) and (e).

### III.    PARTIES

*Plaintiffs*

12.    **Plaintiff Brian J. Driscoll, Jr**., is the former Acting Director of the FBI.  From approximately March 2025 through the date of his termination, he served as the FBI Assistant Director responsible for the Critical Incident Response Group ("CIRG").  In this capacity, Driscoll was in charge of all FBI special operations, including national programs centralizing the country's crisis readiness, response, and resolution through national and field-based law enforcement assets. These programs include aviation, surveillance, counter-unmanned aerial systems, the FBI's 55 Special Weapons and Tactics ("SWAT") Teams and the Hostage Rescue Team ("HRT"), crisis negotiations, behavioral analysis, cyber behavior assessment center, the Violent Criminal Apprehension Program (ViCAP), crisis management, special security events management, counter-IED response, the Hazardous Devices School, and the Weapons of Mass Destruction/Render Safe program.

13.    As head of CIRG, Driscoll was the lead executive responsible for the FBI's large-scale crisis response operations, domestically and internationally.  As part of this role, he was also responsible for the development and execution of strategies that would minimize the country's vulnerabilities to over-the-horizon future threats and mitigate risks to the safety of the American people.

14.    Prior to his role at CIRG, Driscoll was the Acting Director of the FBI.  He held the position for approximately 31 days—from January 20, 2025 through February 20, 2025—until Patel was confirmed by the Senate.  In this role, Driscoll worked closely with FBI leadership and

the White House Transition Team. His goals during this time were to maintain the stability of the FBI, protect the American people, and uphold the United States Constitution.

15.    Before President Donald J. Trump's January 20, 2025 inauguration, Driscoll was the Special Agent in Charge ("SAC") of the FBI's Newark Field Office. Before that, he had been serving as the Commander of the FBI's HRT and the Section Chief of CIRG's Tactical Section, responsible for leading the FBI's National Tactical Program to include all 55 field SWAT, crisis negotiation, and operational medic teams.

16.    Driscoll entered on duty as a Special Agent with the FBI in December 2007. Upon completion of training at the FBI Academy, he was assigned to the New York Organized Crime Task Force, where he worked on cases involving the organized crime syndicate La Cosa Nostra. He eventually became a member of the New York Office SWAT team.

17.    In March 2011, Driscoll was selected to be an operator on the FBI's HRT. With HRT, he served as an operator, sniper, and, ultimately, a Team Leader. During his time with HRT, Driscoll deployed in support of FBI strategic priorities, to include both domestic and international hostage rescue missions and embedded assignments with Department of Defense ("DoD") Special Missions Units. For his courageous actions under fire on numerous tactical operations, the FBI honored Driscoll with the Bureau's Medal of Valor and Shield of Bravery awards.

18.    Driscoll's Medal of Valor was related to his participation in a raid on ISIS operative Abu Sayyaf's residence in Syria. Sayyaf was a Tunisian citizen living in eastern Syria in May 2015 suspected of kidnapping American citizen Kayla Mueller. U.S. forces killed Sayyaf in the raid, detained his accomplice wife, and rescued a young Yezidi woman who had been enslaved by the couple. Driscoll's actions while on target during the raid earned him this prestigious award.

19.    Driscoll's Shield of Bravery was related to his neutralization of a domestic threat. In March 2013, a man named Kurt Meyers set fire to his home and went on a shooting spree in upstate New York, leaving four people dead and two others wounded before barricading himself in a local bar.  Driscoll was part of the responding FBI HRT operation.  When the HRT team breached the building, the shooter opened fire with his shotgun, killing the HRT service dog. Driscoll and his HRT team members, who had been following behind the service dog, swiftly engaged and neutralized Meyers.  This honor is particularly significant since Driscoll was relatively new to the team at this point; one month before this event, he had participated in his very first HRT operation which resulted in the successful rescue of a five-year-old kindergartner who had been kidnapped by an armed gunman in Alabama.

20.    In 2019, Driscoll returned to New York as a Supervisory Special Agent to establish and lead the Long Island Violent Crimes Task Force and the Long Island Child Exploitation and Human Trafficking Task Force.  As a supervisor, he led his team to an exponential increase in prosecuting and preventing child exploitation and human trafficking matters.

21.    As a result of his extensive international counterterrorism experience, in 2020, Driscoll was transferred to New York's Joint Terrorism Task Force ("JTTF") to lead the FBI's North Africa international terrorism investigations squad.  In this role, he integrated closely with the United States Intelligence Community, DoD, and foreign law enforcement and intelligence partners to quickly and effectively address complex counterterrorism missions.  This work included planning and participating in rapid overseas deployments in response to terrorist attacks and threats directed at the United States or its interests.

22.    In October 2020, Driscoll was promoted to Assistant Special Agent in Charge ("ASAC") of the New York JTTF's Extraterritorial Terrorism Branch, consisting of six squads

and approximately 140 personnel to include Special Agents, Task Force Officers, analysts, and professional staff representing 61 state, local, federal and foreign partner agencies. This branch was responsible for leadership of global terrorism investigative and operational efforts in Africa, Western Europe, the United Kingdom, and Canada.

23.     In 2021, Driscoll established and led the FBI's international response to the vetting of the refugees evacuating Afghanistan in 2021. With virtually no notice, he deployed overseas to help create enduring systems used by the U.S. interagency intelligence and defense apparatus that protected the homeland from dangerous actors who sought to take advantage of any disorganization following the Afghanistan withdrawal.

24.     Even before his time with the FBI, Driscoll was committed to federal law enforcement. From 2004 to 2007, he served as a Special Agent with the Naval Criminal Investigative Service, working counter-narcotics and undercover operations.

25.     Like all agents in today's FBI, Driscoll achieved significant academic accomplishments. He earned a bachelor's degree in English from Villanova University and a master's degree in public policy and international relations from Pepperdine University.

26.     Driscoll became a member of the FBI's Senior Executive Service ("SES") in 2022 and remained so up until his unlawful firing. Based on the amount of time he spent in federal service, he would have been fully eligible to retire but could not do so until he turned 50.

27.     **Plaintiff Steven J. Jensen** is the former Assistant Director in Charge ("ADIC") of the Washington Field Office ("WFO"). As ADIC, Jensen led the WFO from April 2, 2025, through his termination on August 8, 2025. One of the FBI's largest offices, WFO is located in the nation's capital and serves as a critical hub for federal, state and local law enforcement coordination. In this role, Jensen oversaw approximately 2,000 employees and task force officers executing FBI

mission priority investigations ranging from domestic and international terrorism, cyber and counterintelligence, public corruption, white collar crime, transnational organized crime, and violent crime within the capital region. Due to WFO's unique location, Jensen oversaw multiple specialized units whose primary responsibility included safeguarding the nation's capital from foreign and domestic threats, investigating threats against elected officials and critical incident response. During his tenure, Jensen directed the multi-jurisdictional response to the attack at the National Capital Jewish Museum, international deployments of FBI personnel to facilitate the Foreign Transfer of Custody of priority terrorism subjects, and numerous high profile immigration enforcement arrests.

28.    Prior to his promotion as ADIC, Jensen served approximately two weeks as the FBI's Director of Operations of National Security. Prior to that role, Jensen was the SAC of the Columbia Field Office in South Carolina. He served in that role from March 2023 until his transfer to FBI Headquarters in March 2025.

29.    Before his unlawful firing, Jensen spent nearly two decades serving the country as an FBI agent and supervisor. He joined as a Special Agent in 2006 and was first assigned to the New York Field Office where he investigated health care fraud, domestic terrorism, and organized crime. As a Special Agent, Jensen served on the SWAT team from 2009 through 2012 in which time he served as an operator, sniper, and instructor. While in this role, he participated in numerous high risk warrant operations, domestic and international dignitary protection details, and high-profile witness protection. For more than 16 years, he was certified as a firearms and defensive tactics instructor.

30.    In 2012, Jensen was promoted to be a supervisory special agent instructor at the FBI Academy in Quantico, where he was responsible for instructing new agent trainees in the

practical application of firearm skills. In addition, Jensen established and maintained high standards of performance and professionalism, serving as an example for aspiring special agents. In 2014, he was promoted to the Rockford Resident Agency of the Chicago Field Office to serve as the Supervisory Senior Resident Agent ("SSRA"). The Rockford office's jurisdiction covered the 10 northwestern counties outside of Chicago. As the SSRA, Jensen refocused his squad's investigations to reduce violent crime, investigate public corruption, and target violent crimes against children. Jensen built a violent crime task force—the first of its kind in the region—combining the capabilities of multiple local agencies with the resources of the FBI, resulting in local joint press conferences and a town hall symposium on violent crime reduction hosted by Congressional representatives. Jensen also oversaw critical incident response to law enforcement officer line-of-duty death investigations, serial robbery investigations, and kidnapping-for-ransom investigations. For his dedication to mission and leadership, Jensen was recognized by FBI Chicago executive management with the FBI Medal of Excellence.

31. In 2017, Jensen was named ASAC for the Jackson Field Office in Jackson, Mississippi. As the ASAC, he oversaw the National Security, Criminal, and Administrative branches of the Jackson Field Office, and received a second Medal of Excellence for exceptional leadership across multiple FBI programs.

32. In 2020, Jensen was promoted into the SES as the Section Chief of the Domestic Terrorism Operations Section, Counterterrorism Division at FBI headquarters. This section was principally responsible for program management and coordination of the FBI's Domestic Terrorism investigative portfolio executed across the nation in its (then) 56 field offices. In his role as section chief, Jensen oversaw and coordinated routine domestic terrorism operations and provided resources for field office response to critical incidents which included mass casualty

events, bombings, threats of bombings, threats against public officials, and threats to critical infrastructure.

33.    Beginning on January 6, 2021, the Domestic Terrorism Operations Section became the focal point for all investigations related to the criminal activity stemming from the events of January 6, 2021, at the United States Capitol.  Under Jensen's leadership, this section was responsible for providing coordinating instructions across all 56 (now 55) field offices and ensuring all tips and leads were appropriately processed in a consistent manner.  Jensen held daily coordination calls to provide recent updates and to allow WFO, the United States Attorney's Office for the District of Columbia, and DOJ leadership to identify trends, share intelligence, and update prosecutorial strategy and guidelines.

34.    In October 2021, Jensen was promoted to the Deputy Assistant Director of the Training Division, where he oversaw the day-to-day operations of all basic field training programs and National Academy curriculum.  The National Academy is an internationally renowned, highly competitive law enforcement leadership school, successful completion of which is often required for local agency promotion into Deputy Chief or Chief positions.

35.    In 2023, Jensen was named the SAC of the Columbia Field Office in South Carolina.  In this role, he oversaw all FBI programs throughout the state of South Carolina and ensured FBI priorities were worked effectively within the state.  He also served as the executive representative of the FBI to local government officials, to include as an advisor on Governor Henry McMaster's Homeland Security Advisory Board.  At one point during Jensen's tenure, the South Carolina Field Office was inspected by the FBI's Inspection Division.  The inspection team's focus on leadership resulted in him receiving the highest rating ever for that field office, maximizing scoring in multiple competencies.

36.     Throughout his career, Jensen also served temporary duty assignments to the Attorney General Protection Detail, the Safe Streets Gang Program, and as the director of the High-Value Detainee Interrogation Group ("HIG").   As HIG director, he oversaw multi-agency responses to interrogation deployments.   Intelligence gained from these interrogations during Jensen's tenure assisted DoD operations, FBI counterterrorism missions, and international partner operations.

37.     Prior to joining the FBI, Jensen was a police officer with the Colorado Springs Police Department.   Like all agents in today's FBI, Jensen achieved significant academic accomplishments.   He earned a bachelor's degree in biochemistry from Stony Brook University in New York and a master's degree in leadership studies from Northeastern University.

38.     Jensen became a member of the FBI's SES in 2020 and remained so up until his unlawful firing.   Based on the amount of time he spent in federal service, he would have been fully eligible to retire but could not do so until he turned 50.

39.     **Plaintiff Spencer L. Evans** served in the FBI for over 20 years.   At the time of his unlawful firing, he was on administrative leave and in the process of transitioning from being the SAC of the Las Vegas Field Office in Nevada to the SAC of the Huntsville Field Office in Alabama.

40.     He first joined the FBI in 2004 and maintained a sterling, unblemished record for over two decades.   Like Driscoll and Jensen, he had no performance issues or security violations. Since 2004, Evans served in five separate field office assignments, including New Haven, San Diego, Oklahoma, Jacksonville, and Las Vegas.

