## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BRIAN J. DRISCOLL, JR., *et al.*,<br>        *Plaintiffs*,<br><br>*v.*<br><br>KASHYAP P. PATEL, *et al.*,<br>        *Defendants*. | Civil Action No. 1:25-cv-03109 (JMC) |

### BRIEF OF LAWYERS DEFENDING AMERICAN DEMOCRACY AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS BRIAN J. DRISCOLL, JR., STEVEN J. JENSEN, AND SPENCER L. EVAN'S MOTION FOR SUMMARY JUDGMENT

Lawyers Defending American Democracy,
*by its counsel*:

  /s/ Aderson Bellegarde François
Aderson Bellegarde François
  (D.C. Bar No. 498544)

GEORGETOWN UNIVERSITY LAW CENTER
  CIVIL RIGHTS CLINIC
600 New Jersey Avenue NW, Suite 352
Washington, D.C. 20001

Tel.:    (202) 662-9546
Email:  Aderson.Francois@georgetown.edu

Dated:        February 16, 2026        *Counsel for Amicus Curiae*

1

**TABLE OF CONTENTS**

**TABLE OF CONTENTS** ...................................................................................................... i

**TABLE OF AUTHORITIES** ........................................................................................... ii

**RULE 26.1 CORPORATE DISCLOSURE STATEMENT** ...................................... vii

**IDENTITY AND INTEREST OF AMICUS** ............................................................ viii

**SUMMARY OF ARGUMENT** ..................................................................................... 1

**ARGUMENT** .................................................................................................................... 3

I.    Title V and Longstanding Executive Branch Policy Operationalize the Founding Principle that Law Enforcement Must be Apolitical .................................................. 3

    A.    *Removal Protections for SES Personnel* ........................................................... 3

    B.    *FBI-SES Specific Interest in Nonpartisanship* ................................................ 4

    C.    *Purpose and Function of FBI SES Positions and Protections* ........................ 6

II.    The Constitution and Founding Documents Establish Apolitical Law Enforcement as a Core Check Against Tyranny ............................................................................... 7

    A.    *Impartial Law Enforcement: A Founding Principle* ......................................... 9

    B.    *The Constitution's Treatment of the Military Confirms a Tradition of Checked, Apolitical Law Enforcement* ................................................................................ 12

III.    Laws and Policies from our Founding Era to Present Day Have Consistently Reinforced the Principle of Nonpartisan Law Enforcement ....................................... 14

    A.    *Founding Era Laws and Early Institutional Development* .............................. 15

    B.    *Post-Civil War Disorder and the Strengthening of Institutional Protections* .............. 18

    C.    *Early Twentieth-Century Efforts to Shield Federal Law Enforcement from Politics* ... 20

    D.    *Late 20th and Early 21st-Century Reaffirmations of Founding Principles* ................. 27

IV.    Conclusion: Upholding Statutory Checks Against Politicized Law Enforcement is Essential to Protect Our Nation from Executive Tyranny ....................................... 30

i

**CERTIFICATE OF SERVICE** ................................................................................................ **a**

## TABLE OF AUTHORITIES

**CASES**

*Arnett v. Kennedy*, 416 U.S. 134 (1974) ................................................................. 21

*Berger v. United States*, 295 U.S. 78 (1935) ..................................................... 17, 29

*Boumediene v. Bush*, 553 U.S. 723 (2008) .............................................................. 13

*Bush v. Lucas*, 462 U.S. 367 (1983) ........................................................................ 21

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010)....................... 7

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) .............................................................. 13

*Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) ........................................................ 13

*Kendall v. United States*, 37 U.S. 524 (1838)........................................................ 7, 11

*Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748 (2025).......................................... 9

*Little v. Barreme*, 6 U.S. 170, 179 (1804)................................................................ 11

*Marbury v. Madison*, 5 U.S. 137 (1803)..................................................................... 8

*Taylor v. Trump*, No. 25-3742 (TJK), 2026 U.S. Dist. LEXIS 28773 (D.D.C. Feb. 11, 2026) ................................................................................................................ 24

*U. S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548 (1973).................... 22

*U.S. v. Gore*, 60 M.J. 178 (C.A.A.F. 2004) ............................................................... 24

*United Pub. Workers v. Mitchell*, 330 U.S. 75, 99 (1947)......................................... 22

*United States v. Armstrong*, 517 U.S. 456 (1996) .................................................... 12

*United States v. Fausto*, 484 U.S. 439 (1988) .......................................................... 26

*United States v. Nixon*, 418 U.S. 683 (1974)............................................................ 25

*United States v.* Perkins, 116 U.S. 483 (1886)........................................................... 9

*United States v. Thomas*, 22 M.J. 388 (C.M.A. 1986)..........................................................24

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ...............................................................12

*Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987)..............................17

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ...........................................11

**STATUTES**

10 U.S.C. § 837.....................................................................................................23

15 U.S.C. §§ 1211–1219........................................................................................26

28 U.S.C. §§ 509–510...........................................................................................29

28 U.S.C. §§ 515–519...........................................................................................29

5 U.S.C. § 2301....................................................................................................26

5 U.S.C. § 2302............................................................................................26, 28

5 U.S.C. § 3131..................................................................................................3, 7

5 U.S.C. § 3151.....................................................................................................6

5 U.S.C. § 7543(a) ................................................................................................3

5 U.S.C. §§ 1101–1104.........................................................................................26

5 U.S.C. §§ 1201–1206.........................................................................................26

5 U.S.C. §§ 3393–3395...........................................................................................3

Act of Mar. 2, 1831, ch. 99, § 1-2, 4 Stat. 487 ...................................................18

An Act to Establish the Department of Justice, ch. 150, 16 Stat. 162 (1870) ........................19

Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111 ...............................26

Ethics in Government Act of 1978, Pub. L. No. 95-521, 92 Stat. 1824 ...............................25

Federal Vacancies Reform Act of 1998, Pub. L. No. 105-277, div. C, tit. I, 112 Stat. 2681-611 .....................................................................................................29

FISA Amendments Act of 2008, Pub. L. No. 110-261, 122 Stat. 2436 ...............................27

Foreign Intelligence Surveillance Act of 1978, Pub. L. No. 95-511, 92 Stat. 1783 .............. 25

Hatch Act Reform Amendments of 1993, Pub. L. No. 103-94, § 4, 107 Stat. 1001, 1004
    (codified as amended at 5 U.S.C. §§ 7321–7326) ......................................................... 23

Hatch Act, ch. 410, 53 Stat. 1147 (1939)................................................................................ 22

Inspector General Act Amendments of 1988, Pub. L. No. 100-504, 102 Stat. 2515 ............. 27

Inspector General Act of 1978, Pub. L. No. 95-452, 92 Stat. 1101 ....................................... 25

Inspector General Reform Act of 2008, Pub. L. No. 110-409, 122 Stat. 4302....................... 27

Judiciary Act of 1789, ch. 20, § 27, 1 Stat. 73 ...................................................................... 13

Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73 ...................................................................... 17

Lloyd–La Follette Act, ch. 389, 37 Stat. 555 (1912) (codified at 5 U.S.C. § 7211).......... 20, 21

Oath Act of 1789, ch. 1, 1 Stat. 23 (1789) ............................................................................. 16

Pendleton Civil Service Reform Act, Act of Jan. 16, 1883, ch. 27, 22 Stat. 403 ................... 20

## OTHER

134 Cong. Rec. 10010–11 (1988)............................................................................................. 4

3 Jonathan Elliot, *Debates in the Several State Conventions on the Adoption of the
    Federal Constitution* 59–60 (2d ed. 1888)......................................................................... 10

Akhil Reed Amar, *America's Constitution: A Biography* (2005).......................................... 16

Alpheus Thomas Mason, *Harlan Fiske Stone: Pillar of the Law* (1956) .............................. 22

Andrew Kent et al., *Faithful Execution and Article II,* 132 Har. L. Rev. 2111 (2019) .... 11, 16

Ari Hoogenboom, *Thomas A. Jenckes and Civil Service Reform*, 47 Miss. Valley Hist.
    Rev. 636 (1961) ................................................................................................................. 17

Brennan Center for Justice, *Domestic Intelligence: Powers, Risks, and Oversight* (2019).... 27

