## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

BRIAN J. DRISCOLL, JR., et al.,
     *Plaintiffs*,

     *vs*.

KASHYAP P. PATEL, et al.,
     *Defendants*.

Civil Action No. 25-3109 (JMC)

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## <u>TO DEFENDANTS' MOTION TO DISMISS</u>

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

I.      RELEVANT FACTS ........................................................................................2

II.     LEGAL STANDARD........................................................................................7

        A.      Rule 12(b)(1)........................................................................................7

        B.      Rule 12(b)(6)........................................................................................7

III.    ARGUMENT....................................................................................................9

        A.      Plaintiffs Have Plausibly Alleged a Fifth Amendment Violation
                (Procedural Due Process) and Defendants' Rule 12(b)(6) Motion as to
                Count I Should Be Denied. ...................................................................9

                1.      History and text of 5 U.S.C. § 3151.............................................10

                2.      FBI SES protections form the basis of a procedural due process claim. .........12

                3.      Plaintiffs have sufficiently alleged a liberty interest necessary for a
                        procedural due process claim.........................................................14

        B.      Plaintiffs Have Plausibly Alleged a Fifth Amendment Violation
                (Substantive Due Process) and Defendants' Rule 12(b)(6) Motion as to
                Count I Should Be Denied. ...................................................................19

                1.      Plaintiffs have a significant property interest necessary for a
                        substantive due process claim.........................................................19

                2.      Patel's behavior shocks the conscience. ........................................20

        C.      Plaintiffs Have Plausibly Alleged a First Amendment Violation and
                Defendants' Rule 12(b)(6) Motion as to Count II Should Be Denied. .................22

                1.      Defendants misapply *Garcetti* and *Connick*. .................................22

                2.      Plaintiffs' claims are properly analyzed under *Elrod* and its progeny............23

                3.      Defendants' stated reasons for Plaintiffs' terminations should be
                        inferred to be pretextual..................................................................25

                4.      Plaintiffs have also stated a claim under the "cat's paw" theory....................27

i

D.    Defendants' Unprecedented Article II Theory is Unsupported by Fact or Law....28

    1.    Defendant Patel's purported Article II authority has never been recognized in any court or by Executive Branch officials.............................29

    2.    The plain language of Article II undercuts Defendants' claims. ....................32

    3.    Congress has Article II authority to set appointment and removal conditions..................................................................................................32

    4.    Congress exercised its Article I and Article II authority, and no statute or regulation transfers that authority to the FBI Director. ...............................34

E.    The Court Has Jurisdiction to Hear Counts III and IV and Defendants' Rule 12(b)(1) Motion Should be Denied........................................................................37

    1.    Defendants' jurisdictional argument has been rejected by this Court in *McCabe*..................................................................................................37

    2.    Count III is a constitutional claim................................................................38

    3.    Count IV is a constitutional claim. ..............................................................39

CONCLUSION.......................................................................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Akinsinde v. Not-For-Profit Hosp. Corp.,*
  216 F. Supp. 3d 33 (D.D.C. 2016) ........................................................... 24

*American Federation of Government Employees, AFL-CIO v. United States,*
  330 F.3d 513 (D.C. Cir. 2003) ................................................................. 20

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................ 8

*Atherton v. D.C. Office of the Mayor,*
  567 F.3d 672 (D.C. Cir. 2009) ................................................................. 8

*Avila v. CitiMortgage, Inc.,*
  45 F. Supp. 3d 110 (D.D.C. 2014) ........................................................... 22

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................ 8

*Brady v. Office of Sergeant at Arms,*
  520 F.3d 490 (D.C. Cir. 2008) ........................................................... 26, 39

*Branti v. Finkel,*
  445 U.S. 507 (1980) ................................................................................ 23

*Browning v. Clinton,*
  292 F.3d 235 (D.C. Cir. 2002) ................................................................. 8

*Cine SK8, Inc. v. Town of Henrietta,*
  507 F.3d 778 (2d Cir. 2007) ................................................................... 20

*Cleveland Bd. of Educ. v. Loudermill,*
  470 U.S. 532 (1985) ................................................................................ 20

*Coats v. DeVos,*
  232 F. Supp. 3d 81 (D.D.C. 2017) ........................................................... 27

*Comans v. EOP,*
  1:25-cv-1237-MSN (E.D.V.A.) ................................................................. 29

*Comey v. DOJ,*
  1:25-cv-7625-JMF (S.D.N.Y.) ................................................................. 31

*Comm. of U.S. Citizens Living in Nicaragua v. Reagan*,
859 F.2d 929 (D.C.Cir.1988) ............................................................... 22

*Connick v. Myers*,
461 U.S. 138 (1983) ........................................................................... 23

*Conset Corp. v. Cmty. Servs. Admin.*,
655 F.2d 1291 (D.C. Cir. 1981) ........................................................... 16

*Cook v. Trump*,
804 F. Supp. 3d 14 (D.D.C. 2025) ........................................................ 29

*Dodson v. U.S. Capitol Police*,
2019 WL 4860720 (D.D.C. Sept. 30, 2019) ........................................... 12

*Doe v. U.S. Dep't of Justice*,
753 F.2d 1092 (D.C. Cir. 1985) ....................................................... 15, 16

*Edmond v. United States*,
520 U.S. 651 (1997) ........................................................................... 36

*Elrod v. Burns*,
427 U.S. 347 (1976) ..................................................................... 23, 24

*Esparraguera v. Dep't of the Army*,
101 F.4th 28 (D.C. Cir. 2024) .................................................... *passim*

*Farris v. Clinton*,
602 F. Supp. 2d 74 (D.D.C. 2009) ........................................................ 39

*Fonville v. District of Columbia*,
38 F. Supp. 3d 1 (D.D.C. 2014) ........................................................... 16

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
561 U.S. 477 (2010) ..................................................................... 33, 35

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ..................................................................... 23, 25

*Gordon v. EOP*,
1:25-cv-2409-JMC (D.D.C.) .................................................................. 29

*Graham v. Ashcroft*,
358 F.3d 931 (D.C. Cir. 2004) ....................................................... 13, 37

*Gregorio v. Hoover,*
  238 F. Supp. 3d 37 (D.D.C. 2017)..................................................................8

*Haitian Refugee Ctr. v. Gracey,*
  809 F.2d 794 (D.C. Cir. 1987)......................................................................20

*Harris v. Trump,*
  1:25-cv-412-RC (D.D.C.)..............................................................................29

*Harrison v. Bowen,*
  815 F.2d 1505 (D.C. Cir. 1987)....................................................................39

*Heffernan v. City of Paterson, N.J.,*
  578 U.S. 266 (2016) ...............................................................................24, 25

*Hettinga v. United States,*
  677 F.3d 471 (D.C. Cir. 2012)........................................................................8

*Jefferson v. Harris,*
  170 F. Supp. 3d 194 (D.D.C. 2016)..........................................................14, 19

*Jimenez Fuentes v. Torres Gaztambide,*
  807 F.2d 236 (1st Cir. 1986)........................................................................24

*\*Kartseva v. Dep't of State,*
  37 F.3d 1524 (D.C. Cir. 1994)......................................................................15

*Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.,*
  909 F.3d 446 (D.C. Cir. 2018)........................................................................7

*Kennedy v. Braidwood Mgmt., Inc.,*
  606 U.S. 748 (2025) ...............................................................................32, 34

*Kowal v. MCI Commc'ns Corp.,*
  16 F.3d 1271 (D.C. Cir. 1994)........................................................................8

*Lamb v. Holder,*
  82 F. Supp. 3d 416 (D.D.C. 2015)............................................................13, 39

*Lucia v. SEC,*
  585 U.S. 237 (2018) .....................................................................................32

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) .......................................................................................7

*Mack v. United States*,
   814 F.2d 120 (2d Cir. 1987) ................................................................ 13

*\*McCabe v. Barr*,
   490 F. Supp. 3d 198 (D.D.C. 2020) ..................................................*passim*

*Metro. Washington Chapter v. District of Columbia*,
   57 F. Supp. 3d 1 (D.D.C. 2014) .................................................... 7, 10

*Moran v. U.S. Capitol Police Bd.*,
   820 F. Supp. 2d 48 (D.D.C. 2011) ........................................................ 7

*Morrison v. Olson*,
   487 U.S. 654 (1988) ........................................................................... 33

*Myers v. United States*,
   272 U.S. 52 (1926) ...........................................................................*passim*

*Noisette v. Lew*,
   211 F. Supp. 3d 73 (D.D.C. 2016) ...................................................... 27

*O'Donnell v. Barry*,
   148 F.3d 1126 (D.C. Cir. 1998) .......................................................*passim*

*O'Hare Truck Serv., Inc. v. City of Northlake*,
   518 U.S. 712 (1996) ........................................................................... 24

*Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*,
   631 F.2d 953 (D.C. Cir. 1980) ........................................................... 16

*Painter v. FBI*,
   694 F.2d 255 (11th Cir. 1982) ........................................................... 13

*Palmeri v. M.S.P.B.*,
   164 F.4th 878 (Fed. Cir. 2026) .......................................................... 13

*Pickering v. Board of Ed. of Township High School Dist.*,
   391 U.S. 563 (1968) ........................................................................... 25

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
   758 F.3d 296 (D.C. Cir. 2014) ........................................................... 12

*Ranch v. Noem*,
   2025 WL 2760959 (D.D.C. Sept. 29, 2025) ........................................ 21

*Rann v. Chao,*
    154 F. Supp. 2d 61 (D.D.C. 2001) ................................................................ 7, 15

*Rutan v. Republican Party of Ill.,*
    497 U.S. 62 (1990) ....................................................................................... 24

*Scolaro v. D.C. Bd. of Elections & Ethics,*
    104 F. Supp. 2d 18 (D.D.C. 2000) ................................................................ 8

*Seila Law L.L.C v. CFPB,*
    591 U.S. 197 (2020) ..................................................................................... 33

*Schnitt v. Bondi,*
    1:25-cv-4111-CRC (D.D.C.) ........................................................................ 29

*Shurtleff v. United States,*
    189 U.S. 311 (1903) ................................................................................ 34, 35

*Slaughter v. Trump,*
    1:25-cv-909-LLA (D.D.C.) ......................................................................... 29

*Spagnola v. Mathis,*
    859 F.2d 223 (D.C. Cir. 1988) .................................................................... 38

*Staub v. Proctor Hospital,*
    562 U.S. 411 (2011) ..................................................................................... 27

*Strumsky v. Washington Post Co.,*
    842 F. Supp. 2d 215 (D.D.C. 2012) .............................................................. 5