41.     Throughout his career, Evans served as a case agent on countless narcotics, white collar, and terrorism investigations.   He is also a certified crisis and hostage negotiator.   In that

role, he responded to international kidnappings of American citizens, including securing the release of multiple U.S. persons who had been kidnapped and held hostage by Mexican drug cartels.

42.    In August 2011, he was assigned to FBI Headquarters as a supervisor for the Organized Crime Drug Enforcement Task Force Program.  In 2013, he became a Unit Chief in the Counterterrorism Division in Washington, D.C.  Among other sensitive investigations, he served as one of the senior leaders at FBI Headquarters during the Boston Marathon bombings investigation and prosecution.

43.    From approximately 2014 to 2016, Evans served as a field supervisor who oversaw a JTTF and Child Exploitation Task Force.  From 2016 to 2019, Evans was an ASAC in Oklahoma. Following that assignment, he became the Section Chief of FBI's Office of Private Sector from approximately 2019 to 2020, where he was also responsible for implementing a system of increased information sharing between the FBI and private sector businesses in order to protect critical American infrastructure from foreign spies and other criminals.  From there, he became an Assistant Deputy Director of the FBI's Human Resources Division.

44.    After leaving FBI Headquarters, Evans became the SAC of the FBI's Las Vegas Field Office.  Under his leadership, the FBI saw a dramatic increase in cooperation and partnership with local law enforcement partners in the region, assigning new FBI employees to work directly with them on localized investigations and assignments.  In the months leading up to his termination, he oversaw the FBI investigation of the January 1, 2025 Tesla Cybertruck bombing in front of Trump International Hotel in Las Vegas.  He further oversaw the March 2025

investigation into Tesla firebombing attacks in Las Vegas, which culminated in charges against three individuals.[2]

45.     Shortly before his unlawful firing, Evans was elected as a representative to the FBI Director's Special Agent in Charge Advisory Committee.  He was chosen by his peers—that is, other SACs—to hold this position.  In fact, the Las Vegas Field Office was inspected by the FBI's Inspection Division in December 2024, and he received exemplary leadership scores.  It was noted that his proactive support for, and engagement with, local law enforcement partners was a best practice to be emulated across the entire FBI. Evans has also received numerous incentive awards and was recognized by the Domestic Security Alliance Council as their 2024 recipient of the Distinguished Achievement Award. In August 2025, following his termination, he received a community achievement award from the Asian American Group, which annually honors a law enforcement leader every year for keeping the Las Vegas community safe.

46.     He is a graduate of the International Leadership in Counterterrorism Program, led by the "FVEY" or "Five Eyes," the five-country multinational intelligence alliance between and among the United States, Canada, Australia, the United Kingdom, and New Zealand.

47.     Evans became a member of the FBI's SES in 2019 and remained so up until his unlawful firing.  Based on the amount of time he spent in federal service, he would have been fully eligible to retire once he turned 50.

48.     Prior to joining the FBI, Evans was a credit manager with Citigroup investment bank.  Like all agents in today's FBI, Evans achieved significant academic accomplishments.  He earned a bachelor's degree from Brigham Young University and a Master of Business

---

[2] DOJ Press Release, March 20, 2025, "Attorney General Pamela Bondi Announces Severe Charges Against Violent Tesla Arsonists," available at https://www.justice.gov/opa/pr/attorney-general-pamela-bondi-announces-severe-charges-against-violent-tesla-arsonists.

Administration from the University of Southern California.  When he first joined the FBI, he qualified to be a special agent under the foreign language program, having learned Spanish during his years spent as a missionary in Venezuela.

*Defendants*

49.    Defendant Patel is sued in his official capacity as the Director of the FBI. In that capacity, Patel maintains an office in Washington, D.C.

50.    Defendant FBI is a subordinate component of the DOJ pursuant to 28 C.F.R. § 0.1. The FBI's principal offices are in Washington, D.C.

51.    Defendant Pamela J. Bondi is sued in her official capacity as the Attorney General of the United States.  She is the head of the Department of Justice and maintains an office in Washington, D.C.

52.    Defendant DOJ is headquartered in Washington, D.C. and is an agency of the United States subject to the jurisdiction of this Court.  DOJ controls its components, including the FBI.

53.    Defendant EOP is headquartered in Washington, D.C. and is an agency of the United States subject to the jurisdiction of this Court.

54.    Defendant United States of America is responsible for the exercise of state action by the other named Defendants and being challenged by Plaintiffs.

## IV.    FACTS[3]

### A.  *January 13-20, 2025: Recruitment of Brian Driscoll, Jr. to FBI Leadership*

55.    At the time of President Donald J. Trump's January 20, 2025 inauguration, Driscoll was the SAC of the FBI's Newark, New Jersey Field Office.  Jensen was the SAC of the FBI's Columbia, South Carolina Field Office.  Evans was the SAC of the FBI's Las Vegas, Nevada Field Office.

56.    At some point during the week of January 13, 2025, Driscoll received a phone call from retired FBI Special Agent ("SA") Michael Clark.  Clark stated that he had established a relationship with Patel while Clark was still an active SA and assigned as the primary case agent for the Benghazi terrorist attack investigation.  At the time, Patel was assigned to DOJ's Counterterrorism Section.  Clark stated that he had kept in touch with Patel and was now spending a lot of time with him in an advisory role, prior to the inauguration.

57.    Clark also related that certain retired FBI SAs were also advising Patel in the lead up to the inauguration.  Clark asked if Driscoll would be willing to serve in an acting capacity at FBI Headquarters, though he did not specify in what role.  He also asked if Driscoll would be willing to stay at FBI Headquarters permanently if Patel was confirmed as the FBI Director.

58.    Driscoll responded to Clark by stating that if Patel was in a position of authority and confirmed, Driscoll would serve the men and women of the FBI, the office of the Director, and the office of the President.  Driscoll noted that his service would be to an "office," not to a politician who occupies an office.  Clark stated that he had also spoken to then-FBI SAC of the New York Field Office, Robert Kissane, and had a similar conversation.  A few days after this

---

[3] The facts alleged in this section are based primarily on the firsthand knowledge, best recollections, and/or communications of and involving Plaintiffs.  Unless otherwise indicated with quotation marks, descriptions of conversations and other oral statements are reflected in sum and substance and to the best recollections of Plaintiffs.

initial pre-inauguration call, Clark again called Driscoll and informed him that Patel was going to call him.  A few minutes after this call, Patel called Driscoll.  Patel asked Driscoll if he would be willing to serve at FBI Headquarters in an acting capacity and eventually stay at FBI Headquarters permanently if he (Patel) were to be confirmed.  Driscoll responded in the same manner he had responded to Clark.  Patel then told Driscoll that he would receive a call from the Presidential transition team for vetting purposes.  Driscoll asked what that process might entail.  Patel responded that as long as Driscoll was not prolific on social media, did not donate to the Democratic Party, and did not vote for Kamala Harris in the 2024 election, the "vetting" would not be an issue.  Driscoll did not respond to those comments.  In total, the conversation between Patel and Driscoll lasted less than five minutes.  Prior to this call, Driscoll had never met or spoken with Patel.

59.     Later that evening, Driscoll spoke to the then-Assistant Director in Charge of the FBI's New York Office James Dennehy and Kissane to see if either man had additional details as to why Kissane and Driscoll were being requested to transfer to FBI Headquarters.  Kissane articulated that Clark "recommended" the two of them to Patel and Emil Bove, who Driscoll knew as a former Assistant United States Attorney in the United States Attorney's Office for the Southern District of New York.

60.     Driscoll spoke with soon-to-be-Acting FBI Director Paul Abbate that night concerning Patel's entreaties to Driscoll and Kissane.  Abbate advised that he was relieved that Kissane and Driscoll were being sought to serve at FBI Headquarters in some capacity, presumably as the acting Director and acting Deputy Director respectively.  Abbate advised that Driscoll and Kissane should engage with Clark, Bove, and Patel, and accept leadership roles if offered.

17

61.     Approximately one to two days later, Driscoll received a call from Mr. Paul Ingrassia, a White House representative who identified himself as the White House-DOJ transition liaison.  Ingrassia, then 29 years old, had no experience working in the White House, DOJ, or FBI. Nevertheless, he identified to Driscoll that he was on the White House-DOJ transition team and wanted to conduct a vetting interview with Driscoll who, according to Ingrassia, was being considered for "a high-level position at the FBI."  Driscoll conferred with the FBI Newark Chief Division Legal Counsel to confirm it was legally appropriate to call Ingrassia back.  After confirming it was proper to do so, Driscoll then called Ingrassia back and left a voicemail.

62.     The next day, on January 17, 2025, Ingrassia called Driscoll back and conducted a telephonic interview.  Driscoll asked Ingrassia why he was being interviewed, to which Ingrassia replied that it was for "a high-level position at the FBI."  Driscoll responded that he was already serving in a high-level position in the FBI.  Ingrassia did not elaborate any further. The following is, in summary and substance, a list of the questions Ingrassia asked Driscoll and Driscoll's corresponding responses:

**Question 1:**  *How would you define the most significant threats to the United States?*

**Response 1:**  Cyber; terrorist; and counterintelligence threats posed by China; Russia; Iran; North Korea; Islamic State of Iraq and Syria ("ISIS"); ISIS-Khorasan and their affiliates with external operational capabilities; porous borders; fentanyl; and transnational organized crime, *e.g.*, cartels.

**Question 2:**  *What are your thoughts on the structure of the FBI?*

**Response 2:**  In order to constantly improve, any organization needs to evolve and the FBI is no exception.  Effective evolution with an improved or enhanced end state must be done with a measured and strategic approach.  The FBI can be more efficient, nimble, and field-focused with a deep understanding of the nuanced complexities of each area of responsibility of each field office.

**Question 3:**  *Who did you vote for?*

18

**Response 3:**    Driscoll refused to answer this question and stated that it was an inappropriate question with Hatch Act implications.

**Question 4:**    *Do you agree that the FBI agents who "stormed" Mar-a-Lago, to include the rank-and-file, should be held accountable?*

**Response 4:**    No; FBI personnel were doing their job in furtherance of court orders, legal warrants, and a properly predicated investigation.

**Question 5:**    *What are your thoughts on Diversity, Equity, and Inclusion?*

**Response 5:**    Driscoll mentioned that members of his family were first-generation citizens and that he strongly believes in diversity and a diverse workforce that represents the people the FBI serves. He noted that he does not believe in promoting people for the sole reason of diversity and did not support diluting standards for the sake of diversity alone.

**Question 6:**    *When did you start supporting President Trump?*

**Response 6:**    Driscoll refused to answer this question.

**Question 7:**    *Have you voted for a Democrat in the last five elections?*

**Response 7:**    Driscoll refused to answer this question.

63.    After this final question, Ingrassia ended the interview.

64.    Later that evening, Driscoll received a call from Bove. Driscoll understood that Bove was expected to be named Acting Deputy Attorney General ("A/DAG") of the United States following the inauguration. At the time of the call, Bove was a private lawyer who had been part of President Trump's criminal defense team. Bove asked Driscoll what happened on the vetting call, to which Driscoll responded that he found Ingrassia's questions to be highly inappropriate and political in nature and that he (Driscoll) was not supportive of serving in any leadership role in the FBI if it required him to pass a vetting assessment based on political views. Driscoll noted that he had never shared his political views, or even whether he had any, in his entire professional career.

65.    Bove told Driscoll that he "failed" the vetting interview and that Ingrassia reported that Driscoll was combative and not "based out" enough. Driscoll interpreted Ingrassia's report to

mean that his refusal to answer political questions disqualified him for the "high level position" for which he was being vetted. He further interpreted Bove's use of the term "based out" to mean that Driscoll failed to demonstrate sufficient alignment with and loyalty to the ideology advanced by President Trump's political base.

66.    Driscoll told Bove that he wanted nothing to do with the entire situation if it required him to violate the law, and that not only was he apolitical by nature, but that it was essential for the FBI to remain apolitical.

67.    Bove told Driscoll that during his (Bove's) conversation with Ingrassia, Bove vouched for Driscoll's character and stated that he was indeed a good fit for a senior role at FBI Headquarters. Bove also said that Ingrassia did not know how the government works and that he had to explain to him that FBI agents cannot speak about their political views in their professional capacity. Bove said that he changed Ingrassia's assessment and had the results "flipped" in favor of approving Driscoll to serve in an acting role at FBI Headquarters.