Cato, *Cato IV*, N.Y. Journal (Nov. 8, 1787) .......................................................................... 10

Cong. Globe, 41st Cong., 2d Sess. (1870) ......................................................................... 18, 19

David P. Currie, *The Constitution in Congress: The Federalist Period, 1789–1801* (1997) . 16

Edward H. Levi, U.S. Dep't of Just., Domestic Security Investigation Guidelines (1976).... 27

FBI and DEA Senior Executive Service and GAO Personnel Amendments Act of 1988,
    Subcomm. on Civ. Serv., Comm. on Post Office and Civ. Serv., 100th Cong. (Apr.
    21, 1988) ............................................................................................................ 4

George Mason, Objections to This Constitution of Government (1787) ................................ 10

Griffin B. Bell, Att'y Gen., Address Before Dep't of Justice Lawyers (Sep. 6, 1978) .......... 28

H. R. Rep. No. 95-1283 (1978)............................................................................................ 25

H.R. Rep. No. 100-608 (1988)............................................................................................ 4, 5

Impeachable Offenses: Early Historical Practice, U.S. Const. Annotated, Legal
    Information Institute ........................................................................................ 18

Jed H. Shugerman, The Creation of the Department of Justice: Professionalization
    Without Civil Rights or Civil Service, 66 Stan. L. Rev. 121 (2014) ................................. 19

Jennifer K. Elsea, Cong. Rsch. Serv., LSB10549, Military Appellate Court: Presidential
    Comments Can Amount to Unlawful Command Influence (2020)................................... 24

John Adams, Thoughts on Government (Apr. 1776), in Papers of John Adams (Robert J.
    Taylor ed., 1979). ............................................................................................ 1

Kenneth D. Ackerman, Dark Horse: The Surprise Election and Political Murder of
    President James A. Garfield (2003)................................................................................. 20

Memorandum from Michael B. Mukasey, Att'y Gen., to Heads of Dep't Components and
    U.S. Att'ys (Dec. 19, 2007) ............................................................................. 28

Memorandum from Pam Bondi, Att'y Gen., to all Department Employees (Feb. 5, 2025)... 28

Nancy V. Baker, History, Norms and Conflicting Loyalties in the Office of Attorney
    General, 72 Mercer L. Rev. 833 (2021) ......................................................................... 21

Records of the Federal Convention of 1787 (Max Farrand ed., 1911) ................................. 10

Remarks on Signing the Hatch Act Reform Amendments of 1993, 3 Pub. Papers 1964–69
    (Oct. 6, 1993) .................................................................................................. 23

S. Rep. No. 105-250 (1998)................................................................................................. 29

S. Rep. No. 94-755 (1976).................................................................................................. 25

S. Rep. No. 95-170 (1977) .......................................................................................... 25

Sam Bieler, *Police Militarization in the USA: The State of the Field,* 39 Policing: An Int'l
    J. of Police Strategies & Mgmt. 586 (2016) ....................................................... 12

*Select Comm. to Study Gov'tal Operations with Respect to Intelligence Activities*, Final
    Report (1976) ..................................................................................................... 22

Statement on Signing S. 2640 into Law (Oct. 13, 1978) ......................................... 26

The Declaration of Independence (U.S. 1776) ........................................................ 10

The Federalist No. 51 (James Madison) .................................................................. 9

The Federalist No. 70 (Alexander Hamilton) .......................................................... 11

The Federalist No. 76 (Alexander Hamilton) .......................................................... 8

U.S. Dep't of Just., Justice Manual ................................................................. 27, 28

Whitney K. Novak, Cong. Rsch. Serv., IF11512, *The Hatch Act: A Primer* (2020) ............. 23

William V. Moore, *COINTELPRO* (EBSCO Knowledge Advantage 2024) ......................... 15

**REGULATIONS**

28 C.F.R. § 0.157 (2025) ............................................................................................ 5

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 8, cl. 18 ...................................................................................... 7

U.S. Const. art. II, § 2, cl. 2 ....................................................................................... 8

U.S. Const. art. II, § 3 ............................................................................................... 11

U.S. Const. art. III, § 1 .............................................................................................. 8

U.S. Const. art. VI, cl. 2 ............................................................................................ 10

U.S. Const. art. VI, cl. 3 ............................................................................................ 16

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* Lawyers Defending American Democracy is a nonpartisan tax-exempt 501(c)(3) corporation. Amicus is not owned by any parent corporation and no publicly held company has 10% or more ownership in LDAD.

## IDENTITY AND INTEREST OF AMICUS

Lawyers Defending American Democracy (LDAD) files this amicus brief in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss.  LDAD is a non-profit, non-partisan organization devoted to encouraging the legal profession to enforce and uphold principles of democracy and the rule of law, consistent with our obligations as lawyers; demanding accountability from lawyers and public officials; and identifying attacks on legal norms and prescribing redress for them.  It has a significant interest in this case because summary termination of plaintiffs in violation of statutory for-cause requirements undermines these principles by concentrating vast power in the executive branch without legal accountability.

**SUMMARY OF ARGUMENT**

We are a nation "of laws, and not of men." John Adams, *Thoughts on Government* (Apr. 1776), in *Papers of John Adams* 86, 89 (Robert J. Taylor ed., 1979). This phrase—set forth by John Adams in 1776 and reaffirmed by Gerald Ford upon assuming the presidency amid the Watergate crisis in 1974—embodies the foundational belief for over two centuries that a just and functional society is governed by the rule of law. This principle informs what it means for enforcement of the law to be impartial and apolitical: that law is enforced according to general principles applicable to all, rather than according to favoritism based on the personal or partisan motives of those in power. The impartial and exact execution of the laws to which Adams and our nation's founders aspired requires an impartial and apolitical law enforcement apparatus. This bedrock principle is woven deeply into the fabric of the American system of government, reflected in numerous provisions in the Constitution and reaffirmed in laws and policies throughout our nation's history, including 5 U.S.C. sections 3151 and 7543 and the Federal Bureau of Investigation Senior Executive Service (FBI SES) policies at issue in this case.

This amicus brief discusses the laws, history, and tradition that underscore the commitment to nonpartisan enforcement of law as a foundational principle of the United States. It also highlights examples of abuses over the years that threatened our ability to fulfill this commitment, but that were contained in part by judicial affirmation of the constitutional system of checks and balances on which plaintiffs in this case rely. This history illustrates both our nation's enduring commitment to impartial enforcement of the law and the persistent threat that those in power will seek to use authority to further their own ends. Impartial law enforcement, therefore, is never attained once and for all but is an achievement that requires ongoing vigilance.

1

The U.S. Constitution, founding documents, federal statutes, and historical precedent all make clear that an apolitical and nonpartisan law enforcement apparatus built on competence and fidelity to the law rather than on favoritism or personal dictates is a necessary precondition to equal justice and a functioning democracy. The Constitution is replete with provisions designed to constrain executive power and ensure apolitical enforcement of the law: oath requirements that bind officers to the Constitution and not to the whims of one person; the requirement that the President "take care that the laws be faithfully executed," with "faithfully" requiring impartial fidelity to law and not to partisan interests; due process and equal protection clauses that require that law be enforced based on principles that apply equally to all persons without favoritism; the authority of Congress, not the President, to establish executive departments and agencies and to grant appointment of inferior officers;[1] and, most broadly, the basic structural feature of separation of powers that infuses the Constitution.

Federal statutes such as the Hatch Act and other civil service laws, along with executive branch policies setting out for-cause protections for FBI SES personnel, operationalize these principles. Such laws—enacted by Congress and signed by the President—show a persistent legislative and executive fidelity to apolitical law enforcement as a check against tyranny and a prerequisite for effective federal authority and enduring public confidence in the rule of law. Historical experience—from rejection of the spoils system to post-Watergate reforms— demonstrates an unbroken, bipartisan and cross-branch recognition that politicized law enforcement threatens our democratic order, and that legislation promoting institutional independence and professional integrity is a legitimate and necessary response to this threat.

---

[1] This brief does not take a position on whether plaintiffs are inferior officers.