*Strzok v. Garland,*
    1:19-cv-02367-ABJ (D.D.C. Sept. 23, 2025) .............................................. 13

*Summit Health, Ltd. v. Pinhas,*
    500 U.S. 322 (1991) ....................................................................................... 8

*Tabb v. District of Columbia,*
    477 F. Supp. 2d 185 (D.D.C. 2007) ............................................................... 8

*Thompson v. District of Columbia,*
    530 F.3d 914 (D.C. Cir. 2008) ....................................................................... 9

*Tri County Industries v. District of Columbia,*
    104 F.3d 455 (D.C. Cir. 1997) ............................................................. *passim*

*Trump v. Slaughter,*
   No. 25-332 (U.S. Dec. 8, 2025) ................................................................. 31

*U.S. Civ. Serv. Comm'n v. Nat'l Ass'n Letter Carriers,*
   413 U.S. 548 ........................................................................................ 24, 25

*United States Inst. of Peace v. Jackson,*
   783 F. Supp. 3d 316 (D.D.C. 2025) .............................................................. 9

*United States v. Arthrex, Inc.,*
   594 U.S. 1 (2021) ..................................................................................... 36

*United States v. Comey,*
   1:25-cr-272-MSN (E.D.V.A.) .................................................................... 21

*\*United States v. Perkins,*
   116 U.S. 483 (1886) ............................................................................ 33, 35

*Vitarelli v. Seaton,*
   359 U.S. 535 (1959) .................................................................................. 37

*Wilcox v. Trump,*
   1:25-cv-334-BAH (D.D.C.) ...................................................................... 29

**Statutes**

U.S. Const. art. I, § 8, cl. 18 ........................................................................... 35

U.S. Const. art. II, § 2 ........................................................................... *passim*

5 U.S.C.§ 1103 ............................................................................................ 10

5 U.S.C. § 3151 ..................................................................................... *passim*

5 U.S.C. § 7543 ..................................................................................... *passim*

28 U.S.C. § 1331 ................................................................................... *passim*

28 U.S.C. §§ 2201-2202 ............................................................................... 9

**Rules**

Fed. R. Civ. P. 12(b)(1) .......................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) .......................................................................... *passim*

**Other Authorities**

H. R. Rep. 100-608 ...................................................................................*passim*

S. Rep. 95-969.................................................................................................. 10

28 C.F.R. §§ 0.157, 0.159 ............................................................................ 32, 35

## INTRODUCTION

On August 8, 2025, Defendant Kashyap P. Patel ("Patel") purported to summarily fire experienced and dedicated Federal Bureau of Investigation ("FBI") Senior Executive Service ("SES") employees Brian J. Driscoll, Jr. ("Driscoll"), Steven J. Jensen ("Jensen"), and Spencer L. Evans ("Evans") (collectively, "Plaintiffs"). He did so in flagrant violation of FBI policy, statutory law, and the Constitution. His actions are in direct conflict with his own sworn testimony to Congress and the American public.

As members of the FBI SES, Plaintiffs were statutorily entitled to for-cause removal protections, including 30 days' notice of their terminations, an opportunity to respond and furnish evidence to contest the firings, and legal representation throughout the process. Defendants Patel, FBI, Pamela J. Bondi ("Bondi"), the Department of Justice ("DOJ"), the Executive Office of the President ("EOP"), and the United States of America (collectively, "Defendants") ignored these binding obligations and provided zero due process. That such protections form the basis of a constitutionally protected property interest is well-settled law. In fact, this Court has previously ruled directly on the issue in the context of FBI SES terminations.

Nevertheless, when Plaintiffs sued to challenge their dismissals, vindicate their rights under the First and Fifth Amendments, and declare their terminations legally null, Defendants moved to dismiss the claims with a recycled set of arguments that brush aside the precedents of this Court. Broadly, they claim that FBI SES are at-will employees who have no property interest in their continued employment and that, in any event, Patel can and did wield Presidential removal authority under Article II. Such authority, Defendants' logic goes, also supersedes the Bill of Rights. And to separately get around their First Amendment violations—presaged by loyalty tests and culminating in patronage dismissals—Defendants mischaracterize Plaintiffs' claims, recasting

the causes of action as linked to their official duties as opposed to Defendants' fixation on their political loyalty.

Defendants move to dismiss Plaintiffs' First, Second, and Fifth causes of action (for ease of reference, "Counts I," "II," and "V," respectively) under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Defendants seek to dismiss Plaintiffs' Third, Fourth, and Sixth causes of action ("Counts III," "IV," and "VI," respectively) under Rule 12(b)(1) for lack of subject-matter jurisdiction. For the reasons set forth below, Defendants' arguments fail. Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss ("Mot.") and allow this case to proceed to discovery and the merits.

## I.    <u>RELEVANT FACTS</u>

All three Plaintiffs led exemplary careers in the FBI.

For most of Driscoll's tenure at the FBI, a regular day meant being prepared to put his life on the line for the safety of others. *See, e.g.,* Compl. ¶ 17. He saved kidnapped children and rescued hostages. *Id.* ¶¶ 17, 18, 19. At the time of his firing, he was in charge of the FBI's Critical Incident Response Group, responsible for all FBI special operations. *Id.* ¶ 12. Driscoll became a member of the FBI's SES in 2022. *Id.* ¶ 26.

Jensen spent years training the current FBI workforce. Compl. ¶¶ 30, 34. In 2021, he found himself leading the largest criminal investigation in DOJ and FBI history as head of the FBI's Domestic Terrorism Operations Section following the attack on the United States Capitol. *Id.* ¶¶ 32, 33. He continued to serve the country in FBI leadership positions after the targets of the investigation—violent insurrectionists—were pardoned and released en masse. *Id.* ¶ 122. Jensen became a member of the FBI's SES in 2020. *Id.* ¶ 38.

Evans spent his career combating everything from narcotics to terrorism to white collar crime. Compl. ¶ 41. This included negotiating the release of U.S. persons captured by dangerous

Mexican cartels and arresting those responsible for the January 1, 2025 Tesla Cybertruck bombing in Las Vegas. *Id.* ¶¶ 41, 44, 157. In 2020, during what should have been a routine stint at FBI Headquarters, he played an unexpected role shepherding FBI personnel through a global pandemic. *Id.* ¶ 147. Evans became a member of the FBI's SES in 2019. *Id.* ¶ 47.

Notwithstanding the considerable length of their careers, none of the Plaintiffs' records included so much as a single performance issue or security violation. Compl. ¶ 40. To the contrary, their extraordinary performances were punctuated over the decades with the highest honors within the FBI. *Id.* ¶¶ 18, 19, 30, 35, 45.

That is, until they were summarily fired by Patel.

As of the date of this filing, Patel has been employed by the FBI for roughly one year. Compl. ¶ 113. Before his Senate confirmation hearing, he plainly communicated to Driscoll that his (Driscoll's) position within the FBI depended on his privately held political beliefs. *Id.* ¶ 58. Patel explained that Driscoll could "serve at FBI Headquarters in an acting capacity and eventually stay at FBI Headquarters permanently" if he passed a "vetting" process which would confirm that he "did not donate to the Democratic Party" and "did not vote for Kamala Harris in the 2024 election." *Id.* Defendants DOJ and EOP also made it clear that personal, protected speech was dispositive of personnel decisions. They attempted to learn who Driscoll voted for and whether he had voted for a Democrat in the last five elections prior to elevating him within the FBI. *Id.* ¶¶ 62, 64, 65. Driscoll's refusal to discuss his personal politics resulted in him "fail[ing]" Defendants' vetting because he was deemed not sufficiently aligned with the political base ("based out") of the incumbent party. *Id.* ¶ 65.

Throughout his tenure, Patel continued to fixate on perceived political patronage as a basis for other personnel decisions. For example, Patel and then-Deputy Director Dan Bongino

("Bongino") made multiple references to Jensen's position as head of the Washington Field Office ("WFO") as costing "political capital" and causing Patel to experience "political pressure" from the President's voting base. *Id*. ¶¶ 125-127. Despite Jensen never incorporating his personal politics into his work, members of the incumbent party's political base viewed him as an enemy because of his role in the January 6 investigations. *Id*. ¶¶ 122-124.

Likewise, the FBI put Evans on a "media blackout" and informed him that publication of his work created "political pressure" on Patel. *Id*. ¶¶ 162-163. An individual who knew Patel well enough to have served as a background reference told Evans that Patel acknowledged that Evans's removal from his position as the Special Agent in Charge ("SAC") of Las Vegas was "politically driven." *Id*. ¶ 167. Evans had previously been identified by DOJ leadership as someone insufficiently loyal to the incumbent party's agenda. *Id*. ¶¶ 88-89, 154.

At his Senate confirmation hearing, Patel provided sworn testimony contradicted by his actions. For example, he swore under oath that "all FBI employees will be protected against political retribution" and that "[e]very FBI employee will be held to the absolute same standard, and no one will be terminated for case assignments." Compl. ¶¶ 6-7. Yet, after being confirmed, he expressly admitted to Driscoll that he intended to fire anyone whom Defendants "identified as having worked on a criminal investigation" against President Trump, because "the FBI tried to put the President in jail and he hasn't forgotten it." *Id*. ¶¶ 4, 186. Patel brazenly stated to Driscoll that he would terminate agents even if he knew the terminations were illegal, notwithstanding that he may face a lawsuit and discovery. *Id*. ¶¶ 5, 183-186.

When they were ultimately fired, each of Plaintiffs' termination letters (collectively, the "Termination Letters") stated they were being "summarily dismissed from [their] position[s] at the Federal Bureau of Investigation, and removed from the federal service, under [Patel's] authority

as FBI Director, effective immediately."  Compl. ¶¶ 189, 199, 205.  Each letter then included a brief accusation of a perceived wrongdoing:

- In the Driscoll Termination Letter, Patel wrote that Driscoll "failed to execute and perform requested tasks and issued communications to the FBI workforce that undermined the leadership of the Department of Justice. These communications advocated for insubordination within the Bureau and weakened workforce morale. In addition, you failed to timely respond to unapproved disclosure to the media of law enforcement sensitive information."  Compl. ¶ 189; Plaintiffs' Exhibit ("Ex.") 1.[1]

- In the Jensen Termination Letter, Patel wrote that Jensen "failed to execute and perform requested tasks, resulting in an unreasonable delay in the execution of FBI priorities."  Compl. ¶ 199; Ex. 2.