68.    At this point, Driscoll asked Bove what position he would be asked to occupy, to which Bove replied that he would be asked to serve as the Acting Deputy Director of the FBI. Driscoll stated that he would not agree to serve in such a capacity until someone in an official position of authority in his chain of command requested him to do so.

69.    Bove related that, after President Trump named Bove A/DAG, Bove, in that capacity, would appoint Kissane to serve as FBI Acting Director and Driscoll to serve as FBI Acting Deputy Director. Bove indicated that if Kissane or Driscoll refused to serve in the proposed capacity, there was a strong chance that political appointees from outside of the FBI would serve in the roles.

70.    Driscoll told Bove that he would accept the role subject to two conditions: he would not remove or terminate any FBI personnel at the behest of the incoming administration, and that he would not be beholden to political influence or large-scale strategic structural change.

71.    Bove expressed that Kissane and Driscoll were only being asked to serve in an interim capacity until Patel was confirmed.  Bove continued that he would like the two men to focus on keeping the momentum of the investigations and operations of the FBI going, and assured Driscoll that he would not ask Kissane or Driscoll to fire anybody.

72.    The conversation concluded with the understanding that Kissane and Driscoll should await a call on Sunday, January 19, 2025.  After receiving that call, they would drive down to Washington, D.C. and be prepared to assume the roles of FBI Acting Director and Acting Deputy Director, respectively, beginning on January 20, 2025.

73.    Driscoll updated Abbate on these developments. Abbate confirmed that he and Kissane should follow the plan outlined by Bove.

74.    Driscoll drove from New York to Washington, D.C., on January 19, 2025.

75.    On January 20, 2025, Driscoll received separate calls from both Bove and Abbate asking him to report immediately to FBI Headquarters to serve as the Acting Deputy Director. Driscoll arrived that day at around 1:00 p.m. and met with Abbate, then-FBI Chief of Staff Corey Ellis, then-FBI Deputy Chief of Staff William Miller, and other professional staff.  Kissane arrived shortly thereafter.

76.    Abbate informed Kissane and Driscoll that he was retiring, effective immediately. He conducted a brief turnover, mostly consisting of staff introductions and situational awareness. As Abbate, Kissane, and Driscoll were sitting in the FBI Director's Conference Room, Ellis came in and dropped a printed copy of the White House report announcing government interim

component heads.

77.     The report listed Driscoll as Acting Director, rather than Kissane.  This was the reverse of what the two men had previously discussed with Bove and Abbate.  Perplexed, the group decided that Kissane should call Bove and ask what had happened and if it could be rectified. Kissane left the room to call Bove, who was by then at DOJ as the A/DAG.  He returned a short time later, pointed at Driscoll, and said that he was the new Acting Director of the FBI.

78.     Kissane related that Bove called the White House to fix what everyone collectively understood to be a mistake.  Bove told Kissane that it was a clerical error but that the White House was unwilling to fix it.  As a result, Driscoll was now the Acting Director and Kissane was the Acting Deputy Director.  Ellis asked Driscoll and Kissane if this change was acceptable to them, to which they explained that they had been friends and colleagues for over 17 years and that they were committed to protecting the FBI mission and its people, regardless of what title they each held.

### B.  Brian Driscoll's Service as Acting Director of the FBI

79.     Upon assuming their new roles, Driscoll and Kissane established a cadence of daily internal FBI briefings and DOJ briefings.  Each morning, they convened a briefing that included the FBI leadership team.  Those briefings were operational in nature, to include high-level threat and intelligence briefs.  Following that brief, the participants reduced to a smaller group (based on security clearance levels) to receive another daily brief.  Following these meetings, Kissane, Driscoll, Ellis, William Miller, and others would go to DOJ to brief then-Acting Attorney General James McHenry and Bove on investigative, operational, and threat matters.  Bove led discussion at these meetings and occasionally asked for "stay behind" meetings with Driscoll and Kissane.

80.    During the week of January 20th, Driscoll learned that DOJ had directly hired personnel into the FBI to serve as Patel's "Director's Advisory Team" ("DAT") in advance of Patel's confirmation as FBI Director.  The DAT referred to themselves as "politicals" in reference to them being politically appointed.  Some of these members were retired FBI agents, including Greg Menser, Tom Ferguson, and others.

81.    That week, Driscoll held a meeting with members of the DAT and stated that they were not allowed to refer to themselves as "politicals" because the FBI is an apolitical entity and, as Acting Director, Driscoll would not tolerate any reference to the contrary.  Driscoll asked them their responsibilities, to which they said they had been installed to help advise the future Director, meaning Patel, on how to refine the organization's structure, technical capacity, and leadership development and selection.

82.    Over the coming weeks, Driscoll only met once or twice with members of the DAT. At one meeting with Mesner, which Kissane also attended, Menser provided a list of names and field offices to Driscoll, and indicated the people listed were marked to be removed or terminated. Driscoll informed Menser that he refused to terminate people on the basis of this list. Driscoll continued that, if Menser was delivering this message on behalf of Patel, he should tell Patel that Driscoll did not work for him yet.

### 1.  Emil Bove's Pressure Campaign and Attempt to Purge the FBI

83.    On or about January 27, 2025, Bove requested that Driscoll and Kissane "stay behind" following their daily morning briefing.  At that "stay behind" meeting, Bove stated that he was receiving pressure from White House Deputy Chief of Staff Stephen Miller to see "symmetrical action at the FBI as had been happening at DOJ."   Bove made clear that he and Miller wanted to see personnel action like reassignment, removals, and terminations at the FBI,

similar to the firings and reassignments of senior attorneys at DOJ that had occurred since January 20, 2025.

84.    Driscoll and Kissane responded that if there was an allegation of misconduct, they would initiate an investigative process through the appropriate divisions, including FBI Inspections Division, Office of Professional Responsibility, and/or DOJ's Office of Inspector General.  They affirmed that if the investigations into any FBI employee accused of misconduct yielded results, they would enforce appropriate consequences based on policy and law.

85.    In response, Bove asserted that an allegation of misconduct was not necessary for him to terminate FBI personnel of his choosing and at his discretion.  Bove stated that he intended to terminate FBI personnel if he subjectively felt a "loss of confidence in their ability to carry out the President's agenda."  He also did not address why directives to fire FBI personnel were coming from the White House.

86.    Driscoll and Kissane re-emphasized the necessity for a process, as previously articulated.  Bove repeated that his own unilateral assessment that he had lost faith and confidence in an employee's ability to carry out the President's political agenda was sufficient.

87.    Throughout the week of January 27, 2025, Bove made several demands for FBI investigative squad rosters in the Las Vegas, Miami, and Washington Field Offices, which Driscoll understood to be for the purpose of summary terminations.  Driscoll and Kissane did not provide those rosters.

88.    On or about January 28, 2025, at the DOJ "stay behind" meeting, Bove expressly stated his intent to summarily remove specific individuals in leadership roles at the FBI.  When Driscoll and Kissane asked who he was referring to and why, Bove said he was referring to the Associate Deputy Director, ADIC of WFO, the SAC of Miami, various Executive Assistant

Directors ("EADs"), and potentially the SAC of Las Vegas and SAC of New Orleans. Bove did not refer to the SAC of Las Vegas by name, only the position. Evans then occupied the position.

89.    When Driscoll and Kissane asked whether there was a lawful basis for firing these employees, Bove referred to his lack of confidence that they would carry out the President's agenda. Bove again brought up the pressure he was receiving from Miller to conduct summary firings of agents as had been done with respect to DOJ attorneys.

90.    Driscoll and Kissane communicated that neither man would terminate any of these individuals, to which Bove responded that he (Bove) would be terminating them. Driscoll expressed his disagreement with the proposed terminations and urged that these individuals deserved dignity and respect for their service. He also argued that if Bove insisted on terminating these individuals, the ones who were eligible to retire should be given the opportunity to do so, and the ones ineligible to retire should be given the opportunity to either step down in rank or accept a management directed reassignment, thus keeping them employed.

91.    Driscoll convinced Bove to allow Driscoll one week to apprise the impacted individuals of their options in advance of an expected firing. During a series of discussions with the impacted individuals, Driscoll and Kissane expressed their disagreement with the approach taken by DOJ and assured that any individual who elected to retire instead of being fired would be processed in an expedited manner to ensure that a sooner-than-expected firing would not affect their eligibility for retirement benefits.

92.    On or about January 29, 2025, at the "stay behind" morning meeting at DOJ offices, Bove instructed Driscoll and Kissane to provide a list of FBI personnel associated with the investigations into the January 6, 2021 attacks at the Capitol. At times during the discussion, Bove made reference to a "core case team" of January 6 investigators, which did not actually exist.

Driscoll explained to Bove that the investigations and prosecutions arising from the January 6, 2021 attacks were a DOJ-led effort and included thousands of participants in the FBI, all of whom were doing their jobs pursuant to a predicated investigation.  Driscoll explained that a mass firing of FBI personnel who worked on January 6 matters would not be in accordance with FBI procedures and would put national security at risk.  He further stated that he would not tolerate such an action without an articulated reason and compliance with existing due process requirements.

93.    To emphasize the magnitude and breadth of Bove's request, Driscoll explained that Driscoll himself would be on the list.  He also explained that if that list were ever leaked or made public, the affected FBI employees would potentially face threats, physical and/or otherwise.  In response, Bove said he believed there was "cultural rot" within the FBI.

94.    Driscoll and Kissane asked Bove what he intended to do with the list of January 6 FBI personnel, to which he responded the personnel detailed therein would be subject to a DOJ review for misconduct.  When asked what process would be used to conduct the review, Bove would not provide any other response other than "a DOJ-led review," which Driscoll believed would consist of DOJ's assessment as to whether an employee supported the President's political agenda.

95.    Driscoll and Kissane told Bove that unless he could outline a lawful process for determining whether and how people would be fired, they did not intend to provide a list of names of employees.

96.    Instead of providing a lawful reason, Bove responded that (1) he was above Driscoll and Kissane in the chain-of-command, (2) he was giving them a direct order to provide the list of names, and (3) he could terminate FBI personnel even in the absence of an allegation of

26

misconduct.

97.    Only after seeking counsel from the FBI's Office of General Counsel, Driscoll initiated the process for compiling a list of certain FBI personnel involved in the investigations and prosecutions concerning the January 6, 2021 attacks. However, the FBI had neither the technological nor personnel resources to gather the requested information with 100% accuracy within the abbreviated timeline mandated by DOJ. Nevertheless, Bove demanded the incomplete and inaccurate list to use as a starting point for future terminations.

98.    On or about January 30, 2025, Driscoll and Kissane informed Bove that the unsigned "Fork in the Road" email from the Office of Personnel Management, which encouraged federal employees to opt into voluntary resignation rather than be summarily terminated, as well as the media coverage stating that all probationary government employees would possibly face termination, was causing panic and anxiety in the FBI workforce and putting the FBI's mission, and thus the safety of Americans, at risk. Bove stated that the creation of panic and anxiety in the workforce "was the intent."

99.    On Friday, January 31, 2025, Bove issued a memo addressed to Driscoll with the subject line, "Terminations." The memo set a deadline of February 3, 2025 at 5:30 p.m. to effectuate terminations of eight specified FBI employees and to deliver the list of "all current and former FBI personnel assigned at any time to investigations and/or prosecutions relating to" January 6 and *United States v. Haniyeh et al.*, 24 Mag. 438 (S.D.N.Y.), a case charging senior leaders of the terrorist group Hamas.

100.    On February 3, 2025, at the DOJ "stay behind" meeting, Bove again expressed his view that there was "cultural rot" at the FBI and said that he issued the January 31, 2025 memo re: "Terminations" with a list of expanded scope because Driscoll and Kissane would not provide a

"core January 6 team" and had refused to summarily terminate the EADs and others.  Bove's discussion with Driscoll and Kissane led Driscoll to believe that Bove was well that aware nobody on the "Terminations" list had been provided with any proper notice or an opportunity to respond to any allegation and that there was no legitimate cause or alleged misconduct that had led to the terminations.

101.    Later that day and prior to the 5:30 p.m. deadline, the FBI's acting Chief of Staff provided the latest version of the compiled list to DOJ.  At Driscoll's direction, the listed employees were identified by Universal Employee Identification Number—not by name—in an effort to protect the identities of the employees if the list was exposed.  The list included approximately 6,000 employees and was sent to Bove via email over the FBI's unclassified enclave with necessary caveats.