2

**ARGUMENT**

**I.     Title V and Longstanding Executive Branch Policy Operationalize the Founding Principle that Law Enforcement Must be Apolitical**

*A.     Removal Protections for SES Personnel*

At the core of Plaintiffs' case are removal protections grounded in Title V of the U.S. Code and executive branch FBI SES policies, two examples of long-standing efforts to ensure impartial and apolitical enforcement of law, values dating back to the beginning of the republic.

Congress established the SES under the Civil Service Reform Act of 1978 (CSRA). An important goal in doing so was to "ensure that the executive management of the government of the United States is responsive to the needs, policies, and goals of the Nation while remaining stable in leadership and . . . provide for an executive system which is guided by the public interest and free from improper political interference." 5 U.S.C. § 3131.[2] SES members serve as the crucial link between political appointees and the permanent civil service, providing continuity, professionalism and adherence to law across administrations.

To preserve those values, Congress afforded SES members limited but meaningful protection from politically motivated removal. Under 5 U.S.C. § 7543(a), SES employees may be removed only for cause—defined as "misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment." Related provisions, including 5 U.S.C. §§ 3393–95, further insulate SES officials from arbitrary removal and partisan pressures, and require that their

---

[2] The SES is designed to attract and retain highly qualified senior executives through performance-based compensation and tenure; hold executives accountable for organizational effectiveness and employee performance; reward exceptional achievement; permit reassignment to meet agency needs; provide protections against arbitrary action and nondisciplinary separation support; maintain a merit-based, lawful, and ethical civil service; ensure efficient and economical government; support program continuity and policy advocacy; and promote the ongoing development and appointment of career senior executives where practicable. 5 U.S.C. § 3131.

removal or discipline follow statutory procedures grounded in cause and merit, not political disagreement. These protections reveal Congress's intent to prevent the politicization of the SES in light of its key role in securing nonpartisan law enforcement.

B.      *FBI-SES Specific Interest in Nonpartisanship*

The CSRA originally excluded the FBI and other intelligence agencies from the the government-wide SES program. H.R. Rep. No. 100-608, at 3 (1988). Congress did this because of the sensitive and confidential nature of law enforcement and intelligence operations and the risks associated with public disclosure of personnel information or Office of Personnel Management oversight, and to safeguard operational flexibility by enabling leadership to make rapid personnel decisions without triggering a lengthy appeals process. *See id.* at 3, 11 (1988); *FBI and DEA Senior Executive Service and GAO Personnel Amendments Act of 1988*, Subcomm. on Civ. Serv., Comm. on Post Office and Civ. Serv., 100th Cong. 2–3 (Apr. 21, 1988) (testimony of John Glover, Exec. Assistant Dir., FBI); 134 Cong. Rec. 10010–11 (1988). Even without congressionally mandated protections, the executive branch had already recognized the importance of such protections to a professional and nonpartisan workforce, and promoted these goals through implementation of an internal DOJ personnel system intended to ensure the same protections for FBI SES employees as other government SES employees. H.R. Rep. No. 100-608, at 2; *see* 134 Cong. Rec. 10010-11 (1988).

In 1988, Congress formalized the protections for the FBI SES previously provided solely through executive branch policy. The decision to extend civil service protections to SES-level FBI officials, while denying those same protections to rank-and-file FBI employees, underscores three related judgments: the paramount importance of competent apolitical leadership and management at the FBI; Congress's recognition that the Bureau's traditionally strict discipline

and chain of command depend upon such competent apolitical leadership; and, as this case illustrates, the exceptional danger that politicization poses to the Bureau's institutional integrity.

When Congress authorized the FBI SES program, along with a program for the SES at the Drug Enforcement Agency (DEA), its goal was to retain and incentivize the agencies' most senior and accomplished career civil service employees by extending them all of the protections afforded to government-wide SES employees, reinforcing the apolitical nature of the agencies. Both agencies have historically been valued as nonpartisan "career services" by Congress. *See* H.R. Rep. No. 100-608, at 4 ("The FBI and DEA have traditionally been career services" where senior managers are "selected from men and women who have worked their way up" and the "lack of political appointees in these agencies has been a major strength.").

Unlike the government-wide SES legislation, which permits a limited number of non-career SES positions, the FBI-DEA SES legislation allows non-career SES appointments only in narrow circumstances involving experts or "especially qualified" career employees from other agencies, underscoring the importance Congress placed on professionalization over politicization of SES in law enforcement. *Id.* at 4 ("[I]t is expected that, with this exception, all other senior executives in the FBI-DEA SES will be long-term career employees of these agencies.").

Congress used the term "career employee" deliberately to exclude political appointees, underscoring its strong interest in maintaining nonpartisanship among the FBI's highest ranking career executives. *Id.* at 6 (directing the Attorney General to issue regulations defining "career employee in civil service" and stating that the term is "meant to exclude political appointees and other employees who have no expectation of continued government employment . . ."); 28 C.F.R. § 0.157 (2025) (excluding positions "where the incumbent is traditionally removed

5

upon a change in Presidential Administration" from career-type permanent positions in the FBI SES).

      C.     *Purpose and Function of FBI SES Positions and Protections*

Within the FBI, SES positions—such as Assistant Directors, Deputy Assistant Directors, and Division Chiefs, including the positions occupied by plaintiffs in this case—are critical to maintain the Bureau's apolitical and professional character. Congress intentionally insulated FBI SES officials from improper political interference through for-cause and due process requirements to prevent retaliation based on political affiliation, coercion or personal animus, while also preserving the professional integrity and independence of the FBI. When functioning properly, the FBI also benefits from senior FBI SES officials who provide stability during transitions between administrations and preserve institutional memory and adherence to established nonpartisan law enforcement principles.

FBI SES policy incorporates the government-wide SES statutory mandates and serves to effectuate the same executive good-government values and purposes. 5 U.S.C. § 3151 (requiring FBI SES regulations to meet the requirements set forth in 5 U.S.C. § 3131, the government-wide SES legislation). Those mandates and their underlying purposes are undermined or violated when FBI SES positions, like those occupied by the plaintiffs in this case, are not protected.

The specific congressional mandates undermined or violated when FBI SES positions are not protected include those designed to: "protect senior executives from arbitrary or capricious actions"; "maintain a merit personnel system free of prohibited personnel practices"; "ensure accountability for honest, economical, and efficient Government"; "ensure compliance with all applicable civil service laws, rules, and regulations, including those related to equal employment

opportunity, political activity, and conflicts of interest"; and "provide for an executive system that is guided by the public interest and free from improper political interference." *Id.*, § 3131.

These laws and policies, including the provision of limited removal protections, did not arise in isolation. They are part of a continuous tradition, spanning more than two centuries, of congressional and executive efforts to ensure that law enforcement remains impartial, professional, and governed by law rather than political loyalty, as envisioned by our founders.

## II.    The Constitution and Founding Documents Establish Apolitical Law Enforcement as a Core Check Against Tyranny

The Constitution and the framers' design make clear that the President was not intended to have plenary authority over the hiring and firing of executive officers. The Necessary and Proper Clause expressly authorizes Congress to enact laws "necessary and proper" to carry into execution not only its own powers, but also "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof," confirming Congress's authority to legislate with respect to executive branch personnel and functions. U.S. CONST. art. I, § 8, cl. 18. From the early republic onward, the Supreme Court has recognized that this authority permits Congress to prescribe duties, channel discretion, and impose statutory limits on executive personnel as a means of ensuring faithful execution of the laws, as long as such legislation does not prevent the President from performing core constitutional functions. *Kendall v. United States*, 37 U.S. 524, 610–13 (1838) (holding that Congress may impose mandatory statutory duties on executive officers); *see Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010) (noting with approval prior cases upholding limited restrictions on the President's removal power for inferior officers).

The Appointments Clause explicitly grants Congress, not the President, authority to vest the appointment of inferior officers, including in entities outside the executive branch: "the

7

Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. CONST. art. II, § 2, cl. 2. This explicit grant of authority to parties outside the executive branch to make appointments within it makes clear that the founders did not view the appointment of executive officers as a conclusive or preclusive executive authority. Through Article III, the Judiciary retains, and has regularly exercised, its authority to interpret and enforce these structural constraints, ensuring that executive action remains within lawful bounds and subject to checks and balances. *See id.*, art. III, § 1; *Marbury v. Madison*, 5 U.S. 137, 177 (1803). These grants of authority are a deliberate structural check on unilateral executive control over inferior personnel as a counterweight to the unfettered monarchical appointments power of the British model that the founders rejected.