- In the Evans Termination Letter, Patel wrote that Evans "demonstrated a lack of reasonableness and overzealousness in the implementation of COVID-19 protocols and policies."  Compl. ¶ 205; Ex. 3.

None of the letters included any reference to being "on behalf of" or "from" the President of the United States or any other named government official.  And notwithstanding the above references to apparent misconduct, each Plaintiff had interactions with Defendants which indicated their terminations were not, in fact, based on misconduct.

---

[1] The full relevant text of Plaintiffs' Exhibits 1, 2, and 3 has already been incorporated into the Complaint.  Compl. ¶¶ 189, 199, 205.  Copies of the original letters are attached here as a visual aid.  *See Strumsky v. Washington Post Co.*, 842 F. Supp. 2d 215, 217 (D.D.C. 2012) ("[W]here a document is referred to in the complaint and is central to the plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment." (citation omitted)).

In Driscoll's case, one potential series of occurrences that Patel might have meant by "issu[ing] communications" or "fail[ing] to timely respond," Compl. ¶ 189, occurred months earlier, prior to Patel's confirmation, and resulted in no adverse action. *Id*. ¶¶ 102-111. Additionally, days before Driscoll was fired, Bongino contacted him to ask if he had anything incriminating in his emails during his time as Acting Director, implying that somebody would be searching those emails "in an attempt to find a basis for firing him." *Id*. ¶ 181.

Jensen's last interactions with Patel involved Patel's effusive praise of his performance. Patel gifted him three cigars and the Director's challenge coin. Compl. ¶¶ 141-142. This followed months of Patel's outward support of Jensen, even appearing on national television to defend his decision to recruit Jensen to lead WFO. *Id*. ¶¶ 134-135. Two days before Jensen's firing, Bongino reposted to his own social media a statement Jensen had released about a recent WFO arrest, in an apparent show of support. *Id*. ¶ 194. This post was later deleted. *Id*. ¶ 195.

Evans was specifically informed by FBI leadership that his original placement on administrative leave was not punitive. Compl. ¶ 155. FBI leadership advised him it was not. *Id*. He later confirmed with FBI leadership that Patel found the accusations of a disgruntled former agent who had campaigned for his firing to be "not credible." *Id*. ¶ 158. After learning he was being fired, Evans asked FBI leadership whether it was "for discipline, performance, or misconduct." *Id*. ¶ 203. FBI leadership again advised him it was not. *Id*.

To this day, Defendant Patel has never elaborated on the accusations he made in the Termination Letters to any of the Plaintiffs. Indeed, he had Plaintiffs' own subordinate staff deliver each of the letters rather than communicate with Plaintiffs himself. Compl. ¶¶ 188, 198, 204. Plaintiffs were not initially provided with access to their SF-50 forms (Notification of Personnel Action). Compl. ¶¶ 192, 202, 208. Months after filing their Complaint, Plaintiffs

received their SF-50s, with each of the documents curiously backdated to the date of their firings. For each Plaintiff, the "Legal Authority" section of the SF-50 states "28 U.S.C. 536." The "Remarks" section includes the following line: "Reason(s) for removal: ARTICLE 2 U.S.C."[2]

## II.    LEGAL STANDARD

### A.    Rule 12(b)(1)

When a defendant brings a motion under Fed. R. Civ. P. 12(b)(1), this presents a "threshold challenge" to the court's jurisdiction. *Metro. Washington Chapter v. District of Columbia*, 57 F. Supp. 3d 1, 13 (D.D.C. 2014). A plaintiff can overcome this by "establishing jurisdiction by a preponderance of the evidence." *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011) (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "In reviewing a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the court must accept all the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor." *Rann v. Chao,* 154 F. Supp. 2d 61, 64 (D.D.C. 2001). The Court, in its analysis, "may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000).

### B.    Rule 12(b)(6)

"A Rule 12(b)(6) motion tests the legal sufficiency of a complaint[.]" *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Such a motion should only be granted if it "appears beyond doubt that a plaintiff will be unable to prove any set of facts that supports his claim entitling him

---

[2] This information—generated by Defendants themselves—is by extension already in Defendants' possession as part of Plaintiffs' personnel records and cannot reasonably be contested. As such, the Court may take judicial notice of these facts under Fed. R. Evid. 201(b), particularly where the information is introduced "not for its truth, but for its existence." *Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018).

to relief." *Tabb v. District of Columbia*, 477 F. Supp. 2d 185, 188 (D.D.C. 2007) (citing *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 325 (1991)). A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). Moreover, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), "a judge must accept as true all of the factual allegations contained in the complaint." *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 45 (D.D.C. 2017) (citing *Atherton v. D.C. Off. of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009)). "In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotations omitted); *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (explaining that a court must give the plaintiff the "benefit of all inferences that can be derived from the facts alleged."). Taken as true, a complaint's factual allegations need only raise a right to relief above the speculative level. *Twombly*, 550 at 555. A claim is "plausible on its face" when the facts pled in the complaint allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

### III.    **ARGUMENT**

Defendants do not contest subject-matter jurisdiction as to Counts I, II, and V, but instead challenge whether these causes of action state a claim.[3]  Mot. at 8.[4]  Conversely, Defendants do not contest whether Counts III, IV, and VI state a claim, but instead argue that this court lacks subject-matter jurisdiction over the claims.  *Id*.  This brief will first take up the causes of action for which there is no disagreement as to jurisdiction.

### A.    **Plaintiffs Have Plausibly Alleged a Fifth Amendment Violation (Procedural Due Process) and Defendants' Rule 12(b)(6) Motion as to Count I Should Be Denied.**

Defendants claim that FBI SES are at-will employees and thus have no property interest in their continued employment.  Mot at. 19.  Thus, according to Defendants, Plaintiffs' Fifth Amendment claims fail.  *Id*.  Defendants are wrong.

It is true that many at-will employees may not have a property interest in their employment.  *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024).  But a property interest *does* exist "if the employee can 'be removed only for cause.'"  *Id*. (citing *Thompson v. District of Columbia*, 530 F.3d 914, 918 (D.C. Cir. 2008)).  Here, FBI SES are not at-will employees and can only be removed for cause.  For Defendants to argue otherwise, Mot. at 19-22, is to ignore the recent rulings of this Court on this exact issue.

In 2020, in the context of another high-profile FBI SES termination during a different Trump Administration, this Court rejected the government's arguments that FBI SES are at-will

---

[3] Count V cites the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and outlines the basis for equitable, declaratory relief to which Plaintiffs believe they are entitled.  Compl. ¶¶ 255-258 and "Request for Relief."  That the Court may not consider it a "freestanding" cause of action does not negate any of Plaintiffs' claims for relief under the Act.  *U.S. Inst. of Peace v. Jackson*, 783 F. Supp. 3d 316, 376 n.39 (D.D.C. 2025).

[4] Unless otherwise noted, all page numbers referenced herein relate to the ECF-generated page number found at the top header of the referenced document.

employees and held that the statutory removal protections for FBI SES—a combination of 5 U.S.C. § 3151 and 5 U.S.C. § 7543—"[are] sufficient to create a property interest." *McCabe v. Barr*, 490 F. Supp. 3d 198, 218 (D.D.C. 2020). Defendants disregard *McCabe* and downplay the binding nature of for-cause removal protections for FBI SES employees. Their arguments also ignore the legislative history which established the FBI SES.

### 1. History and text of 5 U.S.C. § 3151.

Section 3151 of Title 5 was first passed in 1988 to establish the FBI SES, about a decade after the Civil Service Reform Act ("CSRA"). The legislative history reflects that, when passing § 3151, Congress expressly cited "[t]he lack of political appointees" in FBI leadership as a "major strength" of the institution. H.R. Rep. 100-608 at 4. Thus, through § 3151, Congress set to specifically bar non-career FBI SES appointments and insulate FBI SES governance from review by the Office of Personnel Management ("OPM"). *Id.* at 2.[5] The new law was "meant to exclude political appointees and other employees who have no expectation of continued Government employment[.]" *Id.* In other words, by passing § 3151, Congress intended to preserve the FBI's tradition of non-partisan law enforcement by eliminating the prospect of at-will employment for career FBI SES.

Section 3151 of Title 5 states, in relevant part:

(a) The Attorney General may by regulation establish a personnel system for senior personnel within the Federal Bureau of Investigation and the Drug Enforcement Administration to be known as the Federal Bureau of Investigation and Drug Enforcement Administration Senior Executive Service (hereinafter in this subchapter referred to as the "FBI-DEA Senior Executive Service"). The regulations establishing the FBI-DEA Senior Executive Service **shall**--

. . .

---

[5] OPM, created by the CSRA, is charged with "executing, administering, and enforcing" the civil service laws. 5 U.S.C. § 1103 (outlining OPM functions). Congress intended OPM to act as "the arm of the President in matters of personnel administration." S. Rep. 95-969 at 24.

(5) provide for—

. . .

(D) removal or suspension consistent with subsections (a), (b), and (c) of section 7543 (except that any hearing or appeal to which a member of the FBI-DEA Senior Executive Service is entitled shall be held or decided pursuant to procedures established by regulations of the Attorney General) . . .

(emphasis added).; *Cf.* Mot. at 21 (emphasizing that section 3151 only requires that regulations "should provide for removal 'consistent with' section 7543").

Subsections (a), (b), and (c) of Section 7543 leave little doubt as to whether FBI SES have for-cause removal protections. They state, in relevant part:

(a) Under regulations prescribed by the Office of Personnel Management, an agency may take an action covered by this subchapter against an employee **only for** misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function.

(b) An employee against whom an action covered by this subchapter is proposed **is entitled to**—

(1) at least 30 days' advance written notice, unless there is reasonable cause to believe that the employee has committed a crime for which a sentence of imprisonment can be imposed, stating specific reasons for the proposed action;

(2) a reasonable time, but not less than 7 days, to answer orally and in writing and to furnish affidavits and other documentary evidence in support of the answer;

(3) be represented by an attorney or other representative; and

(4) a written decision and specific reasons therefor at the earliest practicable date.

(c) An agency may provide, by regulation, for a hearing which may be in lieu of or in addition to the opportunity to answer provided under subsection (b)(2) of this section.

(emphasis added).

Finally, any question as to whether Congress intended the combination of these statutes to provide for due process protections is put to bed by the legislative record:

> Section 3151(a)(5)(D) requires that the regulations provide procedures for removal or suspension which are consistent with subsections (a), (b), and (c) of section 7543 of title 5. In lieu of any hearing or appeal which might be available outside the agency to an individual in the government-wide SES, the Attorney General's regulations **shall** provide for an alternative hearing or appeal. **This provision is intended to ensure basic due process to members of the FBI-DEA SES** while not undermining the need for confidentiality within these agencies.