102.    Beginning on approximately January 30, 2025, media coverage of Bove's efforts to terminate people based solely on politics and prior case assignments began to escalate.  At no point in Driscoll's more than 20-year career in federal law enforcement—with the exception of a single official telephonic interview with Fox Digital that had been coordinated, approved, and monitored by the FBI Office of Press Affairs regarding the arrest of an FBI Top Ten fugitive while he was Acting Director—has he ever provided a comment to the press in any form or fashion.

103.    On or about February 5, 2025, Driscoll returned to his office at FBI Headquarters following the DOJ daily morning brief.  His executive assistant ("EA") handed him a printed copy of an email from Bove, addressed to the entire FBI workforce.

104.    Driscoll found this confusing, since he did not receive the email himself.  His EA then explained that Bove had attempted to email the entire FBI workforce, but had failed because he was not actually an FBI employee and therefore could not send the email through the FBI

computer systems. Driscoll then read the email, which, among other things, accused him of insubordination and refusing to comply with Bove's orders. For example, in an attempt to explain why he demanded the names of any employee who worked on January 6 investigations, Bove wrote:

> The purpose of the requests was to permit the Justice Department to conduct a review of those particular agents' conduct pursuant to President Trump's Executive Order concerning weaponization in the prior administration. FBI acting leadership refused to comply. That insubordination necessitated, among other things, the directive in my January 31, 2025 memo to identify all agents assigned to investigations relating to January 6, 2021.

105. Understanding Bove's intent to communicate with the FBI's workforce on his own without Driscoll's knowledge, Driscoll instructed his EA to arrange for the exact words of Bove's email to be sent to the workforce, from Driscoll, on Bove's behalf. That was achieved a short time later that day.

106. In the days that followed, Driscoll and Kissane communicated with the workforce on various investigative, operational, and personnel matters in order to provide stability for ongoing FBI operations. To Driscoll and Kissane, this seemed particularly important at a time when, as Bove had previously put it, stoking panic and anxiety within federal law enforcement and other federal agencies "was the intent."

107. Intense media coverage of the FBI continued, but Driscoll never spoke to any media of any kind. At some point in February 2025, Secretary of Homeland Security Kristi Noem and "Border Czar" Tom Homan publicly accused members of the FBI of leaking sensitive law enforcement information regarding immigration enforcement operations. As a result, the FBI initiated a thorough insider threat investigation, which concluded that the accusations were false.

108. On or about February 12, 2025, at the daily DOJ "stay behind" meeting, Bove accused Driscoll and Kissane of leaking information about their daily meetings to the media and

"controlling" the negative media attention that had been directed at Bove in recent weeks.  Driscoll truthfully stated that neither he nor Kissane had leaked any information about their daily meetings, and that any suggestion otherwise was completely inaccurate.  He reiterated that the FBI was continuing to investigate all leaks, including potential leaks concerning recent immigration enforcement operations, and that there was no evidence that anyone at the FBI was responsible for any such leaks.  Bove responded that he considered Driscoll to be a bad leader and that he trusted neither he nor Kissane, nor any FBI internal leak investigation.

109.    Bove sought to assign blame to Driscoll for the negative morale in the FBI workforce, notwithstanding that the instability within the FBI had been specifically instigated by Bove's threat of summary firings and mass probationary agent firings.  Bove had confirmed as much when he had stated that the very "intent" of these actions was to cause panic and anxiety.

110.    Bove's efforts did, however, create a groundswell of support within the FBI for Driscoll's and Kissane's leadership.  Rank-and-file agents appeared to appreciate that the two men were the reasons the country had not been catapulted into a national security emergency brought on by suspected mass firings at the FBI.  Bove told Driscoll that he was angry that, in parody videos apparently created by FBI employees, Bove was portrayed as the Batman villain "Bane," while Driscoll was portrayed as "Batman."   Driscoll responded that he did not make the video, nor could he control unknown individuals' feelings or expressions of said feelings.

111.    Bove responded that Driscoll could have told the FBI's workforce that Driscoll trusted him.  Bove then stated that he and now-confirmed Attorney General Pam Bondi were going to have an in-person meeting with Patel later that afternoon to discuss "what they were going to do with Kissane and Driscoll."  Both Driscoll and Kissane reiterated that they had not engaged in "leaking" and had not spoken to the media about the daily DOJ meetings.   Bove responded that

he did not trust the men.

### 2. Transition of FBI Leadership to Mr. Patel

112.    Prior to Patel's confirmation, Driscoll and Kissane oversaw the FBI's background investigations of individuals nominated for positions within the Administration.  On or about February 12, 2025, Bove told Kissane and Driscoll to pause any FBI background investigations, explaining that the background investigations would resume after Patel was confirmed because Patel would be more accountable to Bove.

113.    On February 20, 2025, Patel was confirmed as the ninth Director of the FBI.  Later that evening, he arrived in the Director's Office and was provided a brief tour of his office and other spaces by members of his staff.  He had a brief private conversation with Driscoll, thanked him for his service as Acting Director, and stated that Driscoll was placed in "an impossible situation."  He then asked Driscoll to make a list of poor leaders within the FBI, to which Driscoll stated that he would not be the "judge, jury, and executioner."

114.    Driscoll explained to Patel the multiple FBI processes to determine the strengths and weaknesses of FBI leaders.  Patel asked where Driscoll wanted to go within the FBI, to which Driscoll stated that he was not ready to commit to any particular position at that time.  He told Patel that he intended to take some leave to spend time with his family, to which Patel stated that he understood and supported him.

115.    At the conclusion of the conversation, Driscoll said goodbye to staff members and his protection detail, then drove himself home.

### C. Steven Jensen Becomes ADIC of WFO

#### 1. Patel Recruits Jensen back to Washington, D.C.

116.    At some point between late February and early March, Jensen received a call from Patel.  At the time, Jensen was the SAC of the FBI's Columbia Field Office in South Carolina. Just a few years before that, Jensen had left his position as the chief of the Counterterrorism Section at FBI Headquarters where he had overseen domestic terrorism investigations, including the FBI's investigation into the January 6 cases.

117.    In this initial conversation, Patel said that multiple people had recommended he reach out to Jensen and to consider him as a possible leader during Patel's time as Director.  Jensen and Patel discussed the former's approach to the January 6 investigations.  Specifically, Jensen explained that his section coordinated between the lead investigative office (WFO), DOJ, and the other 55 field offices who were receiving leads, tips, and collecting evidence pursuant to properly predicated investigations.  His goal, he told Patel, was to ensure consistency across multiple and disparate areas of responsibility while meeting the needs and demands of DOJ prosecutorial decisions.

118.    Patel asked if Jensen had ever pushed back against DOJ leadership running the investigations.  Jensen responded that he often advocated that investigative focus should be on those who committed acts of violence against law enforcement, damaged or stole government property, and on the genesis of the pipe bombs found that day, not on lower-level offenses like trespass.  However, FBI agents are limited in how to control the prosecution of a case, and charging decisions ultimately rest with attorneys at the DOJ.

119.    A few weeks after this phone call, on or about March 12, 2025, Patel again called Jensen.  In this second phone call, Patel told Jensen that he had verified some of the information

that Jensen told him and asked him if he would become the FBI Branch and Operations Director of National Security. Jensen hesitated, noting that this would be a significant "leapfrog" of other FBI colleagues who worked at headquarters since Jensen was then the SAC of a relatively small field office. Patel said it was not a problem and that Jensen was exactly the man he wanted for the job. Jensen accepted the position and reported back to Washington, D.C. to assume his new responsibilities on March 17, 2025.

120.    For approximately two weeks, Jensen served as the FBI's Operations Director of National Security with direct oversight of 16 SACs. He had daily interactions with Patel and FBI Deputy Director Dan Bongino, who had started in his position on March 17, 2025. Within approximately one week, both Patel and Bongino had separate, one-on-one meetings with Jensen to tell him that they wanted him to become ADIC of the FBI's WFO. Both Patel and Bongino indicated that they needed a "leader" to take control of that particular field office. Bongino had described the position to Jensen as the "fourth most powerful position in the FBI."

121.    By approximately March 26, 2025, both men had separately indicated to Jensen their desire to have him become the highest-ranking agent at the WFO. As ADIC, he would be able to install five Special Agents in Charge as subordinate leaders in the office. Accordingly, by April 2, 2025, just over two weeks after returning to Washington, D.C. to become the Operations Director, Jensen left that position and arrived at WFO as the ADIC.

122.    Jensen's promotion to ADIC at WFO set off a social media firestorm. Former January 6 defendants and their sympathizers immediately recognized him as having played a leading role in their criminal investigations. Subscribing to President Trump's position that the FBI investigators who were assigned to January 6 cases were "[t]hugs", "[t]yrants," and

"Gestapo,"[4] January 6 rioters and their sympathizers began aggressively posting to Patel and Bongino's social media pages calling for Jensen's firing or other retribution.

123.    Bongino was apparently unaware of Jensen's past work at the Counterterrorism Section.  On the Saturday following Jensen's promotion, Bongino called Jensen directly to ask him whether the things people were saying online were true, citing the vitriol he had been receiving on his social media pages.  Jensen responded that he did indeed serve as the Section Chief of the Domestic Terrorism Operations Section and coordinated the FBI's response to the January 6 investigations, that this was not new information, and that it was part of his publicly available FBI biography and official personnel file.

124.    Neither Patel nor Bongino appeared to have anticipated the backlash from President Trump's political base, who frequently tagged members of the Executive Office of the President in their angry online posts.  As the online clamor among sympathizers of January 6 defendants grew, Patel suggested to Jensen that he (Patel) was counteracting some of the negative attention by placing positive stories in the media about Jensen's promotion.

125.    Both Patel and Bongino lamented to Jensen that they were spending "a lot of political capital" to keep him in the ADIC position, a position that Jensen had not sought in the first place.

126.    The online backlash to Jensen's promotion from President Trump's political base was significant.  In sum, that backlash expressed that Jensen should be fired or arrested for his participation in the January 6 investigations, and that Patel and Bongino had made a politically

---

[4]       *See*       @realDonaldTrump,       *Truth       Social*,       available       at https://truthsocial.com/@realDonaldTrump/posts/109745175533954622 [https://perma.cc/Y9Y9-E8HL];       @realDonaldTrump,       *Truth       Social*,       available       at https://truthsocial.com/@realDonaldTrump/posts/109529028482982758  [https://perma.cc/F728-A87A].

poor choice by promoting him.  Frequently, critics of Jensen's promotion would "tag" Patel and Bongino in an attempt to bring their displeasure to those individuals' attention.[5]

127.    In response, Patel urged Jensen to sue the more prominent online personalities for defamation.[6]  Doing so, Patel explained, would help take the political pressure off of him (Patel) for his decision to promote Jensen.  Patel even offered to connect Jensen with defamation attorneys.  Jensen declined, noting that he was unconcerned with the viewpoints of online personalities and would remain focused on the FBI's mission.

128.    Despite Patel and Bongino telling Jensen that his promotion had cost them "political capital," Jensen continued to have a cordial and professional relationship with both men during his time as ADIC of WFO.  He regularly updated Bongino on investigations that Bongino considered priorities, including into the January 6 pipe bomber, the leak of the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), and the discovery of cocaine at the White House during the Biden Administration, which were three cases that Bongino frequently discussed in media interviews and on his social media feed.

129.    During these briefings, Jensen became alarmed at Bongino's intense focus on increasing online engagement through his social media profiles in an effort to change his followers' perception of the FBI.  Jensen was concerned that the emphasis Bongino placed on creating content for his social media pages could risk outweighing more deliberate analyses of investigations.

---

[5] In general terms, to "tag" another person on social media means to hyperlink another user's account to specific content, which triggers a notification to that user's account and increases the visibility of the post.

[6] Although Patel and Jensen did not discuss this, one of the online personalities Patel suggested Jensen sue had coincidentally also been fixated on Plaintiff Spencer Evans, as discussed in further detail herein.

130.    At some point in May 2025, Jensen received a phone call from Bongino, who was audibly upset.  He asked Jensen whether he knew who SA Walter Giardina was and told Jensen that he has "got to go." Giardina was an agent assigned to WFO.  Jensen asked him to elaborate, but Bongino explained that he could not do so over the phone.  Jensen met him at FBI Headquarters to continue the discussion.  Jensen knew Giardina to be a dedicated and hardworking FBI agent who was assigned to high-profile investigations into members of both political parties because of these qualities.