The Federalist Papers confirm that this limitation on executive control was intentional and fundamental. *See* THE FEDERALIST No. 76 (Alexander Hamilton). Hamilton emphasized that the Appointments Clause was a safeguard against "the absolute power of appointment" and an essential barrier to favoritism, patronage, and personal loyalty to the President rather than to law. *Id.* He explained that "a man who had himself the sole disposition of offices, would be governed much more by his private inclinations and interests" and that requiring presidential choices to be subject to another body's judgment would prevent the selection of "unfit characters" chosen for "personal attachment," political pliancy, or willingness to act as "obsequious instruments of his pleasure." *Id.* The framers specifically intended the Appointments Clause to "be a considerable and salutary restraint upon the conduct of that magistrate." *Id.* Likewise, in THE FEDERALIST Nos. 67 and 69, Hamilton described the Clause as a key distinction separating the American

8

presidency from monarchy by ensuring that the President lacked plenary authority over executive personnel.

Because Congress may vest the appointment of inferior officers in actors other than the President and even outside the executive branch, it necessarily may condition the removal of those officers so that their service does not depend solely on personal loyalty. The Supreme Court has long recognized that executive removal authority over inferior officers is not inherent or plenary, but instead is subject to certain congressional control. In *United States v. Perkins*, the Court held unequivocally that "when Congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest . . ." explaining that the "constitutional authority in Congress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as Congress may enact in relation to the officers so appointed." 116 U.S. 483, 485 (1886). The Court further emphasized that the "head of a department has no constitutional prerogative of appointment to offices independently of the legislation of Congress, and by such legislation he must be governed not only in making appointments, but in all that is incident thereto," including removal. *Id.* Modern doctrine confirms this settled principle. Where Congress speaks clearly, it may insulate inferior officers from at-will removal without violating Article II. *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 771 (2025).

A.    *Impartial Law Enforcement: A Founding Principle*

Having rebelled against a monarchy that wielded law enforcement authority as an instrument of political dominance, the founders deeply feared the concentration of police or executive power, believing it posed a grave threat to liberty and republican government. Madison warned that unchecked power would inevitably lead to despotism and therefore required a structural system of checks and balances. *See, e.g.,* THE FEDERALIST No. 51 (James Madison) ("Ambition must be

9

made to counteract ambition."). Anti-Federalists such as George Mason and Patrick Henry echoed this concern and stressed the need for strong safeguards against executive overreach. *See, e.g.*, George Mason, *Objections to This Constitution of Government* (1787); 3 Jonathan Elliot, *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 59–60 (2d ed. 1888); Cato, *Cato IV*, N.Y. Journal (Nov. 8, 1787). They argued that, without sufficient checks, the President could become dangerously like a king.

These founding fears of unchecked executive power appear in several of the grievances listed in the Declaration of Independence, which condemned the King's abuse of law enforcement to favor his allies or harm his foes. These include "obstruct[ing] the Administration of Justice," "protecting . . . from punishment" the royal troops," making judges "dependent on his Will alone" for their jobs, trying colonists "for pretended offences," depriving others "of the benefits of Trial by Jury," and keeping "among us, in Times of Peace, Standing Armies *without the consent of our Legislatures*." THE DECLARATION OF INDEPENDENCE (U.S. 1776) (emphasis added).

In response, the founders embedded in the Constitution safeguards to ensure that executive power, particularly coercive enforcement authority, would remain subordinate to law rather than personal will. Article VI establishes the Constitution and federal statutes as the "supreme Law of the Land," binding all federal officials, including those exercising law enforcement authority. U.S. CONST. art. VI, cl. 2. At the Constitutional Convention, delegates consistently defined executive power as the duty to carry laws into effect, not as an open-ended prerogative. *Records of the Federal Convention of 1787* 67 (Max Farrand ed., 1911). James Wilson emphasized that executive powers are fundamentally those of executing the laws rather than exercising broad discretionary prerogative. *Id.* at 65–66. These statements underscore the

10

framers' design: the executive and its law enforcement authorities derive legitimacy from faithful execution of laws enacted by Congress, not from unconstrained personal discretion.

The Supreme Court has long affirmed that executive authority must be exercised pursuant to law, not personal or presidential will. In *Little v. Barreme*, the Court held that executive officers may not rely on presidential instructions that conflict with governing statutes. 6 U.S. 170, 179 (1804) (concluding that a naval officer could be held personally liable for acting under presidential orders inconsistent with congressional authorization). In *Kendall v. United States*, the Court rejected the notion that executive officers may disregard statutory commands, warning that such a theory would give the President power to control congressional legislation. 37 U.S. 524, 613 (1838). And in *Youngstown Sheet & Tube Co. v. Sawyer*, the Court reaffirmed that "[t]he President's power, if any . . . must stem either from an act of Congress or the Constitution itself." 343 U.S. 579, 585 (1952).

Article II's Take Care Clause, requiring that the laws be "faithfully executed," likewise requires impartial enforcement. U.S. CONST. art. II, § 3. Faithful execution presupposes legality, neutrality, and adherence to the rule of law. *See* THE FEDERALIST No. 70 (Alexander Hamilton) (explaining that energy in the executive must be coupled with accountability to prevent abuse); Andrew Kent et al., *Faithful Execution and Article II,* 132 Har. L. Rev. 2111 (2019). As the founders understood—and as history has demonstrated repeatedly—politicized law enforcement poses risks of selective prosecutions, intimidation of political opponents, erosion of civil liberties, and the consolidation of executive power inconsistent with democratic government.

Statutes promoting professionalism and impartiality in law enforcement therefore do not undermine executive authority. They ensure that enforcement power is exercised according to law rather than partisan or personal animus, assisting the President in fulfilling the constitutional

11

duty of faithful execution, and thus reinforce the founders' vision of a government "of laws, and not of men."

Finally, the principles of due process and equal protection embodied in the Fifth and Fourteenth Amendments require that the government apply laws fairly and without discrimination. Selective or politically motivated enforcement—made more likely by unfettered executive removal power—violates these constitutional guarantees. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886); *United States v. Armstrong*, 517 U.S. 456, 464–65 (1996).

Through these various constitutional provisions, the framers intentionally denied the President unilateral control over inferior officers, required executive officials to act only pursuant to law, and embedded procedural and equal protection guarantees to prevent discriminatory or politically motivated enforcement. Preserving apolitical law enforcement is not merely a policy preference, it is a constitutional imperative and a critical safeguard against the very abuses that led the founders to reject monarchical executive power.

> B.      *The Constitution's Treatment of the Military Confirms a Tradition of Checked, Apolitical Law Enforcement*

Although the Constitution does not expressly address federal police-force authority, its treatment of the military confirms that even core Article II functions involving armed force are subject to binding legal constraints. The founders' treatment of the armed forces, an institution expressly addressed in the Constitution that shares key features with today's increasingly militarized federal law enforcement agencies, thus offers a useful analogy. Like the "standing armies" that deeply troubled the founders, modern federal and local law enforcement agencies deploy permanent armed personnel, wield expansive surveillance authorities, and increasingly use military-grade equipment. *See generally* Sam Bieler, *Police Militarization in the USA: The State of the Field,* 39 Policing: An Int'l J. of Police Strategies & Mgmt. 586 (2016). The analogy

12

is structural, not rhetorical: both concentrate force capable of protecting the public—or being misused against it. The Constitution treats such power as executive in character, but not plenary, and subjects it to legislative and judicial constraint.

Although the President serves as commander-in-chief, Congress has authority to authorize and regulate the armed forces, and the Supreme Court has repeatedly rejected claims of unchecked executive power. In *Hamdi v. Rumsfeld*, the Court rejected the notion of unchecked executive authority, emphasizing that "a state of war is not a blank check for the President" and "whatever power the U.S. Constitution envisions for the Executive . . . , it most assuredly envisions a role for all three branches when individual liberties are at stake." 542 U.S. 507, 536 (2004). In *Hamdan v. Rumsfeld*, the Court enforced congressional constraints on military tribunals, holding that executive action must conform to statutes governing the armed forces. *See* 548 U.S. 557, 593–94 (2006). And in *Boumediene v. Bush*, the Court reaffirmed that neither political branch may exercise coercive authority in a manner inconsistent with constitutional guarantees. *See* 553 U.S. 723, 765 (2008).