H.R. Rep. 100-608 at 6 (emphasis added).

Read together, and consistent with congressional intent, these statutes establish that FBI SES are entitled to for-cause removal protections in any FBI SES personnel system.[6]

### 2. FBI SES protections form the basis of a procedural due process claim.

The next step, then, is to determine whether these for-cause removal protections for FBI SES establish a property interest sufficient to support a procedural due process claim. *See Dodson v. U.S. Capitol Police*, 2019 WL 4860720, at *5 (D.D.C. Sept. 30, 2019) ("To prevail on [a] procedural due process claim, the plaintiff must first show a deprivation of 'life, liberty, or property' and must then show that 'the procedures used by the Government in effecting the deprivation [did not] comport with due process of law.'") (quoting *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014)). This is a short leap. To avoid it, Defendants politely ask this Court to ignore its own ruling in *McCabe*, as well as the D.C. Circuit's ruling in *Esparraguera*, both of which speak decisively on this issue.

---

[6] Defendants note that the FBI SES policy currently in place pursuant to these statutes has been modified since Plaintiffs first became SES employees. Mot. at 12, n.2. Regardless of any granular modifications that may exist in the current policy, the law requires that it *must* "provide for . . . removal or suspension consistent with subsections (a), (b), and (c) of section 7543." 5 U.S.C. § 3151(a)(5).

In *McCabe*, this Court found "that the combination of 5 U.S.C. §§ 3151(a)(5)(D) and 7543 require good cause to remove a member of the FBI SES and that this protection is sufficient to create a property interest." *McCabe* 490 F. Supp. at 218.  A few years later, the D.C. Circuit's ruling in *Esparraguera* held the same, stating that "a property interest exists if the employee can be removed only for cause . . . because an employee removable for cause can expect to remain employed *unless* they do something warranting their termination." *Esparraguera* 101 F.4th at 33; *see also Palmeri v. M.S.P.B.*, 164 F.4th 878, 884 (Fed. Cir. 2026) (emphasis in original) (citing *McCabe* and *Esparraguera* to demonstrate that DEA SES plaintiff without MSPB rights could rightly bring constitutional due process claims in federal court).

Each case cited by Defendants in support of their  contention that Plaintiffs are at-will employees with no property rights is inapposite because none of them involve FBI SES employees afforded the protections of 5 U.S.C. §§ 3151 and 7543.  *See Lamb v. Holder*, 82 F. Supp. 3d 416 (D.D.C. 2015) (FBI SES statutes not at issue); *Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (same); *Mack v. United States*, 814 F.2d 120 (2d Cir. 1987) (non-SES special agent suspended pending dismissal following allegations of drug use, with litigation beginning before the passage of 5 U.S.C. § 3151); *Painter v. FBI*, 694 F.2d 255 (11th Cir. 1982) (non-SES special agent terminated for lying on job application, with litigation predating the passage of 5 U.S.C. § 3151); *Strzok v. Garland*, 1:19-cv-02367-ABJ, Memo Op., ECF No. 164 (D.D.C. Sept. 23, 2025) (summary judgment decision where SES had been provided notice and an opportunity to respond, accepted demotion prior to summary dismissal, and property interest turned on waiver of process rights under "Last Chance Agreement" instead of FBI SES statutes).

In sum, having properly alleged that they have been deprived of a constitutionally protected property interest, Compl. ¶¶ 226-234, Plaintiffs have established a procedural due process claim in Count I.

### 3. Plaintiffs have sufficiently alleged a liberty interest necessary for a procedural due process claim.

Defendants' allegation that Plaintiffs failed to plausibly demonstrate a cognizable liberty interest and have not adequately shown reputational or stigmatized harm as a result of their removals is similarly deficient. Mot. at 22. This Circuit recognizes that "a plaintiff may avail himself of two different legal theories to establish a reputation-based due-process violation." *Jefferson v. Harris*, 170 F. Supp. 3d 194, 205 (D.D.C. 2016). In the first instance, Plaintiffs have plausibly alleged a "reputation-plus" theory—requiring "the conjunction of official defamation and adverse employment action," *see O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998), because Defendants, primarily through Director Patel, publicly connected the termination actions to allegations that Plaintiffs had engaged in "weaponizing" and "politicizing" the FBI. Compl. ¶¶ 211, 229.

By personally appearing in a public TV interview twelve days after terminating Plaintiffs (and two others), Patel engaged in false and defamatory public speech that impugned the professional reputation of each Plaintiff, announcing that these career law enforcement officials acted politically and were unfaithful to the Constitution. The termination and Patel's rhetoric following Plaintiffs' terminations not only caused the loss of Plaintiffs' government employment but also harmed their future employment prospects.[7] Compl. ¶ 229.

_____

[7] Plaintiffs promptly brought suit here within 32 days of termination. As alleged in the Complaint, the FBI delayed processing the paperwork that formalized their terminations. Compl. ¶¶ 192, 202, 208. As a result, the Complaint does not—and could not at the time—include allegations detailing "what future employment they [sought] to engage in," how Defendants' statements "are hampering efforts to seek [new] employment," any "rejection[s] from a job for which they applied," or other

Where there is a loss of present or future government employment combined with the stigmatization of one's reputation "by, for example, charging the employee with dishonesty" in a way that "has hampered future employment prospects," a reputation-plus due process violation has occurred. *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1111 (D.C. Cir. 1985).

Here, there is no dispute Plaintiffs suffered a loss of their present and future government employment prospects. Patel's Termination Letters purported to remove them from all "federal service." Compl. ¶¶ 191, 201, 207, 229, 231. In disputing whether Plaintiffs have shown they are barred from future employment, Defendants ignore D.C. Circuit precedent holding that "if [the government's] action formally or automatically excludes [the plaintiff] from work on some category of future [government] contracts or from other government employment opportunities, that action changes [the plaintiff's] formal legal status and thus implicates a liberty interest." *Kartseva v. Dep't of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994). Here, Patel's asserted Article II authority—and, apparently, authority as the FBI Director—purports to remove Plaintiffs "from the federal service" based on a notion tied to their supposedly irredeemable political incompatibility with the incumbent policy party. Compl. ¶¶ 189, 191, 199, 201, 205, 207. Plaintiffs each dedicated decades of their careers to federal law enforcement, spread out over multiple different political administrations, and were each within mere years of retirement eligibility. *Id.* ¶¶ 26, 38, 47. Yet Patel has, in effect, declared them unfit for any future federal work. Plaintiffs have thus plausibly pled that they are "formally or automatically exclude[d]" from future government employment opportunity. *Kartseva* , 37 F.3d at 1528.

---

"preclusion[s] of opportunities in the field of law enforcement" as a result of their termination that would support a due process violation. Mot. at 25. Having now received them, the SF-50s cite to Article II as a "reason[] for removal," which the Court can reasonably infer means Plaintiffs are barred from *any* federal work in this Administration. *Rann*, 154 F. Supp. 2d at 64.

Worse still, Patel admitted that his decisions to terminate Plaintiffs were aimed at "ridding this place of its former leadership structure that did that weaponization" and even chastised "old leaders" who had once helmed the FBI. Compl. ¶¶ 211-212. Termination based on charges of "weaponization," which amounts to a broad, categorical accusation of dishonesty, politicization, disloyalty, and even corruption of their office on the part of Plaintiffs, infringes protected reputational interests in this Circuit and satisfies the pleading standard for the second prong of a reputation-plus due process violation. *See Doe*, 753 F.2d at 1110 (discussing that a termination based on charges of misconduct, dishonesty, or disloyalty infringes on a government employee's protected liberty interests in professional reputation); *Conset Corp. v. Cmty. Servs. Admin.*, 655 F.2d 1291, 1296 (D.C. Cir. 1981) (holding that government memorandum questioning plaintiff's business integrity and barring plaintiff from future government employment amounted to claim of infringement of protected liberty interest sufficient to survive motion to dismiss); *Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 963 (D.C. Cir. 1980) (branding a government contractor as "nonresponsible" due to a "lack of integrity" constituted government infringement upon reputation-plus liberty interest).

Defendants cite *Fonville v. District of Columbia*, 38 F. Supp. 3d 1, 14 (D.D.C. 2014), to suggest that allegations of "weaponization" and "politicization" do not implicate liberty interests. But the defamatory statement at issue in *Fonville*—where a police chief stated that a police officer's illegally parked car constituted "unacceptable behavior," which "was not consistent with what [the chief] expected from a command member of [his] staff"—falls well short of the reputation-harming statements Patel made here, since the comments in *Fonville* were anchored to a discrete incident and specifically measured against the speaker's own expectations of his staff. *Id*. at 12. In fact, *Fonville* even notes that statements which "impugn the employee's professional

reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession" rise to the level of implicating a liberty interest. *Id*. at 14 (citation omitted).

Defendants claim that "'weaponization' and 'politicization' are too far afield from allegations of 'dishonesty,' 'criminal conduct,' 'mental illness' or 'lack of intellectual ability' that would ordinarily be deemed to compromise a plaintiff's liberty interest," Mot. at 24. But even assuming these are not arguments of fact that require discovery, this dubious assertion is soundly refuted by their own repeated use of the two terms:

- On January 20, 2025, Defendant EOP issued Executive Order ("EO") 14147 titled "Ending the Weaponization of the Federal Government."[8]  The EO described weaponization as "a systemic campaign against perceived political opponents" that included "actions . . . oriented more toward inflicting political pain than toward pursuing actual justice or legitimate governmental objectives" and that "appear to be inconsistent with the Constitution and/or the laws of the United States."

- On February 5, 2025, Defendant Bondi issued a memorandum entitled "Restoring the Integrity and Credibility of the Department of Justice."[9]  The memorandum specifically cited to EO 14147 to explain why "integrity" needed to be "restor[ed]."  She further articulated her definition of weaponization: "No one who has acted with a righteous spirit and just intentions has any cause for concern about efforts to root out corruption and

---

[8]  Available at https://www.govinfo.gov/content/pkg/FR-2025-01-28/pdf/2025-01900.pdf [https://perma.cc/3TDA-DYYR].
[9]  Available at https://www.justice.gov/ag/media/1388506/dl?inline [https://perma.cc/74EX-A5L2].

weaponization. On the other hand, the Department of Justice will not tolerate abuses of the criminal justice process, coercive behavior, or other forms of misconduct."