131.    Upon arriving at FBI Headquarters, Jensen found Bongino in his Chief of Staff's office.  Bongino looked as if he had not slept for several days.  He seemed extremely anxious and agitated.  Jensen asked him what was wrong.  Bongino explained that he had found a room filled with classified documents and "burn bags" related to the now-closed Crossfire Hurricane investigation.  He expressed shock at the existence of these burn bags.

132.    By his comments, it seemed to Jensen that Bongino might not have been fully aware that the use of "burn bags" is a standard method across multiple federal agencies for preparing classified material for destruction when an investigation is deemed closed, or when physical copies of the materials are no longer necessary.  He also appeared unaware that the FBI also stored digital copies of materials on the FBI's classified computer system, and that this was likely the case with these materials. At the meeting, Bongino also made an unfounded additional allegation about Giardina's handling of data, claiming that the allegation was "just out there."

133.    Bongino insisted that Jensen summarily fire Giardina.  Jensen explained that Giardina was a military veteran and was entitled to certain rights which did not allow such a firing. He explained that if Bongino forced him to summarily fire Giardina, he would document in a report that the firing was at the direction of Bongino and had occurred after Jensen explained why the

firing violated FBI procedures and Giardina's rights. He explained that Bongino would likely be deposed in a lawsuit should Giardina choose to challenge his unlawful firing. Bongino did not pursue further his demand that Giardina be summarily fired in that meeting. In fact, Giardina was never assigned to work on Crossfire Hurricane.

134.    Shortly after this meeting, Patel and Bongino sat for an interview with Maria Bartiromo of Fox News. Bongino then publicly discussed the topics that he and Jensen had privately spoken about. Patel publicly defended him during the interview and extolled his embodiment of FBI values:

> Ms. Bartiromo:    You promoted Steven Jensen, the architect of the FBI's overzealous January 6 investigation.
>
> Patel:    I want the American public to realize what we did. That man was in a position where he literally fought back against the machine who was saying, "we want to politicize this event, we want to politicize this event." And at the end of the day, remember, Maria, there's a chain of command here. So you can fight back your chain of command to a certain degree before they fire you. And Steven Jensen and other folks were promoted because they embody what the American public demands of FBI agents.[7]

135.    Jensen maintained a professional relationship with both men over the next few months and ensured that they were updated on matters of national security. For example, on the day of a horrific double homicide and attempted mass casualty event at the Capital Jewish Museum in Washington, D.C., Jensen woke Bongino up during the night to inform him of the situation and provide him with updates. Bongino arrived at the scene and then sat with Jensen at the FBI command post set up to respond to the event. The men also attended a press conference on the event with then-Acting United States Attorney for the District of Columbia Jeanine Pirro. After

---

[7] Maria Bartiromo, Fox News, May 18, 2025, "Wave of Transparency: FBI director hints at agency's move to rebuild American's trust," available at https://www.youtube.com/watch?v=XqI_sFSPbJQ.

the press conference, Bongino sent Jensen a text message commending him for his response to the event and stating that "this is why we put you in place."

## 2. July 2025: Patel praises and rewards Jensen

136.    On July 14, 2025, Jensen attended a regularly scheduled meeting with Patel in the Director's Conference Room along with the Sergeant-at-Arms of the House of Representatives and Marshall Yates, the Assistant Director of Congressional Affairs, to discuss security issues. After discussing specific security matters, Patel told Jensen that his recommendations on the issues were "great" and that he intended to implement them.

137.    At the close of the meeting, Patel warmly invited Jensen into his office, which was connected to the conference room.

138.    Jensen then asked Patel for what he described as a favor.  He knew that Patel planned to disclose Giardina's name in an unredacted report to Congress. Giardina had been assigned to multiple investigations into suspected criminal activity by President Trump and, as such, was the target of political retribution by the White House.  In the records Patel planned to disclose to Congress, Patel intended to leave unredacted only Giardina's name, notwithstanding that Giardina had been an apolitical investigator and that other agents' names within the document would remain redacted.  Jensen observed that Patel's planned disclosure would ignite and direct attention specifically to Giardina.

139.    Jensen explained that Giardina's wife was very ill, suffering from Stage IV cancer, and had days to live.  Because Jensen believed that Patel was under intense political pressure from the White House and Congress to identify and punish FBI agents perceived as politically disloyal to President Trump and that Giardina's name was going to be disclosed, Jensen asked Patel if he would delay the public disclosure until after Giardina had time to deal with his wife's illness and

likely passing.  Yates was present for this interaction.

140.    Because of his reputation for being a hard worker and thorough investigator, Giardina had been assigned to multiple high-profile cases involving prominent members of both political parties, including President Trump.  As should have been clear to Patel and any other FBI official, any disclosure of the name of an FBI agent who worked a case involving President Trump would immediately trigger a torrent of online abuse and threats of violence.  In Jensen's opinion, for Giardina and his family to have to deal with this during such an emotional time seemed inexcusably cruel.

141.    As Jensen got up to leave, Patel called him back and said he wanted to show him something.  He presented Jensen with a Director's "challenge coin" that Patel said he had just ordered.  Such challenge coins—tokens of appreciation given by leaders to their subordinates in government and military environments—are typically the size of a silver dollar.   The coin proffered by Patel, however, was much larger, inscribed with "Director" at the top banner of the coin and "Ka$h Patel" at the bottom banner.  Patel told Jensen that he wanted him to be one of the first recipients of his new challenge coin.

142.    Jensen then noticed collection of whiskey bottles and cigars on Patel's desk.  He asked if he was a collector.  Patel then gave him two cigars, telling Jensen that they were "awesome" and that he has "gotta see this."  Patel explained that he used to produce his own brand of cigars, but they are not in production anymore.  He then gave Jensen a third cigar but said that he should not smoke it because it was from President Trump's inauguration.  Jensen asked whether Patel was sure he wanted to gift Jensen a cigar of such significance for Patel, particularly since Jensen himself did not attend President Trump's inauguration.  Patel insisted that Jensen should take it.  As Jensen walked out of the Director's office, Patel told him to enjoy his leave, that he

should take as much time as he needs, to take care of his family, and that he was "crushing it."

143.     Approximately two days into his leave, on July 16, 2025, at approximately 7:20 a.m., Jensen received a call from Bongino.  Bongino began the call by sternly telling Jensen that he had to "use better judgment," explaining that the SAC of the Philadelphia Field Office had sent out an email to various other SACs about the SAC Advisory Committee indicating that Jensen would assume the vice chair position that had been left vacant by the recent departure of the Richmond SAC.  The SAC Advisory Committee is an organizational structure within the FBI that SACs from across the country rely on to channel communication and concerns to FBI leadership. It is not a formal organization and is, in effect, an additional duty for those who volunteer for the position.  The Philadelphia SAC had asked Jensen to fill the vacancy left by the Richmond SAC and, apparently, Bongino had learned of an email announcing this.

144.     During this phone call, Bongino warned him that if the White House learned that Jensen was on an advisory committee, it would be "problem" for Jensen.

### D.  Defendants Enact Political Retribution Against Spencer Evans

145.     Evans's decades-long FBI record has been objectively successful and without blemish.  Prior to January 2025, his career charted a course typical of his peers amongst the FBI's senior leadership.

146.     He spent significant time in leadership positions at the Jacksonville and Oklahoma City Field Offices and later at FBI Headquarters as a Deputy Assistant Director ("DAD") of the Human Resources Division ("HRD").

147.     Evans's time with HRD overlapped with the onset of the COVID-19 pandemic.  As a result, beginning in 2021, one of his additional duties required him to act as the signatory on FBI personnel's reasonable accommodation requests for exemptions from COVID-19 protocol.  The

FBI's COVID-19 protocol was not set internally; it was incorporated from DOJ's department-wide protocol, which itself was devised directly from the directives of Executive Branch leadership that were regularly recalibrated throughout the pandemic.

148.    From approximately 2021-2022, Evans's role as DAD at HRD required him to review requests from the FBI workforce to be exempted from certain COVID-19 protocol like vaccination requirements and mask guidance.

149.    Although he was often the final FBI signatory on these exemption requests, neither Evans nor HRD played the central role in how the FBI evaluated such requests.  Instead, all such requests were processed through the FBI's Office of Equal Employment Opportunity Affairs ("EEO").  EEO, which has its own separate leadership structure and chain of command outside of HRD, treated COVID-19 exemption requests like any other accommodation requests.

150.    EEO's analysis entailed assessing the circumstances of the request, speaking with the requesting individual's local leadership to determine the feasibility of the requested accommodation, and ultimately making a recommendation for approval or denial by someone in the requesting employee's chain of command.  EEO recommendations for COVID protocol deviations were subsequently subjected to an additional level of review by an attorney from the FBI's Office of General Counsel ("OGC"), which made its own recommendation about the accommodation request.  Then, somebody from outside of the EEO signed off on a final decision based on the EEO and OGC recommendations.  For COVID-related requests, FBI senior leadership determined this official would be a DAD or Assistant Director in the HRD.

151.    To Evans's knowledge, he approved every single request for an exemption to the vaccination requirement that EEO presented to him during his time as a signing authority.  Further, he has no recollection of ever disagreeing with EEO's recommendation to approve or disapprove

an accommodation request.  In other words, far from displaying a "lack of reasonableness and overzealousness," his role was essentially that of a mid-level manager who, to the best of his memory, always implemented the recommendation generated from FBI EEO's own independent review.

152.    Evans eventually moved on from HRD and became the SAC of the FBI's Las Vegas Field Office in 2022.  Unbeknownst to him at the time, a former FBI Special Agent who had been involuntarily discharged had been regularly posting about Evans on his social media pages and podcast.    Shortly after January 2024, Evans learned that this ex-agent had been airing his grievances on social media against Evans and other FBI leaders since at least 2022 and had developed a close relationship with Patel.

153.    Since the inauguration, this ex-agent has claimed that he had advised Patel prior to his confirmation to fire Evans as soon as he was confirmed and that Patel had agreed.  For example, the ex-agent posted a screenshot that purports to show a text message between himself and then-nominee Patel where the ex-agent stated, "THIS guy is the dude in charge of HR who PERSONALLY denied my request to not take a Covid test every 2 days in order to keep my job. And removed me. Good morning."  According to the posted communication, a contact named "Kash" replied, "He's fucked."[8]

154.    As explained above, the "SAC of Las Vegas" appeared on a list of individuals to be terminated that Bove had shared with Kissane and Driscoll on January 28, 2025.  At the time, Bove did not appear to know the name of the SAC of Las Vegas, only that whoever held that position was on a list to be terminated for failing to be sufficiently loyal to the President's agenda.

---

[8] https://x.com/KyleSeraphin/status/1955645066040721776 [https://perma.cc/WG3V-5JL3]

155.    Kissane called Evans on January 30, 2025 and advised that DOJ planned to terminate his FBI employment if he did not retire by the weekend.  Evans responded that he was ineligible to retire and Kissane subsequently advised Evans the FBI would place him on administrative leave for an undefined period of time.  Shortly after that discussion, the Assistant Director at HRD emailed Evans to confirm he was being placed on administrative leave and should not carry out agent functions, but that the action was not punitive.  Being unsure of what the ultimate outcome might be, Evans emailed the Las Vegas office to inform them of the developments—namely, that he had received notification he was being fired and had been given no rationale for the decision, which had come as a shock—and to encourage them to stay focused on the mission in the event of his termination.

156.    DOJ leadership ultimately decided not to fire him.  After taking a week of administrative leave, FBI leadership directed Evans to return to work.

157.    Upon his return, Evans continued to fulfill the role of SAC Las Vegas and led the office through, among other things, the successful investigation and ultimate arrest of an individual alleged to be responsible for firebombing at a Tesla business in March 2025.  Indeed, he is recognized in DOJ's own press release covering the arrest for his contributions to the case, alongside Bondi and Patel.[9]

158.    Evans remained concerned that DOJ or FBI leadership might attempt to fire him again, based on false allegations of misconduct surrounding COVID protocols.  On multiple occasions in February and March 2025, Evans asked FBI Associate Deputy Director Will Rivers, FBI Operations Director Michael Glasheen, and other senior FBI officials to ensure that Patel and

---

[9] DOJ Press Release, March 27, 2025, "Nevada Resident Arrested and Charged in Connection with Violent Tesla Arson in Las Vegas," https://www.justice.gov/opa/pr/nevada-resident-arrested-and-charged-connection-violent-tesla-arson-las-vegas.