In contrast, unlike military authority, the Constitution contains no explicit grant of federal domestic police power to the Executive. Reflecting the founders' concern with concentrated coercive power, the early Republic maintained no standing armed federal law enforcement. Today's federal law enforcement instead developed through statute, and the FBI did not exist as a law enforcement agency until Congress established it in the twentieth century. Notably, one of the earliest federal law enforcement bodies—the United States Marshals Service—was created within the Judiciary Branch. *See* Judiciary Act of 1789, ch. 20, § 27, 1 Stat. 73.

Both the absence of any explicit constitutional grant of police power and the legislative assignment of law enforcement authority to a judicial branch entity during our nation's earliest

13

days suggest that police power is not a core constitutionally imbued power exclusive to the Executive. Although the President exercises executive authority over the FBI, that authority flows from statute, not from an inherent presidential power to create, staff, or arm a domestic police force. Absent congressional authorization under the Necessary and Proper Clause, the President would possess no clear authority to establish such an apparatus. This statutory origin logically carries with it Congress's authority to define duties, prescribe qualifications, and impose limits designed to prevent partisan misuse of coercive power.

There is no constitutional basis for concluding that the President enjoys greater, or less constrained, authority over domestic law enforcement, an institution entirely created by statute, than over the military, whose command is expressly conferred by the Constitution itself. History, structure, and precedent confirm Congress's authority to legislate to help ensure that law enforcement, like the military, operates with professionalism and fidelity to law rather than partisan or personal command. Enforcing those safeguards is not an intrusion on Article II, but a necessary restraint on the misuse of coercive power the Constitution was designed to prevent.

III.    **Laws and Policies from our Founding Era to Present Day Have Consistently Reinforced the Principle of Nonpartisan Law Enforcement**

Congress and the Executive have regularly exercised their authorities in a manner that reaffirms the principle of apolitical law enforcement. Time and again, in the face of threats to impartial execution of the law, the co-equal branches have recognized that statutory and policy guardrails are an essential and constitutionally appropriate counterweight to the potential for abuse inherent in unchecked enforcement powers. Congress has enacted a series of statutes over more than 200 years, often in response to scandals exposing the misuse of investigative or prosecutorial power, all designed to ensure that enforcement of federal law remains professional and independent of political coercion. From the establishment of the Department of Justice in

14

1870 through the Hatch Act of 1939 and the Inspector General Act of 1978, to responses to major crises like COINTELPRO,[3] Watergate and U.S. Attorneys firings, Congress and the executive branch have repeatedly built enduring legislative and institutional protections for independent law enforcement as a bulwark against tyranny. Together, these measures affirm the constitutional principle that the President's duty to "take Care that the Laws be faithfully executed" is subject to the counterbalancing principle that Congress may legislate to ensure an executive branch committed to the rule of law, not the rule of politics.

The sheer number and scope of statutes requiring and supporting the apolitical exercise of law enforcement authority—enacted over more than two centuries on a bipartisan basis, signed and followed by Presidents of both parties, implemented through enduring executive-branch norms, and regularly upheld by the courts—demonstrate a settled and shared constitutional understanding. Restraints on unfettered presidential power are not novel intrusions on executive power, but foundational features of our nation's history and legal tradition, fully consistent with Article II and other constitutional mandates. This section traces several of the most significant statutory safeguards, the abuses that occurred when norms were ignored or laws were insufficient, and how Congress and the judiciary responded with further safeguards.

A.    *Founding Era Laws and Early Institutional Development*

1.    Early Affirmation of Nonpartisanship: The Oath Act of 1789

From our nation's founding onward, the framers and subsequent legislators consistently demonstrated a commitment to a professional and nonpartisan executive branch workforce,

---

[3]COINTELPRO, short for Counterintelligence Program, was a series of covert and illegal FBI projects between 1956 and 1971 aimed at surveilling, infiltrating, discrediting, and disrupting American political parties and organizations that the FBI perceived as subversive. William V. Moore, *COINTELPRO* (EBSCO Knowledge Advantage 2024).

15

including in law enforcement. The Constitution requires all executive and judicial officers to take an oath not to a person but to the law, "to support this Constitution." U.S. CONST. art. VI, cl. 3. To implement this constitutional requirement, the First Congress enacted the Oath Act in May 1789, requiring that all federal officials swear: "I do solemnly swear (or affirm) that I will support the Constitution of the United States." Oath Act of 1789, ch. 1, 1 Stat. 23 (1789). This simple wording was intentional. The framers wanted to avoid oaths that pledged loyalty to a person or party, fearing that such pledges could be used to consolidate power or punish dissent. *See* Andrew Kent et al., *Faithful Execution and Article II,* 132 Har. L. Rev. 2111 (2019); Akhil Reed Amar, *America's Constitution: A Biography* 192–94 (2005).

The 18th century debates surrounding the Oath Act showcased a conscious rejection of monarchic traditions and an early commitment to nonpartisan governance. Although some legislators proposed adding language that would bind officials to the President or to Congress, James Madison and others firmly opposed and ultimately rejected such amendments. *See* David P. Currie, *The Constitution in Congress: The Federalist Period, 1789–1801* 27–28 (1997). Madison argued that the oath must express "fidelity to the Constitution" alone, warning that any oath of personal loyalty risked "dangerous deviations from republican government." *Id.* The final version thus codified the core constitutional principle that every federal official's ultimate duty is to the Constitution and rule of law, not to the particular person who holds the office of President.

Just as the founders rejected an oath of personal loyalty to any individual, a system that enables executive branch officers to act based on loyalty to a political figure or party would violate the Constitution and statutory oath requirements and must be rejected as inconsistent with the principles of republican government. Laws prohibiting firing for partisan or pretextual reasons, and requiring for-cause determinations, are fully consistent with this tradition.

16

2.      Impartial Federal Prosecution: The Judiciary Act of 1789

During the founding era, Congress established the office of United States Attorney in the Judiciary Act of 1789, with a defined statutory duty to prosecute violations of federal law. By framing the role in terms of duty to the nation and courts—rather than to executive prerogative—Congress conceived federal prosecutors as officers of public justice charged with faithful application of the law, not as instruments of personal or political control. Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 92. In the nineteenth century, as reformers affirmed that understanding, emphasizing the need for an "independent administration of affairs" in federal legal offices so that prosecutors would not be "at the mercy or the caprice of . . . politicians" and could work "in service of the people" rather than partisan interests. Ari Hoogenboom, *Thomas A. Jenckes and Civil Service Reform*, 47 Miss. Valley Hist. Rev. 636, 637 (1961).

The Supreme Court has consistently reinforced this founding era principle that federal prosecutors exercise authority on behalf of the people and are bound by a duty of impartiality. *See Berger v. United States*, 295 U.S. 78, 88 (1935) (prosecutor's duty is to see "that justice shall be done"); *see also Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 803 (1987).

3.      Responding to Abuse of Enforcement Power: The Obstruction of Justice
        Act of 1831

Throughout our history, Congress has consistently acted to shore up the guardrails in response to abuses of law enforcement power. An early example of Congress responding to abuses of law enforcement power—in this case by the Judicial Branch—occurred in 1830. In the decades after the founding, federal judges exercised their inherent contempt power in sweeping ways. A notable episode involved federal Judge James H. Peck who imprisoned and suspended an attorney for publishing a newspaper criticism of one of Peck's judicial opinions. *See*

17

*Impeachable Offenses: Early Historical Practice*, U.S. CONST. Annotated, Legal Information Institute, https://perma.cc/AS2A-RYS3 (last visited Feb. 2, 2026).

The House impeached Peck for this misuse of judicial authority, and the ensuing trial created cross-party consensus that statutory limits were essential to prevent any judge—or any federal officer vested with coercive authority—from acting arbitrarily in his own cause. *Id.* In response, Congress passed the federal Obstruction of Justice Act that, among other things, curtailed federal courts' contempt power to matters related to court proceedings. Act of Mar. 2, 1831, ch. 99, § 1-2, 4 Stat. 487, 488; *see id*. The 1831 Act stands as one of the earliest federal statements that coercive enforcement authority must be constrained by law, not personal discretion.