- Defendant Patel's references to weaponization on social media and media appearances are too plentiful to count. A recent representative sampling displays stigmatizing characterizations: a February 6, 2026 Fox News interview where he discussed that the Bureau during the time Plaintiffs were employed was "weaponized," "politicized," and did not base investigations "on law and facts"[10]; a December 5, 2025 Fox New interview where he described the FBI's J. Edgar Hoover Building Headquarters as having "built a diseased temple of weaponization,"[11]; and an October 7, 2025 social media post where he again described recently fired agents as "weaponized" and said that were terminated for having "acted unethically."[12]

Plaintiffs have also plausibly alleged a "stigma-plus" theory at this stage,[13] which "differs from [a reputation-plus claim] in that it does not depend on official *speech*, but on a continuing stigma or disability arising from official *action*." *O'Donnell*, 148 F.3d at 1140 (emphases added). Put simply, the stigma-plus theory "depends only on governmental imposition of 'a continuing stigma or other disability arising from official action' that 'foreclosed the plaintiff's freedom to

---

[10] Video posted by Rapid Response 47 (@RapidResponse47), X (Feb. 6, 2026 at 10:03 PM), https://x.com/RapidResponse47/status/2019970140973285564?s=20 [https://perma.cc/HN4H-8HFG].

[11] Video posted by Fox News (@FoxNews), YOUTUBE, Kash Patel Calls Out 'DISEASED Temple of Weaponization', (Dec. 5, 2025), https://www.youtube.com/watch?v=GokcoPH_TrM [https://perma.cc/4Q26-VUGD].

[12] Image posted by FBI Director Kash Patel (@FBIDirectorKash), X (Oct. 27, 2025 at 1:32 PM), https://x.com/FBIDirectorKash/status/1975615124556632540?s=20 [https://perma.cc/V2BY-RAMS].

[13] While Defendants' Motion states only that "Plaintiffs' complaint fails to state either type of reputation-based due process claim" (Mot. at 23), it does not offer any argument about how Plaintiffs have failed to plausibly allege a "stigma plus" claim. Plaintiffs submit that this argument should be deemed waived but will nevertheless briefly respond to this conclusory allegation.

take advantage of other employment opportunities.'" *Jefferson v. Harris*, 170 F. Supp. 3d 194, 205 (D.D.C. 2016) (quoting *O'Donnell*, 148 F.3d at 1140). Plaintiffs' termination letters, which purported to preclude them broadly from "federal service," effectively communicate to any future employer that Plaintiffs' alleged misconduct or disloyalty has rendered them unsuitable for federal work. Compl. ¶ 231. As a result, Defendants have effectively stigmatized Plaintiffs' reputations and imparted a "status change" upon them that has implicated their liberty interests.

**B.    Plaintiffs Have Plausibly Alleged a Fifth Amendment Violation (Substantive Due Process) and Defendants' Rule 12(b)(6) Motion as to Count I Should Be Denied.**

Count I alleges both procedural and substantive due process violations. To combat the substantive due process claim, Defendants again rely on their failed argument that FBI SES personnel "have no constitutionally protected property interest in their continued employment with FBI." Mot. at 26. Defendants further argue, while conceding that this Court is bound by contrary precedent on the issue, that "the substantive due process doctrine does not protect property interests in public employment." *Id.* Finally, Defendants deny that any conscience-shocking behavior has taken place. *Id.*

**3.    Plaintiffs have a significant property interest necessary for a substantive due process claim.**

Again, Defendants' property interest argument has already been raised before—and rejected by—this Court. *McCabe*, 490 F. Supp. 3d at 221-22. While it is true that most substantive due process claims require "significant personal or property rights," *Tri County Industries v. District of Columbia*, 104 F.3d 455, 459 (D.C. Cir. 1997), Defendants rely on the exact same inapposite cases they cited in *McCabe* to support their argument that Plaintiffs' employment is constitutionally insignificant. *Compare* Mot. at 26 *with McCabe*, 1:19-cv-2399-RDM, ECF No. 31 at 25 (government's summary judgment reply brief citing the same cases). And the Defendants'

argument was rejected when this Court held in *McCabe* that "[t]he D.C. Circuit's decision in *American Federation of Government Employees, AFL-CIO v. United States*, 330 F3d 513 (D.C. Cir. 2003), does not question that government employment can, at least at times, constitute a property interest protected by substantive due process." *McCabe*, 490 F. Supp. 3d at 221; *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985) (noting the "significance of the private interest in retaining employment cannot be gainsaid" and acknowledging "the severity of depriving a person of the means of livelihood").

Plaintiffs devoted a collective sixty years of their lives to service to the United States, incurring not even a single performance issue or security violation prior to their firings. Compl. ¶¶ 2, 40. Each of them had reached the necessary years of service for retirement but were precluded only by age requirements. *Id*. ¶¶ 26, 38, 47. Yet because Patel's Termination Letters purport to remove them "from the federal service," *Id*. ¶¶ 189, 191, 199, 201, 205, 207, if they cannot be reinstated into federal service, they will be deprived of ever realizing their federal retirement benefits absent relief from this Court. And this is to say nothing of Plaintiffs' immediate loss of salary and health insurance as a result of Patel's "effective immediately" actions. *Id*. ¶ 228.

### 2.    Patel's behavior shocks the conscience.

The flippant way in which Patel discarded each of Plaintiffs' exemplary careers, *see, e.g.*, Compl. ¶¶ 18, 19, 29, 32, 41, in plain violation of statutory law and acting *ultra vires* is enough to show "grave unfairness."[14]    *Tri County Industries*, 104 F.3d at 459. But even if this Court entertained *arguendo* that Plaintiffs' statutorily protected careers could be erased on an apparent

---

[14] Some caselaw suggests that *ultra vires* action, in and of itself, establishes a substantive due process violation. *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 812 n.14 (D.C. Cir. 1987) (noting that "a claim that ultra vires governmental action" caused injury to a plaintiff may "violate[] the due process clause"); *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 789 (2d Cir. 2007) (explaining that procedurally irregular actions were "ultra vires and, as a result, sufficiently arbitrary to amount to  a substantive due process violation").

whim, *see, e.g.*, Compl. ¶¶ 134, 142, 194 (detailing Defendants' praise for Plaintiffs' work before summarily firing them), the Complaint alleges a strong inference of "deliberate flouting of the law" which meets the "shock the conscience" standard. *Cf. Ranch v. Noem*, No. 20-CV-3478-CRC, 2025 WL 2760959, at *13 (D.D.C. Sept. 29, 2025).

The Complaint alleges detailed, fact-specific instances of the Director of the FBI's casual willingness to violate the law. Compl. ¶¶ 4, 5, 178, 183-186. The Complaint also alleges that the Director—in conducting unlawful, politically-motivated terminations—acted contrary to his statements made under sworn testimony that "all FBI employees will be protected against political retribution," "[e]very FBI employee will be held to the absolute same standard," "no one will be terminated for case assignments," and "personnel decisions should be based on performance and adherence to the law." *Id.* ¶¶ 6, 7. His deviation from his sworn statements were accompanied by naked admissions of lawlessness, acknowledging that he knew his terminations of certain agents based on political retribution was "likely illegal and that he could be sued and later deposed." *Id.* ¶ 186. When Driscoll confronted Patel with this unlawfulness, Patel *again* contradicted his sworn testimony by flouting the law to summarily fire Driscoll himself.

One reasonable inference drawn from these facts under a Rule 12(b)(6) framework is that Patel was deliberately untruthful under oath and that this untruthfulness was a central characteristic of the path to Plaintiffs' firings. Notably, Defendants have stated on the record in a contemporaneous case involving an FBI Director that any appearance of "lying to . . . Congress under oath about actions [taken] while serving as the Director of the Federal Bureau of Investigation" is a "true affront to the criminal justice system." *United States v. Comey*, 1:25-cr-

272-MSN (E.D.V.A.), ECF No. 138 at 47.[15]  If using a defendant's flouting of the law to show a substantive due process violation, "the manner in which the violation occurs as well as its consequences are crucial factors to be considered."  *Tri County Industries, Inc.*, 104 F.3d at 459 (quoting *Comm. of U.S. Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 944 (D.C.Cir.1988)).  Here, the allegations in the Complaint—taken as true, as they must be at this stage—establish a grievous abuse of Patel's position as the Director of the FBI and truly shocks the conscience.

### C.     Plaintiffs Have Plausibly Alleged a First Amendment Violation and Defendants' Rule 12(b)(6) Motion as to Count II Should Be Denied.

#### 1.     Defendants misapply *Garcetti* and *Connick.*

Defendants mischaracterize Plaintiffs' First Amendment claim.  They argue against a strawman by framing Plaintiffs' apolitical work at the FBI as something "intended to be communicative" of some type of protected expression.  Mot. at 27-28 (citation omitted).  In reality, Count II alleges that Defendants terminated Plaintiffs for remaining *apolitical* and failing to pledge personal political loyalty and patronage, not that Plaintiffs' job activities were protected speech. Compl. ¶¶ 236, 240, 241 ("Partisan affiliation and political support for the Defendants are not legal or appropriate requirements for the effective performance of Plaintiffs' respective roles within the FBI.").  Plaintiffs took pains to ensure that they conducted their duties in an apolitical fashion and avoided voicing allegiance to any political party.  *See e.g.*, *id.* ¶ 58 ("Driscoll noted that his service would be to an 'office,' not to a politician who occupies an office.") and ¶ 62.  They allege that

---

[15] "[A]mong the documents subject to judicial notice on a motion to dismiss are public records, which includes records from other court proceedings."  *Avila v. CitiMortgage, Inc.*, 45 F. Supp. 3d 110, 117 (D.D.C. 2014) (cleaned up).

Defendants retaliated against them for a perceived lack of political loyalty and partook in patronage dismissals in violation of the First Amendment.

By recasting Plaintiffs' First Amendment claim as challenging employment action taken in response to employee speech, Defendants walk this Court through an inapposite line of case law. *See* Mot. at 27-29 (*citing*, *inter alia*, *Garcetti v. Ceballos*, 547 U.S. 410 (2006) and *Connick v. Myers*, 461 U.S. 138 (1983)). An analysis that Plaintiffs' conduct is not "speech" meriting First Amendment protection is irrelevant to the patronage claims made in Count II.