Bongino were briefed on the history and facts of the FBI's enforcement of COVID protocols. Rivers and Glasheen told Evans not to worry about the false allegations because Patel and Bongino had been fully briefed on the background of the former FBI employees making the COVID allegations and, according to Rivers and Glasheen, knew they were not credible.

159.    Around this time, Evans virtually met Patel and Bongino through a series of video teleconference meet-and-greets they were conducting with various SACs.  During these meetings, Patel and Bongino did not bring up COVID-19 protocol or Evans's role at HRD.  Instead, they generally congratulated Evans and others for doing good work and indicated that, as SACs, they should be posting more about their successful investigations and other "FBI wins" on social media.

160.    Following Patel's and Bongino's guidance, in early April, Evans posted on the FBI Las Vegas official social media page a video announcing the arrest of a suspected MS-13 fugitive accused of committing multiple murders.  The official DOJ press release about the arrest includes a quote from Evans.[10]  On or about April 11, 2025, Patel and Bongino reposted the video announcement to their own social media pages, which meant that a video of Evans announcing the arrest was now visible on their social media news feeds.  The video subsequently amassed over 2 million views.  Patel added a comment to his re-post of Evans's video, saying "@FBILasVegas has been a critical part of our work to locate more violent criminals, get them off the street, and make America safer. Well done team."[11]  Bongino's re-post of the video appears to now be deleted.

161.    After seeing Evans appear in the re-posts by FBI leadership, the ex-agent who had been fixated on Evans publicized Patel's re-post and claimed, "[a]fter [Kash Patel] was nominated,

---

[10] DOJ Press Release, April 2, 2025, "High Ranking MS-13 Leader And Fugitive Wanted For Multiple Murders Found And Arrested In Long Island," https://www.justice.gov/usao-nv/pr/high-ranking-ms-13-leader-and-fugitive-wanted-multiple-murders-found-and-arrested-long.

[11] https://x.com/FBIDirectorKash/status/1910681370008981712 [https://perma.cc/29VF-8WZR]

he asked me about people in the FBI who were problems. I said Spencer Evans, the SAC of Las Vegas, was the man who PERSONALLY denied the religious accommodations for Covid 19 shots and testing protocols. Kash said 'Gone.'"[12]  The ex-agent tagged Patel in this post.

162.    Shortly after this, Evans received an email from the Assistant Director of the FBI's Public Affairs Office instructing him to immediately cease all postings to FBI Las Vegas social media sites and go on a "media blackout."  He was further instructed to remove links to a local TV news interview Evans had conducted about cyber scams earlier that week and which FBI Las Vegas had posted to its social media platforms to increase public awareness about cyber-crime. This seemed to contradict Patel's and Bongino's guidance just weeks prior to substantially increase the quantity of social media postings by local FBI field offices.

163.    Glasheen, who had headquarters-level supervisory authority over the Las Vegas Field Office and served as Evans's direct supervisor, privately reassured Evans on April 23, 2025 that Patel thought he was doing excellent work but added that the publicization of his work was creating "political pressure" for the Director.

164.    On May 19, 2025, Glasheen phoned Evans to tell him that the Director was removing him as SAC of Las Vegas.  Glasheen noted that the night prior, Bongino told him Evans "had to go," and that Glasheen had confirmed this with Patel that morning.  Evans inquired if he was being removed for performance or misconduct reasons and was told he was not.

165.    Evans was told he needed to vacate his SAC position by the end of the first week of June and that the FBI would ask him to waive the usual 30-day written notification of transfer for SES members, which he eventually did.  In the interim, the FBI would place Evans on administrative leave for several weeks until he reported to a new assignment.  Evans was told to

---

[12] https://x.com/KyleSeraphin/status/1910682452734992689 [https://perma.cc/L3VJ-8BLV]

pick an unfilled Section Chief or Deputy Assistant Director position.  However, when he inquired about an unfilled Section Chief-level position in Australia, he was told by Rivers his reassignment could not appear to be a reward or to a position viewed as highly coveted.  Evans ultimately was assigned to a Deputy Assistant Director position in Huntsville, Alabama and was placed on nine weeks of administrative leave to cover the period between his removal from Las Vegas and his anticipated report date to Huntsville.  Yet again, he was not fired.

166.    On August 6, 2025, while Evans was packing his truck to leave for his new assignment in Huntsville, Rivers called again.  This time, he said Evans was being fired.  Evans asked whether he was being fired for discipline, performance, or misconduct.  Rivers said no.

167.    In the lead up to August 6, 2025, Evans had spoken with his professional colleagues and friends in the Las Vegas law enforcement community, some of whom knew Patel during his time living in Nevada.  One of these individuals—who was close enough to Patel to have served as a background reference for him—discussed Evans's situation with Patel at some point between May and August.  In this conversation, later relayed to Evans, Patel had confided to this law enforcement professional that the personnel actions directed at Evans were "all DOJ," and "politically driven," and that the matter was out of Patel's hands.

### E.  Brian Driscoll Opposes the Illegal Termination of Christopher Meyer

168.    After leaving his role as Acting Director, Driscoll was ultimately reassigned to be the Assistant Director of the CIRG.  As explained above, CIRG is critical to the country's ability to respond to fast-moving threats across the globe.  CIRG also includes the FBI's aviation units.

169.    On or around August 1, 2025, FBI Supervisory Special Agent Chris Meyer became the subject of intense social media activity.  Specifically, various social media posts claimed

incorrectly that Meyer had been the signatory to the Mar-a-Lago search warrant affidavit and was now Patel's personal pilot.

170.    In fact, Meyer was not the signatory to the Mar-a-Lago search warrant affidavit. He was not the case agent for the investigation concerning President Trump's handling of classified documents, nor did he participate in the search of Mar-a-Lago.

171.    On Friday, August 1, 2025, FBI Deputy Chief of Staff for Policy Jake Hemme called Driscoll to say that "social media" was reporting that a pilot for Patel had been involved in the Mar-a-Lago search.  Hemme asked Driscoll to confirm if this was true and to ask his subordinate units, which included all relevant FBI aviation units.

172.    Driscoll explained that the act of inquiring whether any of the people he supervised had been involved in the Mar-a-Lago search would cause significant disruption, since it would strongly imply that they would face discipline or termination for this case assignment. Nevertheless, at Driscoll's direction, FBI Deputy Assistant Director Steven Palmer pulled all of the agents' personnel details from the FBI's HRD, which included the general dates of service for employees within the CIRG as well as previous office assignments for these employees.  There were only four licensed G550 Gulfstream pilots, including Meyer.

173.    On Saturday, August 2, 2025, the FBI's Associate Deputy Director and Chief Operating Officer Will Rivers called Driscoll to ask him for details about Meyer. Meyer is a military veteran and a qualified pilot.  As part of his duties with the FBI, he flew the FBI's private jet, a Gulfstream G550, which means he served as the FBI Director's pilot while on duty.  Along with those duties, Meyer—and all of the G550 pilots—also flew HRT personnel to overseas missions and other mission-critical assignments.  HRT is also responsible for flying "Foreign Transfer of Custody" missions, which detains and transports terrorists and criminals from overseas

to the United States to face criminal prosecution.  In short, each pilot in CIRG plays an essential role in critical FBI missions.

174.    Rivers wanted to know Meyer's current location and whether he was flying the Director on his current trip.  He also asked Driscoll about Meyer's tenure with the FBI, which was approximately 13 years.  Rivers told Driscoll that Meyer was no longer permitted to fly the Director's plane.

175.    Driscoll responded that he would comply with that directive but that he would not completely halt Meyer's work as a pilot and that Meyer would still fly all his other missions and training profiles.  Moreover, Driscoll also informed Rivers that Meyer was on annual leave with his family during the coming week, until approximately August 8, 2025.  Driscoll also pointed out that prohibiting Meyer from flying Patel would create a significant reduction in pilots and have serious negative impacts on the FBI's ability to support the Director's travel, as well as the ability to accomplish the FBI's critical domestic and overseas missions.

176.    Later that same day, Driscoll received another call from Rivers. Rivers said that he had gotten a call from Bongino who advised that he and Patel were under a lot of pressure from the White House regarding Meyer.  Rivers reported that Bongino said that he and Patel did not want Meyer to return to work after his annual leave, since they would face negative consequences if he did.

177.    Driscoll asked for clarification as to whether that meant someone in the White House, through the FBI Director or Deputy Director, intended to fire Meyer.  Rivers indicated that he believed this to be true.

178.    Driscoll replied that firing Meyer was wrong, illegal, and not for cause, to which Rivers replied that he knew that.  Rivers said he was addressing the legal implications with Patel

and Bongino.  Moreover, as a military veteran, Meyer was entitled to special protection from the Merit System Protection Board.  Driscoll asked Rivers if Meyer's termination was imminent, to which Rivers responded that he had been told that Meyer would be fired by Friday, August 8, 2025.

179.    At this point, Driscoll demanded an opportunity to speak with Patel in person, to which Rivers agreed.  Driscoll scheduled a meeting with Patel for Tuesday, August 5, 2025.

180.    Driscoll later spoke with Meyer over the phone and informed him that he would no longer be allowed to pilot Patel's aircraft.  Driscoll also told Meyer that he would be raising the issue with the Director and would challenge the decision.

181.    On Monday, August 4, 2024, Driscoll received a call from Bongino.  Bongino asked Driscoll if anybody would be able to "find anything" in his emails from the time he (Driscoll) was serving as Acting Director.  Driscoll replied that there would be nothing incriminating to find in his emails during this time and took Bongino's question to mean that somebody besides Bongino and Patel would be searching through his old emails in an attempt to find a basis for firing him. Bongino said that he would attempt to keep Driscoll in place.

182.    On Tuesday, August 5, 2025, at 9:00 a.m., Driscoll again met with Rivers.  This meeting included a status update on Meyer.

183.    At 10:00 a.m. on August 5, 2025, Driscoll met directly with Patel to discuss Meyer. Specifically, Driscoll stated that summarily firing Meyer would be illegal based on his military veteran status and would also violate all established FBI policies for adverse actions against personnel.

184.    Patel responded that Meyer would be fired by Friday, August 8, 2025, and that there was nothing either Patel or Driscoll could say or do that would stop it.  Driscoll pointed out that

Meyer had not committed any misconduct and that being assigned to cases could not be grounds for termination.  Patel said he understood this, but that as Driscoll should know from "sitting in this seat," meaning serving as the Director, that "you can't save everyone."

185.    When Driscoll explained it, Patel acknowledged that the FBI would be sued and would lose in court.  He also acknowledged that he would likely be deposed concerning his knowledge of the reasons for Meyer's termination.  He also acknowledged that the FBI workforce would likely respond negatively to Meyer's termination.

186.    Patel stated that all FBI employees who they identified who had worked on the cases against President Trump would be removed from their jobs, regardless of their retirement eligibility status.  He then stated that Driscoll needed to understand that "the FBI tried to put the President in jail and he hasn't forgotten it."  Patel then stated that his own job depended on the removal of the agents who worked on the cases against the President, regardless of whether the agents chose to work on those cases or not.  Patel acknowledged that this would be in direct violation of internal FBI processes meant to adjudicate adverse actions and prevent retaliation based on case assignments.  He again commented that he knew the nature of the summary firings were likely illegal and that he could be sued and later deposed.

187.    One of the online personalities who had first raised Meyer's identity on social media later claimed in an interview to have provided the information directly to a "Trump administration insider" who was "in the president's orbit."[13]

---

[13] Daniel Klaidman, CBS News, August 20, 2025, *Politics may have spurred August purse of 5 veteran FBI agents*, https://www.cbsnews.com/news/politics-may-have-spurred-august-purge-of-5-veteran-fbi-agents/.

### F.  The Firing of Brian J. Driscoll, Jr.

188.     On August 8, 2025, a subordinate within CIRG received a one-page letter addressed

from Patel to Driscoll (the "Driscoll Termination Letter") in his email inbox with instructions to

print it and hand-deliver it to Driscoll.  The letter was written on letterhead for the United States

Department of Justice, Federal Bureau of Investigation, "Office of the Director."

189.     The Driscoll Termination Letter reads as follows:

This document provides official notice that you are being summarily dismissed from
your position at the Federal Bureau of Investigation, and removed from the federal
service, under my authority as FBI Director, effective immediately.