B.     *Post-Civil War Disorder and the Strengthening of Institutional Protections*

In the turbulent decades after the Civil War, Congress again confronted the dangers of politicized and uneven federal law enforcement. Reconstruction had produced a patchwork of federal legal representation: departmental solicitors, United States attorneys, and politically connected private lawyers often pursued federal cases inconsistently, sometimes favoring local political allies or declining to enforce federal law uniformly across jurisdictions. Contemporary critics warned that this decentralized structure allowed partisan influence and personal loyalties to shape federal enforcement decisions, undermining public confidence in the rule of law and weakening federal authority during a period of national reconstruction. *See, e.g.*, CONG. GLOBE, 41st Cong., 2d Sess. 3036–38 (1870) (warning that fragmented legal representation fostered favoritism and inconsistency, and urging centralized, uniform enforcement of federal law).

1.     Institutionalizing Apolitical Law Enforcement: The Department of Justice Act of 1870

18

Against this backdrop, Congress passed the Department of Justice Act of 1870. An Act to Establish the Department of Justice, ch. 150, 16 Stat. 162 (1870). The Act consolidated the government's scattered legal officers under the aegis of the Attorney General, required federal legal representation to be carried out by duly appointed U.S. Attorneys rather than private or political lawyers, and transferred supervisory authority from partisan patronage networks to a centralized, professionalized structure. *See id.* §§ 3–7. The Act's purpose was to "secure uniformity" in the execution of federal law and "put an end to a system which might be perverted to purposes of favoritism." CONG. GLOBE, 41st Cong., 2d Sess. at 3038. Legislative records show that members viewed professionalization and insulation from partisan pressure as essential to faithful execution under Article II, not as a constraint upon it. *Id.*

Modern legal historians likewise understand the 1870 Act as a professionalizing reform aimed at insulating federal law enforcement from partisan control. *See, e.g.,* Jed H. Shugerman, *The Creation of the Department of Justice: Professionalization Without Civil Rights or Civil Service*, 66 Stan. L. Rev. 121, 126 (2014). Congress sought to "increase professional independence by increasing bureaucratic accountability to the Attorney General, not to the President," and deliberately removed government lawyers from ordinary patronage networks to "insul[ate] them from regular politics." *Id.* at 126. In this way, the post-Civil War redesign of federal law enforcement reaffirmed the founding principle that the legitimacy of federal power depends on nonpartisan, law-bound administration, not on loyalty to any faction or individual.

    2.    Limiting Patronage and Professionalizing Federal Service: The Pendleton Civil Service Reform Act of 1883

Despite multiple attempts to ensure impartial enforcement of the law, the spoils system— a form of political patronage in which government positions were awarded to allies based on loyalty rather than merit or competence—persisted in the first century after Independence,

19

presenting a challenge to this core principle. Reform efforts repeatedly stalled until the

assassination of President James A. Garfield by a disgruntled office-seeker galvanized public and

congressional support for civil service reform. *See* Kenneth D. Ackerman, *Dark Horse: The*

*Surprise Election and Political Murder of President James A. Garfield* (2003).

Congress responded to entrenched patronage practices by enacting the Pendleton Civil

Service Reform Act, which President Chester A. Arthur signed into law. The Act required many

federal positions to be filled through competitive examinations, prohibited dismissal or demotion

of covered employees for partisan reasons, and established a merit-based civil service system.

*See* Pendleton Civil Service Reform Act, Act of Jan. 16, 1883, ch. 27, 22 Stat. 403. Requiring

that federal employees be selected and retained based on merit rather than partisan loyalty and

thus could perform their duties in a politically neutral manner insulated career civil servants from

political coercion while preserving executive accountability. *See id.*

C.      *Early Twentieth-Century Efforts to Shield Federal Law Enforcement from Politics*

1.      Safeguarding Federal Employees from Partisan Discipline: The Lloyd-La Follette Act

This consistent historical pattern in which partisan abuse of executive resources triggered

congressional measures to restore and reinforce the Constitution's vision of apolitical

governance continued in the early twentieth century. In response to documented abuses of

federal employees disciplined for providing information to congressional committees or refusing

to participate in partisan activity, Congress enacted the Lloyd–La Follette Act of 1912, the first

comprehensive statutory protection against arbitrary termination and political retaliation. *See*

Lloyd–La Follette Act, ch. 389, 37 Stat. 555 (1912) (codified at 5 U.S.C. § 7211).The Act—now

a cornerstone of apolitical, merit-based federal service—established "for cause" removal

protections, prohibited politically motivated discipline, and safeguarded the ability of federal

employees, including inferior law enforcement officials, to communicate with Congress without retaliation. *See Id.*

Courts have repeatedly affirmed these protections as a valid exercise of Congress's authority to structure the federal workforce and to protect federal employees from politically motivated or arbitrary discipline. *See Arnett v. Kennedy*, 416 U.S. 134, 151–54 (1974) (plurality opinion) (upholding the statutory "efficiency of the service" removal standard rooted in the Lloyd–La Follette Act); *Bush v. Lucas*, 462 U.S. 367, 388–89 (1983) (deferring to Congress's judgment that the civil service system is an adequate safeguard against improper termination or demotion).

2.    Reinforcing Nonpartisan Enforcement in Response to Scandal: The Teapot Dome Scandal and the Hatch Act of 1939

The Teapot Dome scandal in the 1920s made the need for constant vigilance apparent once more. This scandal, one of the most notorious corruption episodes in American history, exposed a DOJ compromised by personal and political interests. The Secretary of the Interior accepted cash and bribes in exchange for preferential oil-lease arrangements, and the Attorney General, a close ally of the President, was accused of obstructing related investigations and using federal prosecutorial power for partisan ends. Teapot Dome highlighted how partisan control of prosecutorial power could corrode the legitimacy of law enforcement and catalyzed renewed demands to professionalize and further insulate the DOJ from patronage networks. *See* Nancy V. Baker, *History, Norms and Conflicting Loyalties in the Office of Attorney General*, 72 Mercer L. Rev. 833, 842-43 (2021). A separate and later scandal—allegations that officials in the Works Progress Administration (WPA) were pressuring employees to support Democratic candidates and mobilize votes through government resources—further underscored the dangers of a politicized executive work force.

21

In response, Congress and successive administrations moved to reinforce professional norms and safeguard federal law enforcement from political influence. Upon taking office, President Calvin Coolidge worked to restore the Department's integrity by appointing Harlan Stone as Attorney General. *See Senate Confirms Stone*, N.Y. Times, Apr. 8, 1924, at 18. Stone reorganized the DOJ around merit-based appointments and strict ethical standards. *Select Comm. to Study Gov't Operations with Respect to Intelligence Activities*, Final Report, bk. I, ch. 4(B) (1976). His reforms, which included disbanding the "radical unit" that conducted politically motivated surveillance and raids, helped re-establish the DOJ as an impartial law enforcement institution. *See* Alpheus Thomas Mason, *Harlan Fiske Stone: Pillar of the Law* (1956).

Congress supplemented these executive branch reforms with statutory safeguards. Most prominently, it enacted *An Act to Prevent Pernicious Political Activities*, commonly known as the Hatch Act of 1939, which restricts partisan political activity by executive-branch employees in order to protect the civil service from political pressure and prevent the abuse of governmental authority for partisan ends. *See* Hatch Act, ch. 410, 53 Stat. 1147 (1939).

These legislative limits on executive-branch activity have been upheld by the courts and function as a longstanding structural protection for apolitical enforcement of the law. *See United Pub. Workers v. Mitchell*, 330 U.S. 75, 99, 102 (1947) (upholding the Act as a valid exercise of congressional authority and warning that denying Congress power to address the "supposed evils of political activity" in federal service would leave the Nation "impotent" to address a serious threat to the democratic system); *U. S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 557, 565 (1973) (recognizing "impartial execution of the laws" as a legitimate legislative goal and noting that "it is in the best interest of the country, indeed essential, that federal service should depend upon meritorious performance rather than political service").