Echoing the *Elrod v. Burns*, 427 U.S. 347 (1976), line of cases, *Connick* and *Garcetti* actually reiterate that government employees retain First Amendment protections, though with some limitations. *See Connick*, 461 U.S. at 142 ("[A] state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."); *Garcetti*, 547 U.S. at 417 (affirming that "public employees do not surrender all their First Amendment rights by reason of their employment"). In fact, in *Connick*, the Court rejected the proposition "that a public employee ha[s] no right to object to conditions placed upon the terms of employment" including restrictions which inhibit constitutional rights. *Connick*, 461 U.S. at 143. To the contrary, the Court highlighted that the constitutional rights retained by government employees include "that the government [can]not deny employment because of previous membership in a particular party." *Connick*, 461 U.S. at 144 (citing cases).

### 2. Plaintiffs' claims are properly analyzed under *Elrod* and its progeny.

Plaintiffs' First Amendment claims should be analyzed under the "political patronage" line of cases. Patronage dismissals are characterized by the termination of employment simply because the employee is "not affiliated with or sponsored by" the relevant party. *Branti v. Finkel*, 445 U.S. 507, 517 (1980) (*quoting Elrod*, 427 U.S. at 350). Such dismissals are impermissible under the

First Amendment.  S*ee Elrod*, 427 U.S. at 373; *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990) (stating that where party affiliation is not a job requirement, "the First Amendment forbids government officials [from] discharg[ing] or threaten[ing] to discharge public employees solely for not being supporters of the political party in power"); *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714 (1996) ("Government officials may not discharge public employees for refusing to support a political party or its candidates, unless political affiliation is a reasonably appropriate requirement for the job in question.").  These principles apply equally to cases where an employee is terminated for their *perceived* affiliation with a political party or campaign, regardless of whether that perception is accurate.  *Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016).

Defendants here made clear that personal political allegiances were dispositive in their personnel decisions.  *See, e.g.*, Compl. ¶¶ 62, 65, 94, 122-128, 163, 167.  "[A] patronage system involving the wholesale dismissal of public employees for partisan reasons, applied without regard to an employee's responsibilities," will fail First Amendment scrutiny.  *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 239 (1st Cir. 1986) (*citing Elrod,* 427 U.S. at 367).[16]  These political motives informed Defendants' personnel decisions and Plaintiffs were dismissed for "refusing to support" the objectives of the incumbent political party.  *O'Hare Truck Serv.*, 518 U.S. at 714.

Government employees "are expected to enforce the law and execute the programs of the Government without bias or favoritism for or against any political party or group or the members thereof."  *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 564-65.  The

---

[16] Defendants chose to ignore *Elrod* and its progeny, putting forward no arguments that Plaintiffs' dismissals were the "least restrictive" means for a "vital government end."  *Elrod*, 427 U.S. at 363. This Court would have "no obligation to entertain arguments first raised for the first time in a reply brief," since doing so would unfairly deprive Plaintiffs an opportunity to respond.  *Akinsinde v. Not-For-Profit Hosp. Corp.*, 216 F. Supp. 3d 33, 40-41 (D.D.C. 2016).

1939 Hatch Act was passed to "reduce the hazards to fair and effective government."  *See id.* (*citing* 84 Cong. Rec. 9598; 86 Cong. Rec. 2433-34, 2864; Hearings on S. 3374 and S. 3417 before the Senate Committee on Post Office and Civil Service, 92d Cong., 2d Sess., 171).  Plaintiffs meticulously complied with these standards to protect Americans and upholding the values and mission of the FBI.  *See, e.g.*, Compl. ¶ 62.  Whether or not Plaintiffs actually supported a political party other than the incumbent's party is immaterial.  *Heffernan*, 578 U.S. at 273-74.  Plaintiffs' diligent insistence on remaining apolitical, despite great pressure to partake in partisan activities and political retribution, resulted in their termination and cost them a dignified end to their careers in government service.

### 3.    Defendants' stated reasons for Plaintiffs' terminations should be inferred to be pretextual.

In some sense, Defendants are correct; because the Complaint *does* not allege that Plaintiffs were fired for speech or conduct made as part of their official duties, the Court here need not wade into the balancing test articulated in *Pickering v. Board of Ed. of Township High School Dist.*, 391 U.S. 563 (1968) and referenced by *Garcetti*.  Mot. at 29-30.  Instead, Count II claims that Plaintiffs were targeted for their perceived political allegiances.  Compl. ¶¶ 237-242.  Whereas the plaintiff in *Garcetti* was terminated because of employer dissatisfaction with a memo written "pursuant to [plaintiff's] official responsibilities" as a government employee,  *Garcetti*, 547 U.S. at 424, the dismissals of Plaintiffs were completely unrelated to their performance of official duties.  In fact, they appear to have been terminated *in spite of* their performance.

It is worth pausing here to return to the content of Plaintiffs' termination letters.  Each letter represents Patel's blunderbuss attempt to cite a lawful basis for terminating Plaintiffs.  In just a

few sentences, he cites the FBI's summary dismissal policy (which does not apply to FBI SES[17]), invokes Article II (which does not extend to the FBI Director), and makes a half-hearted attempt at for-cause removal. For Driscoll, Patel made vague allegations about communications and media leaks. Compl. ¶ 189. For Jensen, Patel wrote opaquely about a failure to timely respond to tasks. *Id*. ¶ 199. For Evans, Patel referenced a false claim about Evans's application of the DOJ's COVID-19 protocol. *Id*. ¶ 205.

Tellingly, in their motion to dismiss, Defendants have made no attempt to revisit, defend, or rely on these preposterous accusations. In fact, they now correctly and inconsistently admit that Plaintiffs served "with distinction." Mot. at 10. Given this irregularity, there is a strong inference that these quasi-for-cause accusations were simply pretext for an unlawful motive. *See Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 n.3 (D.C. Cir. 2008) (noting that in the context of employment discrimination cases, pretext can be shown by "changes and inconsistencies in the stated reasons for the adverse action" or "the employer's failure to follow established procedures or criteria"). Indeed, Defendants now appear to be relying solely on their novel interpretation of "Article II" removal authority as justification for the terminations. Mot. at 16-18. But if this were always Defendants' genuine position, there would be no reason for Patel's clumsily drafted for-cause removal reasonings for each Plaintiff.

The inference of pretext is further underscored by former Deputy Director Bongino's exchange with Driscoll on August 4, 2025, four days before his firing. In that exchange, Bongino asked Driscoll whether "anybody would be able to 'find anything' in his emails" during his time as Acting Director. Driscoll understood this to represent Defendants' efforts to find something

---

[17] *See, e.g.*, Department of Justice, Office of the Inspector General, *Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct Investigations*, 21-127, September 2021, at 2, n.9 (available at https://oig.justice.gov/sites/default/files/reports/21-127.pdf).

incriminating to use as a basis to fire him, when the true reason he was being fired was for *not* illegally firing someone else.  Compl. ¶¶ 176-186.  That the false allegation of "misconduct" referenced in the Termination Letters was pretextual can also be inferred from Bongino's and Patel's regular praise of Jensen's work prior to his termination, only to be followed by the Termination Letter's blasé claim that he "failed to execute and perform requested tasks."  *Id*. ¶¶ 134-142, 199.  Still more evidence of pretext includes FBI leadership's denial that "discipline, performance, or misconduct" played a role in Evans' dismissal, yet Patel citing a "lack of reasonableness and overzealousness" in his Termination Letter.  *Id*. ¶¶ 203, 205.

### 4.    Plaintiffs have also stated a claim under the "cat's paw" theory.

Finally, any suggestion that Patel—or any other listed Defendant—acted on behalf of higher authorities and thus is not liable for the actions taken against Plaintiffs, ignores the "cat's paw" theory of liability.  *See Noisette v. Lew*, 211 F. Supp. 3d 73, 94 (D.D.C. 2016) (citing *Staub v. Proctor Hospital*, 562 U.S. 411 (2011) (explaining that an employer can be held liable for discriminatory action when their supervisor "harbors discriminatory animus and influences the ultimate decision maker," even if there is no evidence of the decision maker's own discriminatory intent); *Coats v. DeVos*, 232 F. Supp. 3d 81, 88-89 (D.D.C. 2017) ("[T]he involvement of an unbiased 'ultimate decisionmaker' will not insulate an employer from liability.").

Under the "cat's paw" theory, it is of no moment that Patel indicated that the White House and the Department of Justice "directed him to fire anyone who they identified as having worked on a criminal investigation against President Donald J. Trump."  Compl. ¶ 4; *see also id.* ¶ 83 ("Bove made clear that he and Miller wanted to see personnel action like reassignment, removals, and terminations at the FBI, similar to the firings and reassignments of senior attorneys at DOJ that had occurred since January 20, 2025."), or that he may claim the personnel actions taken

27

against Evans were "'all DOJ,' and 'politically driven,' and that the matter was out of Patel's hands." *Id*. ¶ 167; *see also id*. ¶ 163 ("Patel thought [Evans] was doing excellent work but added that the publicization of his work was creating 'political pressure' for the Director."). However, evidence of pressure from the White House or the Department of Justice to terminate all employees who were not "based out" enough, *id*. ¶ 65, will not protect Patel from liability. *McCabe*, 490 F. Supp. 3d at 214 ("*[A]ll* federal officials take an oath to uphold the Constitution and that no one is entitled to an irrebuttable presumption of virtue under the law.") (emphasis in original). Patel, who is an attorney, was aware that his actions were likely illegal and that he could be liable for the personnel decisions. Compl. ¶¶ 5, 185-86. He decided to proceed anyway.

Plaintiffs swore an oath of allegiance to protect the American people and uphold the Constitution. Compl. ¶ 1. Plaintiffs consistently fulfilled these promises throughout their combined 60 years of distinguished government service. *Id*. ¶ 2. Rendering their continued employment contingent upon their allegiance to political retribution or a political party, whether perceived or actual, violates Plaintiffs' First Amendment rights. Taking all facts in the Complaint as true and drawing all inferences in Plaintiffs' favor, Plaintiffs have demonstrated that Defendants' actions violate the First Amendment of the United States Constitution.

### D. Defendants' Unprecedented Article II Theory is Unsupported by Fact or Law.

Defendants make an unprecedented argument that the Director of the FBI—an officer subordinate to the Attorney General—has sweeping Article II removal authority (and, apparently, appointment authority). *See* Mot. at 9-11; Compl. ¶¶ 189, 199, 205 (purporting to remove Plaintiffs "from the federal service, under my authority as FBI Director, effective immediately"). For the reasons outlined below, this argument is unsupported by facts or law.

### 1.    Defendant Patel's purported Article II authority has never been recognized in any court or by Executive Branch officials.