You have failed to execute and perform requested tasks and issued communications to
the FBI workforce that undermined the leadership of the Department of Justice. These
communications advocated for insubordination within the Bureau and weakened
workforce morale. In addition, you failed to timely respond to unapproved disclosure
to the media of law enforcement sensitive information.

Pursuant to Article II of the United States Constitution and the laws of the United
States, your employment with the Federal Bureau of Investigation is hereby
terminated.

If applicable, you may have a right to file an appeal of this removal with the U.S. Merit
Systems Protection Board (MSPB) within 30 days of the effective date of the removal
action. For more information on how to file an appeal with the MSPB, please visit
www.mspb.gov.

190.     The Driscoll Termination Letter was signed by Patel and dated August 8, 2025.

191.     At the time of his firing, Driscoll had amassed 20 years' worth of federal service

but had not yet reached the age of 50 and thus could not retire.  He was summarily fired and,

according to the letter, "removed from the federal service."

192.     As of the date of this filing, Driscoll has not been provided with an SF-50.  The SF-

50 is a government form titled "Notification of Personnel Action" which is provided to former

employees upon termination.  The "Nature of Action" on an SF-50 would typically signify the

removal of an employee and is completed by the employer.  That section has a corresponding

section, "Legal Authority" which is also intended to be completed by the employer.  As of the date of this filing, individuals within FBI's HRD are reportedly unsure what to enter under "Legal Authority" and have thus not yet completed the form or issued it to Driscoll.

193.    After receiving the letter, Driscoll turned in his badge and firearm, completed various administrative paperwork, and left the FBI.

### G.  *The Firing of Steven J. Jensen*

194.    Throughout the week of August 4, Bongino still publicly supported Jensen.  On August 6, 2025, just two days before Jensen's unlawful firing, Bongino reposted a public statement by Jensen and the WFO on his official FBI account, extolling the FBI's arrest of an active duty military servicemember charged with espionage and export violations on behalf of the Russian government.  A screenshot of that post is below:



195.    This post has since been deleted from Bongino's social media feed.

196.    That same day, Rivers contacted Jensen.  Rivers told Jensen that "trouble was coming" his way.  Rivers said that it was "really bad," that people would lose their jobs that Friday, and that Jensen was among that group.  Rivers attempted to convince Jensen to resign before Friday.  Jensen refused.

197.    On Thursday, having been told that he would be fired the next day, Jensen held a virtual town hall with WFO.  He attempted to answer questions and bolster morale by emphasizing the strong leaders that remain in place.  He spent the rest of the day attempting to make transition preparations.

198.    On August 8, 2025, one of Jensen's subordinate SACs received a letter via email with instructions to print it and hand it to Jensen.  The one-page letter was addressed from Patel to Jensen (the "Jensen Termination Letter").  It was written on letterhead for the United States Department of Justice, Federal Bureau of Investigation, "Office of the Director."

199.    The Jensen Termination Letter reads as follows:

This document provides official notice that you are being summarily dismissed from your position at the Federal Bureau of Investigation, and removed from the federal service, under my authority as FBI Director, effective immediately.

You failed to execute and perform requested tasks, resulting in an unreasonable delay in the execution of FBI priorities.

Pursuant to Article II of the United States Constitution and the laws of the United States, your employment with the Federal Bureau of Investigation is hereby terminated.

If applicable, you may have a right to file an appeal of this removal with the U.S. Merit Systems Protection Board (MSPB) within 30 days of the effective date of the removal action. For more information on how to file an appeal with the MSPB, please visit www.mspb.gov.

200.    The Jensen Termination Letter was signed by Patel and dated August 8, 2025. Neither Patel nor Bongino ever interacted directly with Jensen to discuss his firing.  Jensen met

with his Chief Security Office so that he could be "read out" of various security clearance programs and left his office.

201.    At the time of his firing, Jensen had amassed almost 20 years' worth of federal service and might soon have reached eligibility to retire.  Instead, he was summarily fired and, according to the letter, "removed from the federal service."

202.    As of the date of this filing, Jensen has not been provided with an SF-50.  The SF-50 is a government form titled "Notification of Personnel Action" which is provided to former employees upon termination.  The "Nature of Action" on an SF-50 would typically signify the removal of an employee and is completed by the employer.  That section has a corresponding section, "Legal Authority" which is also intended to be completed by the employer.  As of the date of this filing, individuals within FBI's HRD are reportedly unsure what to enter under "Legal Authority" and have thus not yet completed the form or issued it to Jensen.

### H.  The Firing of Spencer L. Evans

203.    On August 6, 2025, Rivers called Evans and informed him that he was being fired. During their brief discussion, Evans asked whether he was being fired for discipline, performance, or misconduct.  Rivers said no.

204.    On August 8, 2025, Evans received a call from one of his subordinates, an ASAC of the Las Vegas Field Office.  The ASAC had received a letter addressed from Patel to Evans (the "Evans Termination Letter") in his email with instructions to print the letter out and hand-deliver it to Evans.

205.    The letter was written on letterhead for the United States Department of Justice, Federal Bureau of Investigation, "Office of the Director."  The Evans Termination Letter reads as follows:

This document provides official notice that you are being summarily dismissed from your position at the Federal Bureau of Investigation, and removed from the federal service, under my authority as FBI Director, effective immediately.

You demonstrated a lack of reasonableness and overzealousness in the implementation of COVID-19 protocols and policies.

Pursuant to Article II of the United States Constitution and the laws of the United States, your employment with the Federal Bureau of Investigation is hereby terminated.

If applicable, you may have a right to file an appeal of this removal with the U.S. Merit Systems Protection Board (MSPB) within 30 days of the effective date of the removal action. For more information on how to file an appeal with the MSPB, please visit www.mspb.gov.

206.    The Evans Termination Letter was signed by Patel and dated August 8, 2025.

207.    At the time of his firing, Evans had amassed 20 years' worth of federal service but had not yet reached the age of 50 and thus could not retire.  However, he would have been eligible for early retirement.  This was never offered to him.  Instead, he was summarily fired and, according to the letter, "removed from the federal service."

208.    As of the date of this filing, Evans has not been provided with an SF-50.  The SF-50 is a government form titled "Notification of Personnel Action" which is provided to former employees upon termination.  The "Nature of Action" on an SF-50 would typically signify the removal of an employee and is completed by the employer.  That section has a corresponding section, "Legal Authority" which is also intended to be completed by the employer.  As of the date of this filing, individuals within FBI's HRD are reportedly unsure what to enter under "Legal Authority" and have thus not yet completed the form or issued it to Evans.

### I.  *Patel's Post-Termination Statements*

209.    As detailed above, on August 8, 2025, Patel fired Driscoll, Jensen, and Evans by sending letters to their subordinates.  Patel also fired Giardina and Meyer that same day, also

through letter correspondence.

210.    The firings were covered extensively in the news media.  Less than two weeks after the firings, on August 20, 2025, Patel sat for an interview with Larry Kudlow of Fox Business. The interview remains available on Fox Business's website.[14]

211.    Throughout the interview, Patel made several references to the Mar-a-Lago search warrant execution being the result of "weaponization and politicalization by the FBI and the DOJ." He claimed that his actions as FBI Director were "ridding this place of its former leadership structure that did that weaponization."

212.    In an exchange with Kudlow about whether "old leaders" who worked prior criminal investigations into President Trump had been dismissed, Patel stated the following:

> **Every single person** that has been found to have weaponized or participated in that process, has been removed from leadership positions, and if and when we find any others that are involved in this, as you know this is a 37,000-person agency, **we are going to take swift action just like we have**.

(Emphases added).[15]

213.    The only publicly known firings within the FBI that occurred between August 8, 2025 and August 20, 2025, were the unlawful terminations of Driscoll, Jensen, Evans, Giardina, and Meyer.

## V.     RELEVANT PROTECTIONS FOR THE FBI'S SENIOR EXECUTIVE SERVICE

214.    The Civil Service Reform Act of 1978 ("CSRA") is the primary framework through which most federal employees can seek review of personnel action taken against them.  This includes members of the SES, which was designed to be a senior corps of civil service executives, selected for their leadership qualifications, who serve as the link between political appointees and

---

[14] Fox Business, available at https://www.foxbusiness.com/video/6377153656112.
[15] *Id*. beginning at approximately 8:30.

the rest of the federal workforce.  5 U.S.C. § 3131 *et seq.*

215.    But the CSRA expressly excludes FBI employees from most of its provisions, including the right to appeal removals or other adverse actions to the Merit Systems Protection Board ("MSPB"), except where the employee is a preference-eligible veteran.  5 U.S.C. § 7511(b)(8).

216.    To address the gap for FBI senior leadership, Congress enacted a separate scheme, codified at 5 U.S.C. § 3151, authorizing the Attorney General to create a Senior Executive Service specific to the FBI.  Importantly, Congress required that the regulations establishing the FBI SES "shall provide for removal or suspension consistent with subsections (a), (b), and (c) of section 7543."  5 U.S.C. § 3151(a)(5)(D).

217.    Section 7543, in turn, sets out a "for cause" standard: a senior executive may be removed only for "misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function."  5 U.S.C. § 7543(a).  The statute also mandates procedural protections, including written notice of at least 30 days (subject to a shortened seven-day period if there is reasonable cause to believe the executive has committed a crime), the right to respond orally and in writing and to "furnish affidavits and other evidence in support of the answer" after being provided at least seven days to prepare the same, the right to representation by an attorney or other representative, and a written decision with the specific reasons for the final action.  5 U.S.C. § 7543(b).

218.    Read together, § 3151 and § 7543 ensure that FBI SES members are not "at will" employees.  They may not be terminated at the discretion of agency leadership but only for cause, and then only in accordance with statutory procedures. Courts have recognized that these provisions create a protected property interest in continued SES employment at the FBI, meaning

that senior executives are entitled to constitutional due process protections if removal or suspension is sought.

219.    In relevant part, the FBI SES Policy states an intent to "protect senior executives from arbitrary or capricious actions" and "provide for an executive system which is guided by the public interest and free from improper political interference."

220.    Under the FBI SES Policy, different categories of SES members exist.  A "key executive" is a term used for individuals who occupy "the positions of Executive Assistant Director, Assistant Director, Assistant Director in Charge, or General Counsel," and "positions which report to the Director."  As the Assistant Director of CIRG, Driscoll was a key executive. As Assistant Director in Charge of WFO, Jensen was also a key executive.

221.    All three Plaintiffs had completed their SES probationary periods prior to their summary terminations.  If non-probationary SES are removed from their positions for executive performance issues, they are "guaranteed placement in a GS 15 position."  "GS 15" refers to a specific pay grade for federal employees.

222.    In the context of adverse actions like disciplinary removals and suspensions, FBI SES Policy dutifully echoes 5 U.S.C. § 7543(a), providing that an "[a]ction may be taken against a member of the SES for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function."

223.    The FBI SES policy entitles non-probationary FBI SES members to certain rights in the event of such an action.  For example, when faced with adverse action, they are entitled to receive:

    a.  "At least 30 days advance written notice stating specific reasons for proposed actions," subject to the same crime exception found in § 7543;

b.  "A reasonable time, but not less than seven days, to answer orally and in writing and to furnish affidavits and other documentary evidence in support of the answer";

c.  Representation by an attorney or other representative;

d.  "A written decision of the final action and specific reasons therefor at the earliest practicable date."

224.    The policy also provides that FBI SES will receive a notice of any proposed adverse action that informs them of their right to "review the material that is relied on to support the reasons for the action(s)."

225.    Importantly, the FBI SES Policy delineates different approval authorities for adverse actions against SES members.  It states that "[t]he Director has final approval authority regarding removals and adverse actions for the majority of SES employees, **excepting only those who are key executives for which final approval authority resides with the Deputy Attorney General.**"  (Emphasis added.)

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF THE FIFTH AMENDMENT
### (SUBSTANTIVE AND PROCEDURAL DUE PROCESS)
### (Against All Defendants)

226.    The Paragraphs above are incorporated and realleged as if fully set forth herein.

227.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law."  Plaintiffs each have property and liberty interests protected by the Due Process Clause.

228.    As members of the FBI's SES, Plaintiffs have property interests in their continued employment with the FBI, including, but not limited to, their salary, health insurance, retirement benefits, and other benefits.  Defendants deprived Plaintiffs of their property interests by

59

terminating Plaintiffs' respective employment with the FBI without due process of law and in violation of binding statutory and Fifth Amendment protections.