22

Importantly, even when Congress relaxed Hatch Act restrictions for most federal employees in 1993, it deliberately preserved stricter limits for the FBI and employees of designated national security agencies. *See* Hatch Act Reform Amendments of 1993, Pub. L. No. 103-94, § 4, 107 Stat. 1001, 1004 (codified as amended at 5 U.S.C. §§ 7321–7326). The executive branch, through the Office of Special Counsel, also endorsed the Hatch Act when it described it as a "bulwark against undue partisan influence." *See* Whitney K. Novak, Cong. Rsch. Serv., IF11512, *The Hatch Act: A Primer* (2020); *see also* Remarks on Signing the Hatch Act Reform Amendments of 1993, 3 Pub. Papers 1964–69 (Oct. 6, 1993) (presidential statement noting the federal work force must be the "product of merit system, not patronage" and describing law enforcement as among the "most sensitive positions" subject to further restrictions). These stricter limits reflect a cross-branch, bipartisan and recurring judgment— visible from the Lloyd–La Follette Act through the post-Teapot Dome reforms and into the Hatch Act regime—that those entrusted with the government's coercive authorities must be insulated from partisan pressures to protect democratic norms and preserve public confidence.

      3.      Apolitical Law Enforcement in the Military and the Rule Against Undue Command Influence

The rule against undue command influence (UCI), first enacted in 1950 as part of the Uniform Code of Military Justice (UCMJ) and codified today at 10 U.S.C. § 837, reinforces this core constitutional principle: Congress may use its authority to enact safeguards against misuse of the justice system for personal or partisan ends. Indeed, its ability to do so even within the military—an area uniquely subject to presidential command—underscores and strengthens Congress's authority to impose comparable protections in the civilian sphere.

The rule against UCI, which received broad bipartisan support and has been upheld by the courts, prohibits commanding officers or other superiors from attempting to coerce,

influence, or dictate the outcome of courts-martial or other judicial proceedings. The rule arose after World War II when Congress determined that the integrity of military justice depended on insulating those involved in courts-martial from hierarchical or partisan pressure. *See* Jennifer K. Elsea, Cong. Rsch. Serv., LSB10549, *Military Appellate Court: Presidential Comments Can Amount to Unlawful Command Influence* (2020). As the Court of Appeals for the Armed Forces emphasized, "command influence is the mortal enemy of military justice." *United States v. Thomas*, 22 M.J. 388 (C.M.A. 1986), *quoted in U.S. v. Gore*, 60 M.J. 178 (C.A.A.F. 2004); *see also Taylor v. Trump*, No. 25-3742 (TJK), 2026 U.S. Dist. LEXIS 28773, at \*6 (D.D.C. Feb. 11, 2026) (finding statements from the President or Attorney General supporting a particular outcome can render an otherwise legitimate process "a sham" and thus violate due process). The rule against UCI thus rests on the same foundation as civilian reforms promoting nonpartisan law enforcement within the DOJ. It ensures that prosecutorial and adjudicative discretion are exercised according to law, not personal or political favor or coercion.

4.      Lessons from Hoover and Watergate: Bipartisan Rededication to Professional, Impartial Law Enforcement

The most consequential modern reaffirmation of apolitical law enforcement arose from the abuses exposed during the long tenure of FBI Director J. Edgar Hoover and the Watergate scandal. From 1924 to 1972, Hoover exercised extraordinary personal control over federal law enforcement, routinely deploying investigative and intelligence powers for political ends. The FBI compiled dossiers on members of Congress, targeted political critics, and sought to discredit private citizens and disrupt lawful civil rights activities. The Senate's Church Committee concluded that this unchecked concentration of authority produced systemic abuses—including political spying, warrantless surveillance, and covert manipulation of domestic politics. *See* S.

24

Rep. No. 94-755, Books II–III (1976). These findings starkly confirmed the dangers the framers warned against when coercive law enforcement power operates without structural constraint.

Watergate provided a parallel and equally sobering lesson. The 1972 break-in at the Democratic National Committee headquarters and the subsequent cover-up directed from within the White House exposed the risks when officials weaponize law enforcement authority and resources against political rivals. In *United States v. Nixon*, the Supreme Court rejected claims of unchecked executive discretion and reaffirmed that even the President is subject to judicial process necessary to ensure the fair administration of criminal justice, emphasizing that the rule of law requires constraints on executive discretion. 418 U.S. 683, 706–13 (1974).

In response to these dual crises, Congress and the Executive Branch enacted landmark reforms designed to prevent partisan misuse of investigative power and restore public confidence in federal law enforcement. The Foreign Intelligence Surveillance Act of 1978 (FISA), imposed statutory limits and judicial oversight on domestic national security investigations, and the Inspector General Act of 1978, which embedded independent oversight mechanisms within executive agencies. *See* Pub. L. No. 95-511, 92 Stat. 1783; Pub. L. No. 95-452, 92 Stat. 1101. The Ethics in Government Act of 1978 likewise established disclosure requirements and independent investigative authority to guard against political interference in enforcement decisions. Pub. L. No. 95-521, 92 Stat. 1824. Legislative history reveals consistent focus on the need to restore checks and balances and to prevent improper political influence over investigative and prosecutorial functions. *See* S. Rep. No. 95-170, at 28–30 (1977); H. R. Rep. No. 95-1283, at 22–24 (1978). These reforms show a consistent, bipartisan recognition that structural constraints are necessary to ensure that the government's coercive powers are exercised impartially and in accordance with constitutional principles.

25

Most directly relevant here, Congress enacted the CSRA, a cornerstone of the modern statutory framework protecting apolitical law enforcement. *See* Pub. L. No. 95-454, 92 Stat. 1111 (codified as amended at 5 U.S.C.). Far from reflecting legislative encroachment on executive authority, the CSRA was driven by sustained executive branch leadership. President Carter identified civil service reform as a central executive priority and emphasized that merit-based protections were essential to restoring public confidence in government. *See* Statement on Signing S. 2640 into Law (Oct. 13, 1978).

The CSRA codified the principle that hiring, promotion, and discipline must be based on merit rather than partisan affiliation, and it prohibited specified personnel practices including retaliation, coercion of political activity, and discrimination. *See* 5 U.S.C. §§ 2301(b), 2302(b). It also established independent institutions—the OPM, the Merit Systems Protection Board, and the Office of Special Counsel—to enforce these protections through oversight, adjudication, and investigation. *See* 5 U.S.C. §§ 1101–1104, 1201–1206, 1211–1219. Together, these mechanisms form an "integrated scheme of administrative and judicial review" that protects federal employees from politically motivated interference while preserving lawful executive supervision. *United States v. Fausto*, 484 U.S. 439, 443–45 (1988). By replacing the spoils system with a structured regime of rights, remedies, and oversight—at the urging and with the endorsement of the President—Congress and the Executive jointly reaffirmed that federal employees must be able to perform their duties with professionalism, independence, and fidelity to law rather than partisan command.

The Executive Branch undertook its own structural reforms. In 1976, Attorney General Edward Levi issued comprehensive guidelines governing domestic FBI operations to prevent the misuse of law enforcement authorities for political purposes. *See* Edward H. Levi, U.S. Dep't of

Just., Domestic Security Investigation Guidelines § I.A (1976). The Guidelines ensure that investigative powers are exercised impartially, based on law and fact rather than partisan objectives. Brennan Center for Justice, *Domestic Intelligence: Powers, Risks, and Oversight* 10–12 (2019). Successive administrations of both parties have reaffirmed these core principles, now reflected in the Justice Manual, instructing prosecutors that charging decisions must be insulated from improper political influence. *See* U.S. Dep't of Just., Justice Manual §§ 9-27.260, 1-8.100.

Taken together, these reforms reflect a durable, bipartisan, and cross-branch judgment: unchecked executive control over law enforcement threatens constitutional government.

D.     *Late 20th and Early 21st-Century Reaffirmations of Founding Principles*

In the decades following Watergate, Congress and successive administrations of both parties have repeatedly reaffirmed the founding-era principle that federal law enforcement must remain apolitical, professional, and insulated from partisan control. Through statutes, structural reforms, and enduring executive-branch norms, the political branches have repeatedly enacted and reinforced safeguards to prevent partisan misuse of investigative and prosecutorial power.