It will come as no surprise to this Court that the scope of the President's authority to remove officers traditionally understood to have for-cause removal protections is the subject of ongoing litigation.  *See Cook v. Trump*, 804 F. Supp. 3d 14 (D.D.C. 2025) (Cobb, J.).  But in nearly all of those cases, that contested authority was invoked specifically by, or on behalf of, the President of the United States.  *See, e.g., Cook*, 804. F. Supp. 3d at 19 (President cites to "my authority" via a letter posted to his social media account addressed to Governor of Federal Reserve Board); *Wilcox v. Trump*, 1:25-cv-334-BAH (D.D.C.), ECF No. 10-4 (email sent "[o]n behalf of President Donald J. Trump" to member of the National Labor Relations Board); *Harris v. Trump*, 1:25-cv-412-RC (D.D.C.), ECF No. 2-2 (email sent "[o]n behalf of President Donald J. Trump" to member of the Merit System Protection Board);  *Slaughter v. Trump*, 1:25-cv-909-LLA (D.D.C.), ECF No. 1-2 (email sent "[o]n behalf of President Donald J. Trump" to Federal Trade Commissioner); *Comans v. EOP*, 1:25-cv-1237-MSN (E.D.V.A), ECF No. 1 ¶ 17 (memorandum terminating Federal Emergency Management Agency official "at the direction of the President").  In at least a few instances, purported Article II terminations occurred at the direction of an Executive Branch department head.  *See Gordon v. EOP*, 1:25-cv-2409-JMC (D.D.C.), ECF No. 1 ¶¶ 25, 35, 40 (termination correspondence to DOJ employees signed by the Attorney General); *Schnitt v. Bondi*, 1:25-cv-4111-CRC (D.D.C.), ECF No. 1 ¶¶ 28-29 (same).

Here, the President did not direct any communications to Plaintiffs.  Nor did Patel's Termination Letters state he was acting on behalf of the President.  Instead, he presented these terminations as if he acted alone, "under my authority as FBI Director."  Compl. ¶¶ 189, 199, 205; Exs. 1, 2, 3.  And, in sworn testimony to the Senate Judiciary Committee just six days after Plaintiffs filed this Complaint, Patel denied that he had ever discussed personnel decisions with

the White House in response to questions from Senator Richard Blumenthal about the firings, claiming that discussions, if any, about personnel decisions with the White House are "for budgetary purposes":

| | |
|---|---|
| Sen. Blumenthal: | Well, let me just ask you to answer my question. Has anyone from the White House contacted you about personnel decisions? |
| Patel: | Generally speaking, we always discuss with the White House OMB during the budget process, how many personnel we need, who we need where. |
| Blumenthal: | Answer is yes. |
| Kash Patel: | For budgetary purposes. |
| Blumenthal: | If you've been directed to fire people, agents, because they participated in investigations of the president. |
| Patel: | I don't receive directions to do that. |
| Blumenthal: | Has anyone suggested? |
| Patel: | I make the decisions. |
| Blumenthal: | Has anyone asked you to do it?  The best information is yes, you've taken suggestions and directions from the White House in firing qualified agents. |
| Kash Patel: | **Any** termination at the FBI was a decision that **I made** based on the evidence that **I have** as the Director of the FBI and it's my job and I'm not going to shy away from it. And as you stated, those are allegations, and that is an ongoing litigation, so they'll have their day in court and so will we. |
| Blumenthal: | The allegations are not just in that lawsuit, Director Patel, and I think your testimony confirms that in fact, you've taken direction from the White House … |
| Patel: | I don't, it does not. |
| Blumenthal: | … in those retaliatory firings. |

Patel:     It literally does not.[18]

It is now Patel's "day in court." Yet he couches his entire Article II theory in a delegation of authority from the President. Mot. at 17 (discussing exercise of Executive power on the President's behalf) and 18 ("In these circumstances, Article II protections apply the same as if the President had terminated Plaintiffs himself."). But according to his September 16, 2025 testimony, such a delegation never actually occurred.

To the best of Plaintiffs' knowledge, no court has ever ruled on the issue of whether Article II removal authority is delegable to any other officer, implicitly or explicitly, let alone if that person is not the head of an Executive Branch department.[19] Indeed, the government's own theory as to which exact clause of the Constitution serves as the source of such authority is fluid. *See Trump v. Slaughter*, No. 25-332, Trans. at 57:13-61:41 (U.S. Dec. 8, 2025) (identifying the Vesting Clause as the "clearest textual basis" for removal authority but acknowledging the Take Care and Appointments Clauses may play roles as well).[20] This is particularly relevant, since if removal authority flows solely from appointment authority, *Myers v. United States*, 272 U.S. 52, 119 (1926), there would be an additional question as to whether Patel enjoyed a wholesale or partial delegation of authority (or neither). In other words, could Patel simply hire Plaintiffs back

---

[18] U.S. Senate Committee on the Judiciary, Oversight of the Federal Bureau of Investigation, Oversight Hearing (September 16, 2026) (emphasis detectable in original). This particular exchange begins at approximately 2:34:00 of the recorded testimony, available at: https://www.judiciary.senate.gov/committee-activity/hearings/oversight-of-the-federal-bureau-of-investigation-09-16-2025.

[19] The prospect of delegating Article II removal authority to a non-department head is currently being challenged in at least one case. *See Comey v. DOJ*, 1:25-cv-7625-JMF (S.D.N.Y), ECF No. 38 at 10, 54-55 (raising issue of implicit Article II delegability to a DOJ employee).

[20] Available at https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/25-332_7lhn.pdf (last visited February 14, 2026).

tomorrow, or does that lie with the Attorney General?  Patel's logic risks significant conflicts should one officer ever disagree with another on how to wield this so-called Article II authority.

Defendants cite no factual or legal authority which support that the Director of the FBI had implicit or explicit delegated removal authority over employees covered by statutory removal protections.  Therefore, Plaintiffs have properly stated a claim that their removals under Article II were illegal.

### 2.    The plain language of Article II undercuts Defendants' claims.

Defendant's Article II argument also rests on the bald premise that Plaintiffs are "officers" of the United States subject to at-will removal based solely on the nature of their duties.  Mot. at 17-18, n.5.  As a threshold matter, the Court need not decide whether Plaintiffs are "officers" in the constitutional sense to reject Defendants' Article II removal theory.

If Plaintiffs are officers, they are indisputably inferior officers: their work is "directed and supervised at some level" by principal officers.  *See Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 761 (2025); 28 C.F.R. §§ 0.157, 0.159.  If Plaintiffs are not officers, nothing in Article II prevents Congress from dictating conditions of federal employment—including removal standards—for senior employees.  *See Lucia v. SEC*, 585 U.S. 237, 244–45 (2018).  Either way, Defendants' theory of at-will removal fails.

### 3.    Congress has Article II authority to set appointment and removal conditions.

Defendants mischaracterize Article II and the Supreme Court's removal cases by asserting that any official who exercises executive authority must be removable at will, regardless of how Congress has allocated appointment and removal power.  Mot. at 17-18.

As a general rule, Presidential power to remove executive officers is incident to the power to appoint.  *Myers*, 272 U.S. at 119 (1926); *Kennedy*, 606 U.S. at 763. When the President appoints

an officer, the President ordinarily retains authority to remove that officer. *Myers,* 272 U.S. at 119. But Article II draws a critical distinction when appointment authority does not reside with the President.

The Constitution expressly authorizes Congress to vest the appointment of inferior officers "by Law" in the "President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2. When Congress exercises that authority and vests appointment power in a department head—as it has done here—the Constitution permits Congress to define the conditions under which those officers may be removed. *United States v. Perkins*, 116 U.S. 483, 485 (1886).

The Supreme Court settled that rule more than a century ago. In *Perkins*, the Court stated there is "no doubt that when [C]ongress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest." On that basis, it upheld a statute providing that an inferior officer appointed by the Secretary of the Navy could be dismissed only pursuant to court-martial. *Id.*

Subsequent cases have repeatedly reaffirmed that principle. *Morrison v. Olson* upheld for-cause removal protections for an independent counsel appointed by the judiciary. 487 U.S. 654, 670–73 (1988). *Free Enterprise Fund v. Public Company Accounting Oversight Board* confirmed that removal restrictions for inferior officers are constitutionally permissible so long as "only one level of protected tenure separate[s] the President from an officer exercising executive power." 561 U.S. 477, 493–95 (2010). And *Seila Law L.L.C v. CFPB* emphasized that constitutional concerns arise when Congress restricts the President's ability to remove principal officers appointed by the President with Senate confirmation—not inferior officers appointed pursuant to a different provision of the Appointments Clause. 591 U.S. 197, 217–19 (2020).

Most recently, *Kennedy* reiterated the same framework, explaining that when Congress intends to impose for-cause limits on the removal of inferior officers, it may do so, provided it does so "clearly and explicitly." 606 U.S. at 771 (citing *Shurtleff v. United States*, 189 U.S. 311, 318 (1903)). *Kennedy* did not question Congress's authority to impose removal restrictions on inferior officers; it addressed only whether Congress had exercised that authority in the statute before it. *Id*.

This case fits squarely within that settled doctrine. Congress vested appointment authority for FBI Senior Executive Service officials in the Attorney General. 5 U.S.C. § 3151(b). Under Article II, where Congress vests that authority outside the President, Congress may prescribe the standards and procedures governing removal. U.S. Const. art. II, § 2. Here, they did, by virtue of § 3151(a)(5)(D)'s express incorporation of § 7543(a)-(c).

Defendants' theory collapses that constitutional distinction. By treating a regulatory delegation of supervisory authority as a proxy for constitutional removal power, Defendants attempt to import presidential-removal logic into a statutory appointment scheme governed by a different section of the Appointments Clause. Article II does not permit that. Whether appointment and removal authority may be exercised by a subordinate official turns on statutory authorization by Congress—not a generalized notion of "supervision" within the executive branch.

> **4.    Congress exercised its Article I and Article II authority, and no statute or regulation transfers that authority to the FBI Director.**

Defendants' assertion that Article II "appl[ies] the same as if the President had terminated Plaintiffs himself," Mot. at 18, fails because Congress assigned appointment and removal authority over FBI SES officials to the Attorney General, and neither statute nor regulation transfers that authority to the FBI Director.

Congress vested appointment authority for FBI Senior Executive Service officials in the Attorney General.  5 U.S.C. § 3151(b).  Under Article II, Congress is empowered to define who may remove those officials and under what conditions.  U.S. Const., art. II, § 2.  Congress's authority to do so also rests on Article I.  The Necessary and Proper Clause empowers Congress to "make all Laws which shall be necessary and proper for carrying into Execution" not only its own enumerated powers, but also "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."  U.S. Const. art. I, § 8, cl. 18. Structuring the appointment, tenure, and removal of inferior officers is a valid exercise of Congress's authority to design the offices through which Article II power is carried into execution. *See, e.g, Perkins*, 116 U.S. at 485.