229.    The Fifth Amendment's protection against deprivation of liberty without due process of law also protects against reputational harm caused by government officials when that harm is accompanied by other harm.  Here, in the course of unlawfully terminating Plaintiffs' respective employment without due process of law, Defendants—primarily through Patel—publicly connected the termination actions to allegations that Plaintiffs had been "weaponizing" the FBI.  This false and defamatory public smear impugned the professional reputation of each Plaintiff, suggesting they were something other than faithful and apolitical law enforcement officials, and has caused not only the loss of Plaintiffs' present government employment but further harmed their future employment prospects.

230.    As members of the FBI SES, Plaintiffs were each entitled by statutes, policy, and the Fifth Amendment to protections against deprivation of their property and liberty interests without the process required by law.  The lack of any due process accorded to Plaintiffs deprived each of them of the ability to challenge the accuracy of any evidence that allegedly serves as the basis for their removal, if any, as well as to protect each of their reputations.

231.    Defendants' actions have prevented each Plaintiff from participating in his chosen profession or line of work.  The circumstances of Plaintiffs' firings also cast an unconstitutional pall over their future professional opportunities.  By falsely signaling that Plaintiffs lacked integrity in the performance of their duties, Defendants intended to and did adversely impact Plaintiffs' reputations and employment opportunities without affording them the process to which they are entitled.  Plaintiffs' termination letters purported to bar them from all future "federal service," effectively communicating to any future employer that Plaintiffs' alleged misconduct had rendered

them unsuitable for any position within the federal government.

232.    As a result, Defendants have effectively stigmatized Plaintiffs' reputations and imparted a "status change" upon them that has implicated their liberty interests.

233.    As Plaintiffs were never provided any to respond to the termination and removal actions taken by Defendants, Plaintiffs are entitled to, among other remedies, a name-clearing hearing regarding the false public statements regarding their actions and the basis for their respective removals.

234.    Plaintiffs have each suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities.  Defendants' actions to terminate Plaintiffs without due process unlawfully deprived them of their property and liberty interests.

## SECOND CAUSE OF ACTION
### VIOLATION OF THE FIRST AMENDMENT
### (RETALIATION FOR PERCIEVED POLITICAL AFFILIATION)
### (Against All Defendants)

235.    Paragraphs 1-225 are incorporated and realleged as if fully set forth herein.

236.    The First Amendment to the U.S. Constitution guarantees all citizens "the freedom of speech" to include expression and association.  It forbids government officials to fire government employees simply for not being supportive of a political ideology, party, or agenda.  These protections apply even when the government incorrectly perceives a citizen's political affiliation.

237.    Defendants' actions, as set forth above, constitute improper acts of political retribution, in violation of the First Amendment to the United States Constitution.  Plaintiffs' terminations were unlawful, in part, because they were based on an incorrect perception that Plaintiffs' involvement in legitimate law enforcement activities was born of political motives and constituted acts of political disloyalty to President Trump.

238.    As set forth above, Plaintiffs had tactical, operational, and supervisory duties within the FBI.  Those duties and their oath to the Constitution required them to participate in a variety of law enforcement investigations, including those concerning (1) the January 6, 2021 attack on the United States Capitol; (2) President Trump's alleged retention of classified documents; and (3) foreign interference in American elections.

239.    Plaintiffs' duties and their oath to the Constitution also required them to participate in administrative activities within the FBI, including, but not limited to, complying with statutes, regulations, and policies governing the FBI, including those policies enacted during the COVID-19 pandemic, and maintaining the integrity of ongoing FBI investigations and operations. Plaintiffs fulfilled these duties with professionalism, competence, integrity, and free from political considerations of any kind.

240.    As set forth above, Defendants terminated Plaintiffs because of Defendants' perception that their apolitical performance of their duties, as described herein, ran afoul of the political and personal loyalty that Defendants required.

241.    Partisan affiliation and political support for the Defendants are not legal or appropriate requirements for the effective performance of Plaintiffs' respective roles within the FBI.

242.    Defendants' unconstitutional actions harmed Plaintiffs by infringing upon the exercise of their constitutional rights, damaging their reputations, depriving them of their rightful status as FBI employees in good standing, eliminating their primary source of income, depriving them of health insurance, and reducing their retirement benefits.

**THIRD CAUSE OF ACTION**
**LEGAL NULLITY**
**(Against All Defendants)**

243.    Paragraphs 1-225 are incorporated and realleged as if fully set forth herein.

244.    Defendant Patel's termination of Plaintiffs Driscoll and Jensen was not a valid termination action.

245.    As described above, Defendants afforded Plaintiffs none of the required due process statutorily mandated in the event of an adverse action brought against a member of the FBI SES, according to the FBI SES Policy promulgated pursuant to 5 U.S.C. § 3151 and the mandatory removal protections required by 5 U.S.C. § 7543(a)-(c).  This alone makes the actions void and null.

246.    Patel's letters to each Plaintiff were issued "under [Patel's] authority as the FBI Director."  The letters were published on FBI letterhead belonging to the "Office of the Director."  The letters notify Plaintiffs that they are being "summarily dismissed."

247.    In fact, for both Driscoll and Jensen, as an Assistant Director and an Assistant Director in Charge, they were considered "key executives" as that term is defined in the FBI SES Policy.  As that policy clearly states, "The Director has final approval authority regarding removals and adverse actions for the majority of SES employees, excepting only those who are key executives for which final approval authority resides with the Deputy Attorney General."  Therefore, only the Deputy Attorney General had authority to dismiss Driscoll and Jensen, per FBI procedure, and only with due process.  As Patel does not serve as the Deputy Attorney General, he never had authority to remove Driscoll and Jensen from their employment with the FBI.

248.    Patel also stated in the termination letters that he is dismissing Plaintiffs "[p]ursuant to Article II of the Constitution and the laws of the United States."  Here, too, he lacks authority

63

and the action is a nullity.  Article II of the Constitution and the laws of the United States do not

vest any such authority with the Director of the FBI.  Article II provides authority for the President,

and the President alone, to appoint principal officers, concomitant with the power to remove them

"at will."  None of Plaintiffs are principal officers and, more importantly, the FBI Director is not

the President.  Rather, under Article II, Congress has the power to regulate the appointment and

removal of inferior officers and federal employees.  Here, they have done so through Federal law.

Plaintiffs are not "at will" employees and as explained herein, Congress expressly provided for

their removals to be accompanied by due process.

**FOURTH CAUSE OF ACTION**
***ULTRA VIRES* ACTION IN VIOLATION**
**OF CONSTITUTIONAL AUTHORITY**
**(Against Defendants Patel and FBI)**

249.    Paragraphs 1-225 are incorporated and realleged as if fully set forth herein.

250.    Patel purported to terminate each of the Plaintiffs pursuant to his asserted "authority

as the FBI Director" and under "Article II of the United States Constitution and the laws of the

United States."  The letters of termination were signed by Defendant Patel on letterhead sent from

the "Office of the Director."

251.    As described above, pursuant to federal law and operative FBI policy, Patel had no

authority to terminate Driscoll and Jensen from federal service because they were considered "key

executives" of the FBI's SES.  Federal law and operative FBI policy exclusively reserve authority

for such terminations to the Deputy Attorney General.  Further, Patel had no authority to summarily

fire any of the Plaintiffs without affording them due process pursuant to FBI SES policy and its

corresponding statutory authority.

252.    Patel also lacks any ability to invoke "Article II" as a basis for summary

termination.  Article II provides absolutely no removal authority to the Director of the FBI.

Defendants' reliance on Article II of the United States Constitution to support Plaintiffs' terminations is invalid.  Such purported authority violates Article I, Section 8, of the U.S. Constitution, which grants Congress the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof," and Article II, Section 2, which states that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."  Defendants' removal of Plaintiffs under a purported Article II authority violates authorities vested in Congress by Article I of the Constitution, which includes the powers to place limitations on the removals of inferior Officers and federal employees like members of the FBI SES.

253.    Defendants had no lawful authority to terminate Plaintiffs from federal service without adhering to the statutory and constitutional protections afforded to each.  Their terminations were therefore *ultra vires* and without legal force or effect.

254.    Plaintiffs have each suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities. As such, they are each entitled to reinstatement, an award of backpay, and any other available damages.

### FIFTH CAUSE OF ACTION
### DECLARATORY JUDGMENT – 28 U.S.C. §§ 2201 and 2202
### (Against All Defendants)

255.    Paragraphs 1-225 are incorporated and realleged as if fully set forth herein.

256.    Plaintiffs are each entitled to declaratory relief on the basis of all claims identified. There is a substantial and ongoing controversy between Plaintiffs and Defendants, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to

establish that the Defendants do not have authority to remove Plaintiffs without affording each of them all rights and protections set forth by applicable statutes and regulations, the United States Constitution, and the First and Fifth Amendments thereto.

257.    Plaintiffs are further entitled to declaratory relief to establish that their terminations were a legal nullity.

258.    Plaintiffs have each suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities

**SIXTH CAUSE OF ACTION**
**WRIT OF MANDAMUS**
**(Against All Defendants)**

259.    Paragraphs 1-225 are incorporated and realleged as if fully set forth herein.

260.    In the alternative, Plaintiffs are entitled to a writ of mandamus commanding Defendants to return them to their respective offices and not remove them from federal service without following lawful procedures.  Defendants have a legal duty not to terminate Plaintiffs unless and until Plaintiffs have been afforded the protections prescribed by law and, absent this Court granting relief, there is no other adequate means of redress.

261.    The provisions of 28 U.S.C. § 1361 create jurisdiction in cases seeking a writ of mandamus against federal officers, employees, and agencies, and they provide for an independent cause of action in the absence of any other available remedies.  To the extent relief is unavailable under the Constitution, common law equity, or any other law to enjoin unlawful government action, mandamus lies here.

**VII.    JURY DEMAND**

262.    Plaintiffs demand a jury trial on all triable issues.

## VIII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs Brian J. Driscoll, Jr., Steven J. Jensen, and Spencer L. Evans request that the Court award them the following relief:

(1) A declaration that Defendants' Terminations of Plaintiffs was a legal nullity;

(2) A declaration that Defendants' actions violated Plaintiffs' Fifth Amendment due process rights and order appropriate relief, to include, but not limited to, a name-clearing hearing;

(3) A declaration that Defendants' actions violated Plaintiffs' First Amendment rights and order appropriate relief;

(4) An order requiring Defendants to immediately reinstate Plaintiffs and enjoin Defendants from taking any further adverse personnel action against each of them without providing appropriate procedural and substantive due process as required by law and the Fifth Amendment;

(5) An award of backpay and other monetary and administrative relief as appropriate;

(6) An award of the costs of this action and reasonable attorney fees under the Equal Access to Justice Act or any other applicable law; and

(7) Grant such other relief as the Court may deem just and proper.

Date:    September 10, 2025                    Respectfully Submitted,

_/s/ Margaret M. Donovan_
Margaret M. Donovan (DDC No. CT0026)
Christopher M. Mattei (_pro hac vice_ forthcoming)
KOSKOFF KOSKOFF & BIEDER, PC
350 Fairfield Ave., Suite 501
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
mdonovan@koskoff.com
cmattei@koskoff.com
_Attorneys for Plaintiffs Brian J. Driscoll, Jr. and Steven J. Jensen_

_/s/ Abbe David Lowell_
Abbe David Lowell (DDC No. 358651)
Brenna L. Frey (DDC No. 1033878)
David A. Kolansky (DDC No. 7680722)
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowellandassociates.com
BFrey@lowellandassociates.com
DKolansky@lowellandassociates.com
_Attorneys for Plaintiffs Brian J. Driscoll, Jr. and_
_Steven J. Jensen_


_/s/ Mark S. Zaid_
Mark S. Zaid (DDC No. 440532)
Bradley P. Moss (DDC No. 97905)
LAW OFFICES OF MARK S. ZAID, P.C.
1250 Connecticut Avenue, N.W., Suite 700
Washington, DC 20036
T: (202) 498-0011
Mark@MarkZaid.com
Brad@MarkZaid.com
_Attorneys for Plaintiff Spencer L. Evans_


_/s/ Heidi R. Burakiewicz_
Heidi R. Burakiewicz (No. 473973)
BURAKIEWICZ & DEPRIEST, PLLC
1015 15th Street, N.W., Suite 600
Washington, D.C. 20005
202-856-7500
hburakiewicz@bdlawdc.com
_Attorney for Plaintiff Spencer L. Evans_