Congressional enactments since the late twentieth century have imposed statutory constraints on politically sensitive enforcement functions. In bipartisan reauthorizations and amendments, Congress has repeatedly reaffirmed its commitment to FISA and the judicial oversight and statutory limits on domestic national security investigations which it provides. *See, e.g.*, FISA Amendments Act of 2008, Pub. L. No. 110-261, 122 Stat. 2436. Congress also strengthened internal oversight through the Inspector General Act Amendments of 1988 and the Inspector General Reform Act of 2008, which expanded inspectors general's independence, ensured access to agency records, and required advance notice to Congress before removal. Pub. L. No. 100-504, 102 Stat. 2515; Pub. L. No. 110-409, 122 Stat. 4302. These statutory measures,

27

all signed into law by the President, reflect Congress's and the Executive's continuing judgment that effective enforcement depends on institutional checks to reduce the risk of partisan interference.

Parallel executive-branch policies have long protected DOJ's independence from political pressure. Since Watergate, administrations of both parties have imposed formal limitations on contacts between the White House and DOJ concerning investigative and enforcement matters to prevent actual or perceived political influence over prosecutorial decisions and maintain public confidence in the impartiality of justice. *See* Griffin B. Bell, Att'y Gen., Address Before Dep't of Just. Lawyers (Sep. 6, 1978); *see also* Memorandum from Michael B. Mukasey, Att'y Gen., to Heads of Dep't Components and U.S. Att'ys (Dec. 19, 2007); U.S. Dep't of Justice, Justice Manual §§ 1-8.600, 1-8.700 (2023). Defendants likewise have acknowledged that executive conduct "designed to achieve political objectives" is improper. *See, e.g.*, Memorandum from Pam Bondi, Att'y Gen., to all Dep't Employees (Feb. 5, 2025). Although these safeguards are internal policies rather than statutes, their continuity across administrations underscores a settled, bipartisan understanding of the constitutional stakes.

Congress also reinforced apolitical enforcement by protecting those who expose misconduct from retaliation. The Whistleblower Protection Act of 1989 codifies protections from politically motivated personnel actions against federal employees who report unlawful conduct. 5 U.S.C. § 2302(b)(8). By encouraging disclosure through shielding officials from reprisal, the Act strengthens accountability mechanisms essential to neutral and lawful administration.

Structural limits on executive control over enforcement leadership demonstrate this same concern. The Federal Vacancies Reform Act of 1998 restricts the duration and circumstances under which acting officials may serve in Senate-confirmed positions, including senior law

28

enforcement offices. Pub. L. No. 105-277, div. C, tit. I, 112 Stat. 2681-611. By limiting the President's ability to unilaterally designate "acting" officials without Senate confirmation, the FVRA protects Congress's Appointments Clause authority and guards against consolidation of executive power. *See* S. Rep. No. 105-250, at 6 (1998).

Congress has also centralized prosecutorial authority in the Attorney General, subject to statutory and normative constraints designed to ensure apolitical application of our laws. *See* 28 U.S.C. §§ 509–510 and 515–519. As courts have long recognized, the DOJ's centralized structure exists not to serve the political interests of any administration or individual, but to ensure that federal law is enforced uniformly and in the public interest. *See Berger v. United States*, 295 U.S. 78, 88 (1935).

When more recent controversies raised concerns about politicization, both Congress and the DOJ responded by reaffirming institutional norms. Investigations following the mid-term removal of U.S. Attorneys during the George W. Bush administration and public responses to politically sensitive contacts involving senior officials in later administrations, such as the tarmac meeting between former President Clinton and Attorney General Loretta Lynch, underscored bipartisan concern that even the appearance of political influence can undermine confidence in the rule of law. Congressional oversight and internal reforms following these incidents emphasized that federal prosecutors serve the public interest, not the political objectives of any administration.

Taken together, these statutes, reforms, policies and norms form a continuous historical record—from the founding era to the present—demonstrating bipartisan and cross-branch recognition that the legitimacy of federal law enforcement depends on being insulated from personal loyalty, partisan pressure, and political retaliation—and that legislation protecting law

29

enforcement from partisan pressures is an appropriate exercise of congressional and presidential authority. Far from being anomalous, modern protections embody a persistent constitutional tradition: faithful execution of the laws requires law enforcement institutions accountable to law itself, not to the transient interests of any officeholder or party.

**IV.     Conclusion: Upholding Statutory Checks Against Politicized Law Enforcement is Essential to Protect Our Nation from Executive Tyranny**

Since our nation's founding, Congress, the Executive Branch, and the courts have repeatedly recognized the enduring bipartisan consensus, grounded in the constitutional principles of checks and balances and equal justice, that law enforcement must remain nonpartisan and apolitical as a check against tyranny. From the Oath Act of 1789 to modern efforts to insulate inspectors general and prosecutors from political pressure, Congress and the courts have reaffirmed a constitutional equilibrium: the President leads the executive branch, but the law governs the President. These frameworks do not erode Article II authority—they operationalize it, helping to enable "faithful execution" by ensuring that law enforcement serves justice rather than politics.

As the Court evaluates the legal and equitable issues in this case and considers the balance between executive and congressional authority necessary to prevent abuse, it is essential to situate this case within its broader institutional context. This matter does not involve sweeping or unprecedented constraints on presidential power. The statutory safeguard at issue is narrow, longstanding, and consistent with the Constitution's allocation of authority. By contrast, heightened concerns, across administrations and observers of varied political perspectives, about actual or perceived politicization of law enforcement are concrete and growing.[4] The question

---

[4] The present case arises when both major political parties complain that federal investigative authorities were or are being "weaponized" against them, and adherence to longstanding norms

before the Court, therefore, is whether Congress may preserve a proportionate and historically rooted limitation on unfettered removal authority—one that fully preserves the Executive's ability to remove officers for cause consistent with due process—at a time when maintaining public confidence in the impartial enforcement of the law is of paramount and growing concern.

Upholding the statutory and policy measures at issue in this case fits squarely within the nation's long tradition of enacting, implementing, and affirming statutory safeguards to preserve nonpartisan law enforcement as a bulwark against tyranny. By adhering to this tradition, the Court would honor the constitutional design, protect the integrity of federal law enforcement institutions, and help ensure the foundational promise of equal justice under law remains secure.

Respectfully submitted,

Lawyers Defending American Democracy,
*by its counsel*:

  /s/ Aderson Bellegarde François
Aderson Bellegarde François
  (D.C. Bar No. 498544)

GEORGETOWN UNIVERSITY LAW CENTER
  CIVIL RIGHTS CLINIC
600 New Jersey Avenue NW, Suite 352
Washington, D.C. 20001

Tel.:    (202) 662-9546
Email: Aderson.Francois@georgetown.edu

Dated:          February 16, 2026          *Counsel for Amicus Curiae*

---

is faltering. For example, President Trump has alleged that his predecessor weaponized federal law enforcement against him. *See* Exec. Order No. 14147, 90 F.R. 8235 (Jan. 20, 2025). At the same time, he has publicly called for "retribution" and publicly urged investigative, prosecutorial or other enforcement action against a wide range of perceived political adversaries, including former and current federal and state officials, sitting members of Congress, and private organizations. See Peter Eisler, Ned Parker, Linda So & Joseph Tanfani, *Trump's Campaign of Retribution: At Least 470 Targets and Counting*, Reuters (Nov. 26, 2025, 11:00 AM GMT). Whether these uses of law enforcement powers against perceived political adversaries are ultimately deemed legitimate, they are unprecedented in their scope and frequency and have intensified public concerns over the abuse of unchecked executive power.

## CERTIFICATE OF SERVICE

I hereby certify that, on February 16, 2026, I electronically filed the foregoing Brief with the Clerk of Court via the CM/ECF system, which will provide copies to all counsel of record who have entered appearances.

 /s/ Aderson Bellegarde François
Aderson Bellegarde François
 (D.C. Bar No. 498544)

GEORGETOWN UNIVERSITY LAW CENTER
 CIVIL RIGHTS CLINIC
600 New Jersey Avenue NW, Suite 352
Washington, D.C. 20001

Tel.:   (202) 662-9546
Email:  Aderson.Francois@georgetown.edu

Dated:        February 16, 2026          *Counsel for Movant*