Congress did so expressly.  SES officials are governed by a comprehensive statutory framework that specifies both substantive standards and procedural protections for removal.  *See, e.g.*, 5 U.S.C. §§ 3151, 7543(a)–(c).  That framework reflects Congress's judgment that senior career officials should be insulated from arbitrary or politically motivated removals while remaining accountable through an appointing authority—the Attorney General—who is herself removable at will by the President.  *See Free Enter. Fund*, 561 U.S. at 495.

Nothing in the governing statutes reallocates that removal authority to the FBI Director. Nor do the Department of Justice regulations on which Defendants rely confer such authority. Those regulations permit the redelegation of supervisory and administrative responsibilities within the Department.  *See* 28 C.F.R. §§ 0.157, 0.159.  They do not reassign appointment authority, authorize removals of constitutional significance, or displace the statutory protections Congress affirmatively afforded to SES officials.  Delegations of supervision do not silently effect delegations of removal authority.  *See Shurtleff v. United States*, 189 U.S. 311, 318 (1903) (holding

that absent clear and unambiguous language state otherwise removal authority remains with appointment authority); *United States v. Arthrex, Inc.*, 594 U.S. 1, 14–17, 24–26 (2021) (treating supervisory oversight, including the ability to assign and reassign subordinate positions, as distinct from constitutionally salient removal authority).  Even if the regulations could be read to purport such a delegation, they could not lawfully override Congress's statutory allocation of appointment and removal authority.  *See Edmond v. United States*, 520 U.S. 651, 658 (1997).  If Plaintiffs are employees rather than inferior officers, the same conclusion follows.

Where Congress has spoken with this level of precision, a subordinate official may not override that framework by implication.  Congress expressly imposed for-cause removal protections and designated the Attorney General as the official responsible for determining whether that standard is met.  *See* U.S.C. §§ 3151, 7543.  Defendants' position would require the Court to set aside that statutory judgment by recharacterizing ordinary supervisory authority as constitutional removal power.  Article II does not permit that inversion of constitutional and statutory design.

Plaintiffs have plausibly alleged that the FBI Director—who lacked appointment authority over SES officials—removed them from federal service without lawful authorization.  Whether Defendants can ultimately establish a valid delegation of removal authority, and whether any such delegation complied with the statutory framework governing SES removals, are merits questions that turn on statutory text, regulatory scope, and factual development.  These issues cannot properly be resolved on a motion to dismiss.

E.    **The Court Has Jurisdiction to Hear Counts III and IV and Defendants' Rule 12(b)(1) Motion Should be Denied.**

1.    **Defendants' jurisdictional argument has been rejected by this Court in *McCabe*.**

Defendants argue that the Court does not have jurisdiction over Counts III, IV, and VI.[21] According to Defendants, because Plaintiffs' Causes of Action are "grounded in statute or regulation," this Court is deprived of jurisdiction based on Plaintiffs' exclusion from the Civil Service Reform Act ("CSRA").  Mot. at 12.

Defendants have raised—and lost—this CSRA exclusion argument before.  In *McCabe*, this Court rejected the government's attempt to recast McCabe's claims as "statutory or regulatory" simply because the claims referenced removal protection statutes and FBI policies. 490 F. Supp. 3d at 211.  In doing so, the Court noted that the statutory and regulatory references served to "lay the predicate for [McCabe's] constitutional challenges" and that "the CSRA poses no hurdle to constitutional claims."  *Id*. at 211-12.   The same is true here.

In their reprise of their *McCabe* arguments, Defendants—again—point out that most FBI employees are excepted from the CSRA.  Mot. at 13; *Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004).  They—again—note that this exclusion can prohibit personnel claims generated under *Vitarelli v. Seaton*, 359 U.S. 535 (1959).  Mot. at 15; *Graham*, 358 F.3d at 935.  But these precepts are irrelevant for this case.   This is because—again—Defendants are levying them against constitutional claims.

As described in detail above, Congress extended for-cause removal protections to members of the FBI SES specifically to provide due process protections.  *See, e.g.*, H. R. Rep. 100-608 at 6.

---

[21] Plaintiffs' Sixth Cause of Action is a mandamus claim made "in the alternative" to equitable relief under the Constitution.  Compl. ¶ 259.  Because this form of relief only comes into place "[t]o the extent relief is unavailable under the Constitution," *id.*, it is not ripe for a challenge under Fed. R. Civ. P. 12(b)(1).  *McCabe v. Barr*, 490 F. Supp. 3d 198, 211, n.1 (D.D.C. 2020).

If this were not enough to demonstrate the constitutional nature of the claims, *Defendants themselves* invoke Patel's purported Article II removal authority as justification for bypassing statutory and policy requirements. Mot. at 16 (claiming that "any statutory restriction on Plaintiffs' removal would violate Article II"). This demonstrates the justiciable federal question at issue. 28 U.S.C. § 1331.

Like in *McCabe*, Counts III and IV allege constitutional violations contextualized by Defendants' disregard for statutes and regulations. Defendants agree that constitutional violations are justiciable even where a former employee has been excluded from the CSRA. Mot. at 14, n.4 (citing *Spagnola v. Mathis*, 859 F.2d 223, 229-30 (D.C. Cir. 1988), to concede the D.C. Circuit's acknowledgment that the CSRA does not preclude district court jurisdiction of constitutional claims by federal employees altogether); *see also McCabe*, 490 F. Supp. 3d at 212 ("For their part, Defendants agree that the CSRA does not preclude judicial review of . . . constitutional claims[.]" (quotations omitted)).

### 2.    Count III is a constitutional claim.

Count III alleges that Defendants' attempt to terminate Plaintiffs is a legal nullity based on each and every authority Defendant Patel purports to rely on in the Termination Letters, including Article II. In other words, the claim is not just based on statutes (which Defendants violated) and regulations (which Defendants ignored); it instead challenges the asserted authority to bypass those statutes and regulations in violation of Plaintiffs' due process rights and based on an improper invocation of purported Article II authority.[22] Compl. ¶¶ 243-248.

---

[22] The relevant portions of the FBI SES policy for "key executives" cited in ¶ 247 apply only to Plaintiffs Driscoll and Jensen. However, the statutory removal protections apply to all Plaintiffs, as does Patel's misinterpretation of Article II authority.

Moreover, Defendants' argument ignores that alleging violations of policies, statutes, and regulations serves a purpose beyond simply establishing a cause of action.  Instead, even if a statute has otherwise "limited procedural protection," it can still form the basis of a constitutional claim since it "does not preclude the creation of a property interest." *Harrison v. Bowen*, 815 F.2d 1505, 1519 n.33 (D.C. Cir. 1987).  And as referenced above, failure to follow policies and regulations adds crucial context to claims, since "[a] defendant's failure to follow established criteria or procedures can cast doubt on its asserted legitimate, nondiscriminatory reason for [an adverse action]." *Farris v. Clinton*, 602 F. Supp. 2d 74, 87 (D.D.C. 2009) (citing *Brady*, 520 F.3d at 495 n.3).

"Like statutes, regulations may create protected property interests." *Lamb v. Holder*, 82 F. Supp. 3d 416, 425 (D.D.C. 2015).  Thus, the statutes cited in Count III contribute to the constitutional analysis, particularly when considered against the backdrop of FBI regulations fortifying those provisions, even if those sources do not give employees a vehicle for direct review of agency action.  *See Harrison*, 815 F.2d at 1519, n.33. (CSRA section may "preclude[] direct review before the MSPB," but still "create an entitlement to continued employment" such that employee could still "seek judicial review to ensure that he or she is provided procedural due process when removed under that section").

### 3.    Count IV is a constitutional claim.

Defendants' challenge to Count IV also "takes aim at an empty target," *McCabe*, 490 F. Supp. 3d at 212, because the cause of action is literally titled "*ULTRA VIRES* ACTION IN VIOLATION OF CONSTITUTIONAL AUTHORITY."  Compl., *Fourth Cause of Action* (capitalization in original).  While the cause of action does briefly reference the violated statutes

and regulations as a backdrop, Compl. ¶ 251, the obvious thrust of Plaintiffs' claim is Patel's and the FBI's misapplication of Article II.  Compl. ¶¶ 250, 252, 253.

It is worth noting here that it was *Patel*, not Plaintiffs, who chose to expressly cite this purported constitutional removal authority as a basis for the terminations.  So this challenge to his asserted authority is just that: a constitutional challenge.  If there is any doubt as to whether this constitutional issue is a matter for this Court's § 1331 jurisdiction, the Court need look no further than the immediately following section of Defendants' Motion, where they plainly assert that "any statutory restriction on Plaintiffs' removal would violate Article II."  Mot. at 16.

## CONCLUSION

For the reasons outlined herein, Defendants' Motion to Dismiss, ECF No. 17, should be denied in its entirety.

Date: February 17, 2026

Respectfully submitted,

/s/ Margaret M. Donovan
Margaret M. Donovan (DDC No. CT0026)
Christopher M. Mattei (*pro hac vice*)
Koskoff Koskoff & Bieder, PC
350 Fairfield Ave., Suite 501
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
mdonovan@koskoff.com
cmattei@koskoff.com
*Attorneys for Plaintiffs Brian J. Driscoll, Jr. and Steven J. Jensen*

/s/ Mark S. Zaid
Mark S. Zaid (DDC No. 440532)
Bradley P. Moss (DDC No. 97905)
Law Offices of Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W., Suite 700
Washington, DC 20036
T: (202) 498-0011
Mark@MarkZaid.com
Brad@MarkZaid.com
*Attorneys for Plaintiff Spencer L. Evans*

/s/ Abbe David Lowell
Abbe David Lowell (DDC No. 358651)
David A. Kolansky (DDC No. 7680722)
Lowell & Associates, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowellandassociates.com
DKolansky@lowellandassociates.com
*Attorneys for Plaintiffs Brian J. Driscoll, Jr. and Steven J. Jensen*

/s/ Heidi R. Burakiewicz
Heidi R. Burakiewicz (DDC No. 473973)
Burakiewicz & DePriest, PLLC
1015 15th Street, N.W., Suite 600
Washington, D.C. 20005
202-856-7500
hburakiewicz@bdlawdc.com
*Attorney for Plaintiff Spencer L. Evans*